**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2835
_____

BRYAN DAVID RANGE,
                                        Appellant

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA;
REGINA LOMBARDO, Acting Director, Bureau of Alcohol,
Tobacco, Firearms and Explosives


_____


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5:20-CV-03488)
District Judge: Honorable Gene E.K. Pratter
_____

Argued before Merits Panel on September 19, 2022
Argued En Banc on February 15, 2023
Reargued En Banc on October 9, 2024 on Remand from the
Supreme Court of the United States
_____

Before: CHAGARES, *Chief Judge*, JORDAN, HARDIMAN,
SHWARTZ, KRAUSE, RESTREPO, BIBAS, PORTER,
MATEY, PHIPPS, FREEMAN, MONTGOMERY-REEVES,
CHUNG, ROTH,[*] and AMBRO,[**]
*Circuit Judges*.

(Filed: December 23, 2024)

William V. Bergstrom
Peter A. Patterson [Argued]
David H. Thompson
Cooper & Kirk
1523 New Hampshire Avenue, N.W.
Washington, DC 20036

Michael P. Gottlieb
Vangrossi & Recchuiti
319 Swede Street
Norristown, PA 19401

> *Counsel for the Appellant*

Joseph G. S. Greenlee
Firearms Policy Coalition Action
5550 Painted Mirage Road

---

[*] Judge Roth is participating as a member of the en banc court pursuant to 3d Cir. I.O.P. 9.6.4.

[**] Judge Ambro assumed senior status on February 6, 2023 and elected to continue participating as a member of the en banc court pursuant to 3d Cir. I.O.P. 9.6.4.

Suite 320
Las Vegas, NV 89149

>    *Counsel for Amici Curiae FPC Action Foundation and Firearms Policy Coalition, Inc. in Support of Appellant*

Elisa A. Long
Lisa B. Freeland
Renee Pietropaolo
Eleni Kousoulis
K. Anthony Thomas
Helen A. Marino
Heidi R. Freese
Matthew Campbell
Office of Federal Public Defender
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA 15222

>    *Counsel for Amicus Curiae Federal Public & Community Defender Organization of the Third Circuit in Support of Appellant*

Brian M. Boynton
Jacqueline C. Romero
Mark B. Stern
Michael S. Raab
Abby C. Wright
Kevin B. Soter [Argued]
United States Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.

Washington, DC 20530

 *Counsel for the Appellees*

Janet Carter
Everytown Law
450 Lexington Avenue
P.O. Box 4148
New York, NY 10017

 *Counsel for Amicus Curiae Everytown for Gun Safety in Support of Appellees*

_____

OPINION OF THE COURT
_____


HARDIMAN, *Circuit Judge*, filed the Opinion of the Court with whom CHAGARES, *Chief Judge*, and JORDAN, BIBAS, PORTER, MATEY, PHIPPS, FREEMAN, MONTGOMERY-REEVES, and CHUNG, *Circuit Judges*, join. MATEY, *Circuit Judge*, filed a concurring opinion. PHIPPS, *Circuit Judge*, filed a concurring opinion. KRAUSE, *Circuit Judge*, filed an opinion concurring in the judgment, with whom ROTH, *Circuit Judge*, joins in part. ROTH, *Circuit Judge*, filed an opinion concurring in the judgment, with whom KRAUSE and CHUNG, *Circuit Judges*, join in part. AMBRO, *Circuit Judge*, concurs in the judgment only. SHWARTZ, *Circuit Judge*, filed a dissenting opinion with whom RESTREPO, *Circuit Judge*, joins.

Bryan Range appeals the District Court's summary judgment rejecting his claim that the federal "felon-in-possession" law—18 U.S.C. § 922(g)(1)—violates his Second Amendment right to keep and bear arms. We agree with Range that, despite his false statement conviction, he remains among "the people" protected by the Second Amendment. And because the Government did not carry its burden of showing that the principles underlying our Nation's history and tradition of firearm regulation support disarming Range, we will reverse and remand.

I

A

The material facts are undisputed. In 1995, Range pleaded guilty in the Court of Common Pleas of Lancaster County to one count of making a false statement to obtain food stamps in violation of Pennsylvania law. *See* 62 Pa. Stat. Ann. § 481(a). In those days, Range was earning between $9.00 and $9.50 an hour as he and his wife struggled to raise three young children on $300 per week. Range's wife prepared an application for food stamps that understated Range's income, which she and Range signed. Though he did not recall reviewing the application, Range accepted full responsibility for the misrepresentation.

Range was sentenced to three years' probation, which he completed without incident. He also paid $2,458 in restitution, $288.29 in costs, and a $100 fine. Other than his 1995 conviction, Range's criminal history is limited to minor traffic and parking infractions and a summary offense for fishing without a license.

When Range pleaded guilty in 1995, his conviction was classified as a Pennsylvania misdemeanor punishable by up to five years' imprisonment. That conviction precludes Range from possessing a firearm because federal law generally makes it "unlawful for any person . . . who has been convicted in any court, of a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1). Although state misdemeanors are excluded from that prohibition if they are "punishable by a term of imprisonment of two years or less," 18 U.S.C. § 921(a)(20)(B), that safe harbor provided no refuge for Range because he faced up to five years' imprisonment.

In 1998, Range tried to buy a firearm but was rejected by Pennsylvania's instant background check system. Range's wife, thinking the rejection a mistake, gifted him a deer-hunting rifle. Years later, Range tried to buy a firearm and was rejected again. After researching the reason for the denial, Range learned he was barred from buying a firearm because of his 1995 conviction. Range then sold his deer-hunting rifle to a firearms dealer.

B

In 2020, Range sued in the United States District Court for the Eastern District of Pennsylvania, seeking a declaration that § 922(g)(1) violates the Second Amendment as applied to him. He also requested an injunction prohibiting the law's enforcement against him. Range asserts that but for § 922(g)(1), he would "for sure" purchase another deer-hunting rifle and "maybe a shotgun" for self-defense at home. App. 197–98. Range and the Government cross-moved for summary judgment.

6

The District Court granted the Government's motion. *Range v. Lombardo*, 557 F. Supp. 3d 609, 611 (E.D. Pa. 2021). Faithfully applying our then-controlling precedents, the Court held that Range's crime was "serious" enough to deprive him of his Second Amendment rights. *Id.* In doing so, the Court noted the two-step framework we established in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010). *Range*, 557 F. Supp. 3d at 613. The Court began—and ended—its analysis at the first step. It considered five factors to determine whether Range's conviction made him an "unvirtuous citizen" of the kind historically barred from possessing a firearm: (1) whether the conviction was classified as a misdemeanor or a felony; (2) whether the elements of the offense involved violence; (3) the sentence imposed; (4) whether there was a cross-jurisdictional consensus as to the seriousness of the crime, *Binderup v. Att'y Gen.*, 836 F.3d 336, 351–52 (3d Cir. 2016) (en banc) (plurality); and (5) the potential for physical harm to others created by the offense, *Holloway v. Att'y Gen.*, 948 F.3d 164, 173 (3d Cir. 2020). *Range*, 557 F. Supp. 3d at 613–14.

The Government conceded that four of the five factors favored Range because he was convicted of a nonviolent, non-dangerous misdemeanor and had not been incarcerated. *Id.* at 614. But the District Court held the "cross-jurisdictional consensus" factor favored the Government because about 40 jurisdictions would have classified his crime as a felony. *Id.* at 614–15. Noting that our decisions in *Holloway*, 948 F.3d at 177, and *Folajtar v. Att'y Gen.*, 980 F.3d 897, 900 (3d Cir. 2020), had rejected as-applied challenges to § 922(g)(1) despite only one of the relevant factors weighing in the Government's favor, the District Court held that the cross-jurisdictional consensus alone sufficed to disarm Range. *Range*, 557 F. Supp. 3d at 615–16. Range timely appealed.

While Range's appeal was pending, the Supreme Court decided *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). The parties then submitted supplemental briefing on *Bruen*'s impact. A panel of this Court affirmed the District Court's summary judgment, holding that the Government had met its burden to show that § 922(g)(1) reflects the Nation's historical tradition of firearm regulation such that Range's conviction "places him outside the class of people traditionally entitled to Second Amendment rights." *Range v. Att'y Gen.*, 53 F.4th 262, 266 (3d Cir. 2022) (per curiam).

Range petitioned for rehearing en banc. We granted the petition and vacated the panel opinion. *Range v. Att'y Gen.*, 56 F.4th 992 (3d Cir. 2023). The en banc Court reversed and remanded for the District Court to enter a declaratory judgment for Range. We concluded that Range remained one of "the people" protected by the Second Amendment and that the Government did not show the Nation has a longstanding history and tradition of disarming people like Range. *Range v. Att'y Gen.*, 69 F.4th 96, 98 (3d Cir. 2023) (en banc). The Government petitioned the Supreme Court for a writ of certiorari.

While the Government's petition was pending, the Supreme Court decided *United States v. Rahimi*, 144 S. Ct. 1889 (2024). The Court then vacated our en banc decision in *Range* and remanded for further consideration. *Garland v. Range*, 144 S. Ct. 2706 (2024). The parties and amicus filed more briefs and we heard argument again.

8

## II

The District Court had jurisdiction under 28 U.S.C. § 1331 because Range's complaint raised a federal question: whether the federal felon-in-possession law, 18 U.S.C. § 922(g)(1), violates the Second Amendment as applied to Range. We have jurisdiction under 28 U.S.C. § 1291.

## III

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment guarantees an individual right to keep and bear arms unconnected with militia service. 554 U.S. 570, 583–84 (2008). Given that right, the Court held unconstitutional a District of Columbia law that banned handguns and required other "firearms in the home be rendered and kept inoperable at all times." *Id.* at 630. It reached that conclusion after scrutinizing the text of the Second Amendment and deducing that it "codified a *pre-existing* right." *Id*. at 592. The *Heller* opinion did not apply intermediate or strict scrutiny. In fact, it did not apply means-end scrutiny at all. But in response to Justice Breyer's dissent, the Court noted in passing that the challenged law would be unconstitutional "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* at 628–29.

Many courts around the country, including this one, overread that passing comment to require a two-step approach in Second Amendment cases, utilizing means-end scrutiny at the second step. We did so for the first time in *Marzzarella*, 614 F.3d at 97, and we continued down that road for over a decade. *See, e.g.*, *Drake v. Filko*, 724 F.3d 426, 429, 434–40 (3d Cir. 2013); *Binderup*, 836 F.3d at 344–47, 353–56; *Ass'n*

*of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 117 (3d Cir. 2018); *Beers v. Att'y Gen.*, 927 F.3d 150, 154–55 (3d Cir. 2019), *vacated as moot sub nom. Beers v. Barr*, 140 S. Ct. 2758 (2020); *Holloway*, 948 F.3d at 169–72; *Folajtar*, 980 F.3d at 901.

*Bruen* rejected the two-step approach as "one step too many." 597 U.S. at 19. The Supreme Court declared: "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id*. Instead, those cases teach "that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17. And "[o]nly if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Applying that standard, *Bruen* held "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.* at 10. But the "where" question decided in *Bruen* is not at issue here. Range's appeal instead requires us to examine *who* is among "the people" protected by the Second Amendment. U.S. Const. amend. II; *see Bruen*, 597 U.S. at 72 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm . . . ."); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443 (2009) (distinguishing among "who," "what," "where," "when," and "how" restrictions). Range claims he is one of "the people" entitled to keep and bear arms and that our Nation has no historical tradition of disarming people like him. The Government responds that Range has not

been one of "the people" since 1995, when he pleaded guilty in Pennsylvania state court to making a false statement on his food stamp application, and that his disarmament is historically supported.

IV

Having explained how *Bruen* abrogated our Second Amendment jurisprudence, we now apply the Supreme Court's established method to the facts of Range's case. Both sides agree that we no longer conduct means-end scrutiny. And as the panel wrote: "*Bruen*'s focus on history and tradition," means that "*Binderup*'s multifactored seriousness inquiry no longer applies." *Range*, 53 F.4th at 270 n.9.

After *Bruen*, we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct. 597 U.S. at 31–33. If it does, the government now bears the burden of proof: it "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

A

We begin with the threshold question: whether Range is one of "the people" who have Second Amendment rights. The Government contends that the Second Amendment does not apply to Range at all because "[t]he right to bear arms has historically extended to the political community of law-abiding, responsible citizens." Gov't En Banc Br. at 2. So

11

Range's 1995 conviction, the Government insists, removed him from "the people" protected by the Second Amendment.

The Supreme Court referred to "law-abiding citizens" in *Heller*. In response to Justice Stevens's dissent, which relied on *United States v. Miller*, 307 U.S. 174 (1939), the Court reasoned that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. In isolation, this language seems to support the Government's argument. But *Heller* said more; it explained that "the people" as used throughout the Constitution "unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 580. So the Second Amendment right, *Heller* said, presumptively "belongs to all Americans." *Id.* at 581. Range cites these statements to argue that "law-abiding citizens" should not be read "as rejecting *Heller*'s interpretation of 'the people.'" Range Pet. for Reh'g at 8. We agree with Range for four reasons.

First, the criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases. So their references to "law-abiding, responsible citizens" were dicta. And while we heed that phrase, we are careful not to overread it as we and other circuit courts did with *Heller*'s statement that the District of Columbia firearm law would fail under any form of heightened scrutiny.

Second, other constitutional provisions refer to "the people."[1] For instance, "the people" are recognized as having

---

[1] *See, e.g.*, U.S. Const. pmbl. ("We *the People* of the United States . . . ." (emphasis added)); *id.* amend. IX (recognizing

rights to assemble peaceably, to petition the government for redress,[2] and to be protected against unreasonable searches and seizures.[3] Felons are not categorically barred from First Amendment or Fourth Amendment protection because of their status. It is true, however, that prisoners have no First Amendment right to peaceably assemble, *see Pell v. Procunier*, 417 U.S. 817, 822 (1974), and no Fourth Amendment right as to prison-cell searches. *Hudson v. Palmer*, 468 U.S. 517, 526 (1984). We see no reason to adopt a reading of "the people" that excludes Americans from the scope of the Second Amendment while they retain their constitutional rights in other contexts.

Third, as the plurality stated in *Binderup*: "That individuals with Second Amendment rights may nonetheless be denied possession of a firearm is hardly illogical." 836 F.3d at 344 (Ambro, J.). That statement tracks then-Judge Barrett's dissenting opinion in *Kanter v. Barr*, in which she persuasively explained that "all people have the right to keep and bear arms," though the legislature may constitutionally "strip certain groups of that right." 919 F.3d 437, 452 (7th Cir. 2019).

rights "retained by the people"); *id*. amend. X (acknowledging the powers reserved "to the people").

[2] U.S. Const. amend. I ("Congress shall make no law respecting . . . the right of *the people* peaceably to assemble, and to petition the Government for a redress of grievances." (emphasis added)).

[3] U.S. Const. amend. IV ("The right of *the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." (emphasis added)).

We agree with that statement in *Binderup* and then-Judge Barrett's reasoning.

Fourth, as the Government concedes, *see* Gov't Range II En Banc Br. 25, *Rahimi* makes clear that citizens are not excluded from Second Amendment protections just because they are not "responsible." *See Rahimi*, 144 S. Ct. at 1903. The Supreme Court cautioned that "responsible" is too vague a concept to dictate the Second Amendment's applicability and using the term that way would create an "unclear . . . rule" that does not "derive from [Supreme Court] case law." *Id.* So too with the phrase "law-abiding." Does it exclude those who have committed summary offenses or petty misdemeanors, which typically result in a ticket and a small fine? No. We are confident that the Supreme Court's references to "law-abiding, responsible citizens" do not mean that every American who gets a traffic ticket is no longer among "the people" protected by the Second Amendment. Perhaps, then, the category refers only to those who commit "real crimes" like felonies or felony-equivalents? At English common law, felonies were so serious they were punishable by estate forfeiture and even death. 4 William Blackstone, Commentaries on the Laws of England 54 (1769). But at the Founding, many states were moving away from making felonies—including crimes akin to making false statements—punishable by death in America. *See United States v. Moore*, 111 F.4th 266, 270–72 (3d Cir. 2024) (citing various Founding-era felony laws and penalties). For example, in Massachusetts, New Jersey, Kentucky, Virginia, Connecticut, and New York, forgery and counterfeiting were punishable with imprisonment, hard labor, fines, or corporal

14

punishment, but *not* death.[4] Federally, the Crimes Act of 1790 criminalized conduct involving falsification of records and stealing property of the United States, and punished such conduct with fines, corporal punishment, or a term of imprisonment.[5] And today, felonies include a wide swath of crimes, some of which seem minor.[6] Meanwhile, some

---

[4] James T. Mitchell et al., Compiled Statutes at Large of Pennsylvania from 1682 to 1801 (1700-1809); An Act to Prevent Forgery, And For the Punishment of Those Who Are Guilty of the Same. 1784 Mass. Acts Ch. 67; Virginia, Collection of All Such Acts of the General Assembly of Virginia, of a Public or Permanent Nature, as are Now in Force (1803); Harry Toulmin, Collection of All the Public and Permanent Acts of the General Assembly of Kentucky Which Are Now in Force (1802); Acts and Laws of the State of Connecticut (1784); William Paterson, Laws of the State of New Jersey (1800); Thomas Greenleaf, Laws of the State of New York, Comprising the Constitution, and the Acts of the Legislature, since the Revolution, from the First to the Fifteenth Session (1797).

[5] *See* Crimes Act of 1790, §§ 14–15, 1 Stat. 122, 115–16.

[6] *See, e.g.*, 18 U.S.C. § 1464 (uttering "any obscene, indecent, or profane language by means of radio communication"); Mich. Comp. Laws Ann. § 445.574a(2)(d) (returning out-of-state bottles or cans); 18 Pa. Cons. Stat. Ann. § 3929.1 (third offense of library theft of more than $150); *id.* § 7613 (reading another's email without permission).

misdemeanors seem serious.[7] As the Supreme Court noted recently: "a felon is not always more dangerous than a misdemeanant." *Lange v. California*, 594 U.S. 295, 305 (2021) (cleaned up).

At root, the Government's claim that "felons are not among 'the people' protected by the Second Amendment," *see* Gov't Range II En Banc Br. 9 n.1, devolves authority to legislators to decide whom to exclude from "the people." We reject that approach because such "extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label." *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting). And that deference would contravene *Heller*'s reasoning that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." 554 U.S. at 636; *see also Bruen*, 597 U.S. at 26 (warning against "judicial deference to legislative interest balancing").

In sum, we reject the Government's contention that "felons are not among 'the people' protected by the Second Amendment." *Heller* and its progeny lead us to conclude that Bryan Range remains among "the people" despite his 1995 false statement conviction.

Having determined that Range is one of "the people," we turn to the easy question: whether § 922(g)(1) regulates Second Amendment conduct. It does. Range's request—to possess a rifle to hunt and a shotgun to defend himself at home—tracks the constitutional right as defined by *Heller*. 554

---

[7] *See, e.g.*, 18 Pa. Cons. Stat. Ann. § 2504 (involuntary manslaughter); *id.* § 2707 (propulsion of missiles into an occupied vehicle or onto a roadway); 11 Del. Code § 881 (bribery).

U.S. at 582 ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."). So "the Second Amendment's plain text covers [Range's] conduct," and "the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17.

B

Because Range and his proposed conduct are protected by the Second Amendment, we now ask whether the Government can strip him of his right to keep and bear arms. To answer that question, we must determine whether the Government has shown that applying § 922(g)(1) to Range would be "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. We hold that the Government has not carried its burden.

To preclude Range from possessing firearms, the Government must show that § 922(g)(1), as applied to him, "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. Historical tradition can be established by analogical reasoning, which "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30. To be compatible with the Second Amendment, modern laws must be "'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29). "Why and how the regulation burdens the right are central to this inquiry." *Id*.

In attempting to carry its burden, the Government relies on the Supreme Court's statement in *Heller* that "nothing in our opinion should be taken to cast doubt on longstanding

prohibitions on the possession of firearms by felons." 554 U.S. at 626. A plurality of the Court reiterated that point in *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). In his concurring opinion in *Bruen*, Justice Kavanaugh, joined by the Chief Justice, wrote that felon-in-possession prohibitions are "presumptively lawful" under *Heller* and *McDonald*. 597 U.S. at 81 (quoting *Heller*, 554 U.S. at 626–27 & n.26).[8]

Section 922(g)(1) is a straightforward "prohibition[ ] on the possession of firearms by felons." *Heller*, 554 U.S. at 626. And since 1961 "federal law has generally prohibited individuals convicted of crimes punishable by more than one year of imprisonment from possessing firearms." Gov't En Banc Br. at 1; *see* An Act To Strengthen The Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961). But the earliest version of that statute, the Federal Firearms Act of 1938, applied only to *violent* criminals. Pub. L. No. 75-785, §§ 1(6), 2(f), 52 Stat. 1250, 1250–51 (1938). As the First Circuit explained: "the current federal felony firearm ban differs considerably from the [original] version . . . . [T]he law initially covered those convicted of a limited set of violent crimes such as murder, rape, kidnapping, and burglary, but extended to both felons and misdemeanants convicted of qualifying offenses." *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011); *see also United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc).

Even if the 1938 Act were "longstanding" enough to warrant *Heller*'s assurance—a dubious proposition given the

---

[8] The *Heller*, *McDonald*, and *Bruen* Courts cited no such "longstanding prohibitions," presumably because they did "not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626.

*Rahimi* Court's focus on Founding-era sources, 144 S. Ct. at 1899–900, and the *Bruen* Court's emphasis on Founding- and Reconstruction-era sources, 597 U.S. at 34, 59–60—Range would not have been a prohibited person under that law. Whatever timeframe the Supreme Court might establish in a future case, *see Rahimi*, 144 S. Ct. at 1898 n.1, we are confident that a law passed in 1961—some 170 years after the Second Amendment's ratification and nearly a century after the Fourteenth Amendment's ratification—falls well short of "longstanding" for purposes of demarcating the scope of a constitutional right. So the 1961 iteration of § 922(g)(1) does not satisfy the Government's burden.[9]

The Government's attempt to identify older historical analogues also fails. The Government argues that "legislatures traditionally used status-based restrictions" to disarm certain groups of people. Gov't En Banc Br. at 4 (quoting *Range*, 53 F.4th at 282). Apart from the fact that those restrictions based

[9] Nor are we convinced by the 1920s and 1930s state statutes banning firearm possession by felons, or the 1960s laws disarming drug addicts and drug users, 1980s laws disarming persons unlawfully present in the United States and persons dishonorably discharged from the armed forces, or 1990s laws disarming domestic violence misdemeanants. Gov't Range II En Banc Br. 17, 20–21. These are all too late: "20th-century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66 n.28; *Rahimi*, 144 S. Ct. at 1924 (Barrett, J. concurring) ("[T]he history that matters most is the history surrounding the ratification of the text; that backdrop illuminates the meaning of the enacted law. History (or tradition) that long postdates ratification does not serve that function.").

on race and religion now would be unconstitutional under the First and Fourteenth Amendments, the Government does not successfully analogize those groups to Range. That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today. And any such analogy would be "far too broad[ ]." *See Bruen*, 597 U.S. at 31 (noting that historical restrictions on firearms in "sensitive places" do not empower legislatures to designate any place "sensitive" and then ban firearms there). For instance, as the Government notes, colonial laws disarmed Loyalists for helping the British army or "bearing arms against" the Continental Congress. Gov't Range II En Banc Br. 13 (quoting Resolution of Mar. 13, 1776*, in Journal of the Provincial Congress of South Carolina*, 1776, at 77 (1776)). The colonies reasonably feared that Loyalists might take up arms again. But there is no such basis to fear that Range is disloyal to his country.

According to the Government, taken together, these proposed historical analogues support a principle that "American legislatures disarmed classes of individuals who posed a danger of misusing firearms." Gov't Range II En Banc Br. 19.

*Rahimi* did bless disarming (at least temporarily) physically dangerous people. The law that it upheld required "a finding that [the defendant] represents a credible threat to [someone else's] physical safety." 18 U.S.C. § 922(g)(8)(C)(i); 144 S. Ct. at 1894, 1896, 1898, 1901–02. It did so "because the Government offer[ed] ample evidence" of a tradition of disarming people who "pose[ ] a clear threat of physical violence to another." *Id.* at 1898, 1901; *accord id.* at 1898 ("credible threat to the physical safety of others"). But the

Government does not try to justify disarming Range on this ground, and with good reason: it has no evidence that he poses a physical danger to others or that food-stamp fraud is closely associated with physical danger. It conceded as much the first time this Court heard the case en banc. Oral argument at 35:05–34:10; 32:55–31:52; 28:45–28:10.

Rather, the Government seeks to stretch dangerousness to cover all felonies and even misdemeanors that federal law equates with felonies. It notes that *Rahimi* left open the possibility of "banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." Gov't Range II En Banc Br. 19 (quoting 144 S. Ct. at 1901). And it argues that those "convicted of serious crimes, as a class, can be expected to misuse firearms." *Id.* at 22 (internal quotation marks omitted); *accord United States v. Jackson*, 110 F.4th 1120, 1127–29 (8th Cir. 2024).

Even if that categorical argument could suffice to uphold the original 1938 felon-in-possession ban, it does not support the current one. Again, it is "far too broad[ ]." *Bruen*, 597 U.S. at 31. It operates "at such a high level of generality that it waters down the right." *Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring). Like the Sixth Circuit, we refuse to defer blindly to § 922(g)(1) in its present form. *See United States v. Williams*, 113 F.4th 637, 658–61 (6th Cir. 2024) (categorizing crimes as crimes against the person, crimes like burglary and drug trafficking that "pose a significant threat of danger," and nondangerous ones).

To support the de facto permanent disarmament that § 922(g)(1) imposes, the Government points out that "the Founding generation determined that many criminal offenses were of such 'gravity' that they should 'expose offenders to the

21

harshest of punishments, including death.'" Gov't Range II En Banc Br. 10 (citation omitted). Our dissenting colleagues likewise reason "that fraudsters could lose their life, and hence their firearms rights." Dissent of Shwartz, J., at 5. It is true that "founding-era practice" was to punish some "felony offenses with death." Gov't Range II En Banc Br. 10. For example, the First Congress made forging or counterfeiting a public security a capital offense. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112, 115 (1790). That said, the crime to which Range pleaded guilty—making a false statement to obtain food stamps—may be more analogous to other offense defined in the same law punishable by a term of imprisonment or fine.[10] While some states at first punished nonviolent crimes "such as forgery and horse theft" with death, *see Folajtar*, 980 F.3d at 904 (citations omitted), by the early Republic, many states assigned lesser punishments.[11]

Yet the Founding-era practice of punishing some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue here—de facto lifetime disarmament for all felonies and felony-equivalent misdemeanors—is rooted in our Nation's history and tradition.

---

[10] *See e.g.*, Crimes Act of 1790, § 15, 1 Stat. 122, 115–16 ("any person [who] shall feloniously . . . alter [or] falsify . . . any record . . . in any of the courts of the United States, by means whereof any judgment shall be reversed" is punishable by fine, whipping, or "imprison[ment] not exceeding seven years"); *id.* § 16 ("any person . . . [in] custody . . . of any victuals provided for the victualing of any soldiers . . . [who] for any lucre or gain, . . . embezzle, purloin or convey away [such goods]" is punishable by fine or public whipping).

[11] *See supra* note 4.

22

Though our dissenting colleagues read *Rahimi* as blessing disarmament as a lesser punishment generally, the Court did not do that. Instead, it authorized temporary disarmament as a sufficient analogue to historic temporary imprisonment *only* to "respond to the use of guns to threaten the physical safety of others." *Compare Rahimi*, 144 S. Ct. at 1902, *with United States v. Diaz*, 116 F.4th 458, 469–70 (5th Cir. 2024) (similarly broad reasoning).

For similar reasons, Founding-era laws that forfeited felons' weapons or estates are not sufficient analogues either. Such laws often prescribed the forfeiture of the specific weapon used to commit a firearms-related offense without affecting the perpetrator's right to keep and bear arms generally. *See, e.g.*, Act of Dec. 21, 1771, ch. 540, N.J. Laws 343–344 ("An Act for the Preservation of Deer, and other Game, and to prevent trespassing with Guns"); Act of Apr. 20, 1745, ch. 3, N.C. Laws 69–70 ("An Act to prevent killing deer at unseasonable times, and for putting a stop to many abuses committed by white persons, under pretence of hunting"). So in the Founding era, a felon could acquire arms after completing his sentence and reintegrating into society.

Against this backdrop, it's important to remember that Range's crime—making a false statement on an application for food stamps—did not involve a firearm, so there was no criminal instrument to forfeit. And even if there were, government confiscation of the instruments of crime (or a convicted criminal's entire estate) differs from a status-based lifetime ban on firearm possession. The Government has not cited a single statute or case that precludes a convict who has served his sentence from purchasing the same type of object that he used to commit a crime. Nor has the Government cited forfeiture cases in which the convict was prevented from

23

regaining his possessions, including firearms (unless forfeiture preceded execution). That's true whether the object forfeited to the government was a firearm used to hunt out of season, a car used to transport cocaine, or a mobile home used as a methamphetamine lab. And of those three, only firearms are mentioned in the Bill of Rights.[12]

For the reasons stated, we hold that the Government has not shown that the principles underlying the Nation's historical tradition of firearms regulation support depriving Range of his Second Amendment right to possess a firearm.[13] *See Rahimi*, 144 S. Ct. at 1898; *Bruen*, 597 U.S. at 17.

\* \* \*

Our decision today is a narrow one. Bryan Range challenged the constitutionality of 18 U.S.C. § 922(g)(1) only

---

[12] Even arms used to commit crimes bordering on treason were sometimes returned to the perpetrators during the Founding era. After the Massachusetts militia quelled Shays's Rebellion in 1787, the state required the rebels and those who supported them to "deliver up their arms." 1 Private and Special Statutes of the Commonwealth of Massachusetts from 1780–1805, 145–47 (1805). But those arms were to be returned after three years upon satisfaction of certain conditions. *Id.* at 146–47.

[13] Our concurring colleague criticizes that our opinion "creates more questions than it answers" and that we "decline to adopt any articulable methodology of [our] own." Concurrence of Krause, J., 67, 65. But in this as-applied constitutional challenge, our task is to decide only Mr. Range's case, rather than preview how this Court would decide future Second Amendment challenges.

24

as applied to him given his violation of 62 Pa. Stat. Ann. § 481(a). Range remains one of "the people" protected by the Second Amendment, and his eligibility to lawfully purchase a rifle and a shotgun is protected by his right to keep and bear arms. More than two decades after he was convicted of food-stamp fraud and completed his sentence, he sought protection from prosecution under § 922(g)(1) for any future possession of a firearm. The record contains no evidence that Range poses a physical danger to others. Because the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights. We will reverse the judgment of the District Court and remand so the Court can enter a declaratory judgment for Range, enjoin enforcement of § 922(g)(1) against him, and conduct any further proceedings consistent with this opinion.

MATEY, *Circuit Judge*, concurring.

Having "arms for [one's] defence . . . is indeed a public allowance, under due restrictions, of the natural right of resistance and self-preservation." 1 William Blackstone, Commentaries *143–44. I agree with the majority that the Justice Department has not shown that § 922(g)(1) can be applied to disarm Bryan Range. I write separately to explain why that conclusion follows classical principles respecting the natural rights that inform "our regulatory tradition." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024). Doing so demonstrates the "reason and spirit" of the law, 1 Blackstone, Commentaries *61, or the "principles underlying the Second Amendment," *Rahimi*, 144 S. Ct. at 1898. Although historical practices need not be a "dead ringer" or a "historical twin," *Rahimi*, 144 S. Ct. at 1898 (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1, 30 (2022)), they must always faithfully follow the "the first and primary end of human laws, [which] is to maintain and regulate [the] absolute rights of individuals," Alexander Hamilton, The Farmer Refuted (1775), *reprinted in The Revolutionary Writings of Alexander Hamilton* 53 (Richard B. Vernier ed., 2008) (emphasis omitted) (quoting 1 Blackstone, Commentaries *124). That is the tradition informing our historical practice, and the principle that necessarily guides our analysis.

**I.**

Preserving "unalienable rights" justified our separation from England, Declaration of Independence para. 2 (U.S. 1776), and required a government "ordain[ed]" to "promote the general Welfare" and "secure the Blessings of Liberty," U.S. Const., pmbl. That is because "natural liberty is a gift of the beneficent Creator," while "[c]ivil liberty is only natural

1

liberty, modified and secured by the sanctions of civil society." Hamilton, *supra*, at 70 (emphasis omitted); *see also Collected Works of James Wilson* 1083 (Kermit L. Hall & Mark David Hall eds., 2007) ("[M]an does not exist for the sake of government, but government instituted for the sake of man."). But the fundamental rights that predate America are not unlimited, and like any law, never license acting contrary to the common good.[1] These inherent limitations apply to all of man's "natural rights," and are consistent with the Supreme Court's repeated explanation that the "pre-existing" "individual right to keep and bear arms" for self-defense is "not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 592, 595 (2008) (emphasis omitted); *see also Bruen,* 597 U.S. at 20; *Rahimi*, 144 S. Ct. at 1897.[2]

---

[1] *See Collected Works of James Wilson* 1055–56. ("[S]elfishness and injury are as little countenanced by the law of nature as by the law of man."); Thomas Aquinas, *Summa Theologica*, pt. I-II, q. 90, art. 2 (Fathers of the English Dominican Province trans., Benzinger Bros. 1947) (c. 1271) ("Consequently, since the law is chiefly ordained to the common good, any other precept in regard to some individual work, must needs be devoid of the nature of a law, save in so far as it regards the common good. Therefore every law is ordained to the common good.").

[2] *See Collected Works of James Wilson* at 1056. ("Upon the whole, therefore, man's natural liberty, instead of being abridged, may be increased and secured in a government, which is good and wise. As it is with regard to his natural liberty, so it is with regard to his other natural rights."); *The Unsigned Essays of Supreme Court Justice Joseph Story: Early American Views of Law* 262 (Valerie L. Horowitz ed., 2015)

Surveying history helps us understand the reasons relied on to regulate the right, *see Bruen*, 597 U.S. at 27–29; *Rahimi*, 144 S. Ct. at 1898, ensuring a "[c]ontinuity of [p]rinciples" faithful to our inherited tradition.[3] We look, in other words, for "markers or indicators that the later doctrine is essentially continuous with the earlier one and grows out of it, rather than representing a break with the past that mutilates or fundamentally transforms the core and essence of the doctrine." Adrian Vermeule, *Common Good Constitutionalism* 123 (2022). So we must consider the sources that animate the

---

("[U]nder certain circumstances, life, and liberty, and property, may justly be taken away; as, for instance, in order to prevent crimes, to enforce the rights of other persons, or to secure the safety and happiness of society.").

[3] John Henry Newman, *An Essay on the Development of Christian Doctrine* 178 (Longmans, Green, & Co. 1909) (1845); *see also id.* at 178–79 ("[P]rinciples are permanent," so "[d]octrines stand to principles, as the definitions to the axioms and postulates of mathematics."); Jamie G. McWilliam, *A Classical Legal Interpretation of the Second Amendment*, 28 Tex. Rev. L. & Pol. 125, 159 (2024) ("Even when circumstances evolve, the principles remain the same" so any "statutes governing arms for the common good must be evaluated for their compliance with the principles of the *ius naturale* and the determinations thereof embodied in the Second Amendment."); *Bank of Toledo v. City of Toledo*, 1 Ohio St. 622, 630–31 (1853) ("[L]aw is the *perfection* of *reason*, and that it is the *reason* and *justice* of a legal principle, which give to its *vitality*," therefore, "recurrence should be had to fundamental principles, and the authority of precedent regarded so far only as there is to be found a conformity to *reason* and the *true nature* of our own government.").

natural right to bear arms, and the origin of the tradition that inspired that right, since "the object" of declaring our independence was "not to find out new principles, or new arguments, never before thought of, [or] merely to say things which had never been said before." Letter from Thomas Jefferson to Henry Lee (May 8, 1825). Instead, we sought to "place before mankind the common sense of the subject . . . giv[ing] to that expression the proper tone and spirit called for by the occasion. [A]ll [its] authority rests then on the harmonising sentiments of the day, whether expressed, in conversns in letters, printed essays or in the elementary books of public right, as Aristotle, Cicero, Locke, Sidney Etc." *Id.*[4]

---

[4] I follow the well-established practice of consulting classical authorities discussing natural law to inform the determination of written rights. "[S]eventeenth- and eighteenth-century jurists such as Hugo Grotius, Samuel Pufendorf, Emmerich de Vattel, and William Blackstone" all held a "jurisprudential worldview" that reflects an "interpretive tradition" of viewing "natural law not simply as a collection of universally valid substantive moral principles grounded in human nature, but also as an interpretive approach." Robert Lowry Clinton, *The Supreme Court Before John Marshall*, 27 J. Sup. Ct. Hist. 222, 227 (2002). The theory that "the substance of the law *pre-exists* its 'declaration' by courts or other authoritative interpreters" "formed the horizon within which the pre-Marshall and Marshall Courts understood the judicial function and its limitations." *Id.* Examples from the early years following the Founding abound. *See, e.g.*, *United States v. The La Jeune Eugenie*, 26 F. Cas. 832, 846 (Story, Circuit Justice, C.C.D. Mass. 1822) (No. 15,551) ("[E]very doctrine, that may be fairly deduced by correct reasoning from the rights and duties of nations, and the nature of moral

obligation, may theoretically be said to exist in the law of nations . . . . And I may go farther and say, that no practice whatsoever can obliterate the fundamental distinction between right and wrong, and that every nation is at liberty to apply to another the correct principle, whenever both nations by their public acts recede from such practice, and admits the injustice or cruelty of it."); *United States v. Libellants & Claimants of The Schooner Amistad* (*The Amistad*), 40 U.S. (15 Pet.) 518, 595 (1841) (relying on the "enteral principles of justice and international law"); *Coffin v. United States*, 156 U.S. 432, 453–57 (1895) (tracing the "principle that there is a presumption of innocence in favor of the accused" back to the Roman law). That practice continued into the Twentieth Century. *See, e.g.*, *Lochner v. New York*, 198 U.S. 45, 65–67 (1905) (Harlan, J., dissenting) (explaining that although the "inherent rights" to "'be free in the enjoyment of all his faculties, to be free to use them in all lawful ways, to live and work where he will, to earn his livelihood by any lawful calling, [and] to pursue any livelihood or avocation'" are free from "undu[e] interference," the government may exercise its "police power" to "promote the general welfare, or to guard the public health, the public morals, or the public safety" (quoting *Allgeyer v. Lousiana*, 165 U.S. 578, 589 (1897))); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925) ("The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."); *Berea Coll. v. Kentucky*, 211 U.S. 45, 67–68 (1908) (Harlan, J.,

Absent exploration of the natural principles that support our legal tradition, we overlook those "certain primary truths, or first principles, upon which all subsequent reasonings must depend." The Federalist No. 31, at 193 (Alexander Hamilton) (C. Rossiter ed., 1961). In other words, an appropriate historical inquiry cannot be conducted while blind to the "reason and spirit" of the law, 1 Blackstone, Commentaries *61, which provided for its validity and natural purpose.[5]

Rightly framed, history reveals two principles informing a consistent tradition. First, because the right to self-defense is protected by the Second Amendment and preexists our Founding, laws extensively regulating the types of firearms a person can possess and the places where possession is permitted can "eviscerate the general right to publicly carry arms for self-defense." *Bruen*, 597 U.S. at 31;

---

dissenting) ("The capacity to impart instruction to others is given by the Almighty for beneficent purposes; and its use may not be forbidden or interfered with by government,—certainly not, unless such instruction is, in its nature, harmful to the public morals or imperils the public safety. . . . The denial of either right would be an infringement of the liberty inherent in the freedom secured by the fundamental law."); *Farrington v. Tokushige*, 273 U.S. 284, 299 (1927) (explaining that despite "grave problems" incident to changing social conditions, the government cannot infringe on the "fundamental rights of the individual" that the Fourteenth Amendment was enacted to protect).

[5] "The Founders saw nothing particularly strange, or insuperable, in the task of appealing to those laws of reason . . . ." Hadley Arkes, *Constitutional Illusions and Anchoring Truths: The Touchstone of Natural Law* 25 (2010).

*see also Heller*, 554 U.S. at 636. All showing a robust protection of the right to bear arms by those within the civil society that can rarely be circumvented by the sovereign.

Second, because "public Virtue is the only Foundation of Republics,"[6] the natural right to self-defense, like all other natural rights, can be exercised only by "a virtuous people who were controlled from within by a moral compass" that "respect[] social order, legitimate authority," and "civic virtue."[7] This principle provides the reason for restrictions of the right to bear arms on those who set themselves against civil

---

[6] Letter from John Adams to Mercy Otis Warren (Apr. 16, 1776); *see also* Washington's Farewell Address (Sept. 17, 1796), *in* 1 *A Compilation of Messages and Papers of the President, 1789–1897*, 213, 220 (James D. Richardson ed., 1896) ("It is substantially true, that virtue or morality is necessary spring of popular government. The rule indeed extends with more or less force to every species of free government."); Letter from John Adams to Zabdiel Adams (June 21, 1776) ("[I]t is Religion and Morality alone, which can establish the Principles upon which Freedom can securely stand . . . . The only foundation of a free Constitution, is pure Virtue, and if this cannot be inspired into our People, in a greater Measure, than they have it now, They may change their Rulers, and the forms of Government, but they will not obtain a lasting Liberty.—They will only exchange Tyrants and Tyrannies.").

[7] Daniel L. Dreisbach, *Reading the Bible with the Founding Fathers* 68 (2017); *see also* John Adams to the Officers of the First Brigade of the Third Division of the Militia of Massachusetts (Oct. 11, 1798) ("Our Constitution was made only for a moral and religious people.").

society by individual actions inconsistent with the common good.[8] *See Rahimi*, 144 S. Ct. at 1901 ("[C]ommon sense suggests [that] [w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed."); 1 Blackstone, Commentaries \*251 ("For civil liberty, rightly understood, consists in protecting the rights of individuals by the united force of society; society cannot be maintained, and of course can exert no protection, without obedience to some sovereign power; and obedience is an empty name, if every individual has a right to decide how far he himself shall obey."). Regulations concerning *what* types of firearms a person may carry and *where* a person may carry uniformly apply to everyone. But regulations on *who* may carry center on remedying, through punishment, present threats to the community stemming from individualized conduct. And rightfully so, because "[t]he object of human punishment" includes "depriving the offender of the power of doing mischief" in order to "secure the safety of the community." *The Unsigned Essays of Supreme Court Justice Joseph Story: Early American Views of Law* 98 (Valerie L. Horowitz ed., 2015) [hereinafter *Essays of Justice Story*]. Because it is "the right of every society to protect its own peace and interests," necessary measures may be implemented as "punishment, if the safety of society requires it." *Id.*; *see also* Thomas Aquinas, *Summa*

---

[8] This principle is not synonymous with the Justice Department's erroneous argument that the Second Amendment can be exercised only by law-abiding and responsible citizens, which the Supreme Court rejected in *Rahimi*. *See* 144 S. Ct. at 1903 (rejecting "responsible" as too vague a term). As explained, "responsible" is not defined by the whim of the sovereign or the will of the majority, but instead flows from the classical concept of the common good.

*Theologica*, pt. I-II, q. 96, art. 2 (Fathers of the English Dominican Province trans., Benzinger Bros. 1947) ("[H]uman laws do not forbid all vices, from which the virtuous abstain, but only the more grievous vices, from which it is possible for the majority to abstain; and chiefly those that are to the hurt of others, without the prohibition of which human society could not be maintained.").[9]

## A.

I begin with a brief examination of the liberty to defend oneself with arms, a right inherent in natural society that "[t]he law very wisely, and in a manner silently, gives a man." Marcus Tullius Cicero, *Speech in Defence of Titus Annius Milo* (c. 52 B.C.), *in* 3 *Orations of Marcus Tullius Cicero* 390, 394 (C.D. Yonge trans., 1913). Cicero explained that "if our life be in danger from plots, or from open violence, or from the weapons of robbers or enemies, every means of securing our

---

[9] Underexplored in this debate is the role of punishment in "depriving the offender of the power of doing mischief" in order to "secure the safety of society." *Essays of Justice Story*, *supra*, at 98. Moving forward, litigants and scholars alike should consider the role of government in punishing individuals who have exhibited dangerous conduct setting themselves against the general welfare of the community. *See Summa Theologica*, *supra*, pt. I-II, q. 87, art. I ("It has passed from natural things to human affairs that whenever one thing rises up against another, it suffers some detriment therefrom. . . . Consequently, whatever rises up against order, is put down by that order or by the principle thereof."); John Locke, *Second Treatise of Government*, §§ 87–88 (1690); Adam Smith, *The Theory of Moral Sentiments*, pt. II, § 2, ch. 1 (1759).

safety is honorable." *Id.* This law of self-defense "is a law . . . not written, but born with us, —which we have not learnt, or received by tradition, or read, but which we have taken and sucked in and imbibed from nature herself; a law which we were not taught, but to which we were made." *Id.*

The Roman empire echoed Cicero's points "for centuries to come." Stephen P. Halbrook, *That Every Man Be Armed* 20 (1984). The *Lex Cornelia de sicariis* of 81 B.C. stated that carrying weapons was lawful but not carrying a "sword of vengeance" or "weapons for the purpose of homicide." J. Inst. 4.18.5 (J. Moyle trans. 1913). Accordingly, "whatever a person does for his bodily security he can be held to have done rightfully." Dig. 1.1.3 (Florentinus, Institutes 1) (Alan Watson, trans., 1998). But "rightfully" is the condition that justifies the action. Dig. 1.1.1 (Ulpian, Institutes 1). "The basic principles of right are: to live honorably, *not to harm any other person*, [and] to render to each his own." Dig. 1.1.10 (Ulpian, Rules 1) (emphasis added). Thus, "it is a grave wrong for one human being to encompass the life of another." Dig. 1.1.3 (Florentinus, Institutes 1).

Centuries later, Thomas Aquinas likewise taught that the "act [of killing another in self-defense], since one's intention is to save one's own life, is not unlawful, seeing that it is natural to everything to keep itself in 'being,' as far as possible." *Summa Theologica*, *supra*, pt. II-II, q. 64, art. 7. But killing a just or innocent is wrong because "the life of the righteous men preserves and forwards the common good." *Id.* art. 6, resp. Aquinas also noted that the fundamental right to defense did not extend to tumultuously rising up against the government in opposition to the "unity and peace of a people." *Id.* q. 42, art. 1. "[S]edition is contrary to the unity of the multitude." *Id.* q. 42, art. 2. Citing to Augustine, Aquinas

defines "sedition" as being against "the assembly of those who are united together in fellowship recognized by law and for the common good," making "sedition . . . opposed to justice and the common good." *Id.*; *see also* 2 St. Augustine, *City of God*, Book II, ch. 21, at 75–76 (Marcus Dods, ed. & trans., Edinburgh, Murray & Gibb 1871) (defining "the people" as "being not every assemblage or mob, but an assemblage associated by a common acknowledgment of law, and by a community of interests"). But "[t]hose, however, who defend the common good, and withstand the seditious party, are not themselves seditious, even as neither is a man to be called quarrelsome because he defends himself." *Summa Theologica*, *supra*, pt. II-II, q. 42, art. 2.[10]

These elementary sources teach that persons have a fundamental right to use arms to preserve innocent human life. But this liberty cannot be used harm another human life, or to rebel against a just government. Taken together, these principles instruct that the natural right of self-preservation does not extend to bearing arms in a manner that undermines the common good.

---

[10] This principle does not criminalize individuals of the community from uprising against a tyrannical government. A "tyrannical government is not just, because it is directed, not to the common good, but to the private good of the ruler." *Summa Theologica*, *supra*, pt. II-II, q. 42, art. 2. So "there is no sedition in disturbing a government of this kind." *Id.*; *see also* McWilliam, *supra*, at 154 ("Resistance to an unjust ruler is also an application of the *ius naturale* principle of self-defense. . . . As such, the natural law has a deep condemnation for unjust rulers who act for their own private good rather than for the common good and justice of all.").

11

**B.**

English practices applied and developed these principles. Blackstone pointed out that the right of all Englishmen to "hav[e] arms for [one's] defence" is rooted in "the natural right of resistance and self-preservation." 1 Blackstone, Commentaries *143–44.[11] It was a "birthright," 1 Blackstone, Commentaries *140, that "appertain[ed] to every Englishmen," *id.* at *136, an "ancient right[] and libert[y]," later codified by Parliament in the English Bill of Rights in 1689, *see* Bill of Rights, 1 W. & M. Sess. 2 c. 2 ("[S]ubjects which are Protestants may have arms for their defence suitable to their conditions and as allowed by law."). John Locke echoed similar points, explaining that "by the fundamental law of nature . . . one may destroy a man who makes war upon him . . . for the same reason that he may kill a wolf or a lion; because such men are not under the ties of the common law of reason, have no other rule, but that of force and violence." John Locke, *Second Treatise of Government*, § 16 (1690). This

---

[11] *See also* William Blizard, *Desultory Reflect on Police: With an Essay on the Means of Preventing Crimes and Amending Criminals* 59–60 (London, 1785) ("The right of his majesty's Protestant subjects, to have arms for their own defence, and to use them for lawful purposes, is most clear and undeniable. It seems, indeed, to be considered, by the ancient laws of this kingdom . . . . [This right is] most unquestionabl[e] . . . [and] most clearly established by the authority of judicial decisions and ancient acts of parliament, as well as by reason and common sense."); 3 Blackstone, Commentaries *3–4 ("Self-defence, therefore, as it is justly called the primary law of nature, so it is not, neither can it be in fact, taken away by the law of society.").

comports with reason that "man [must] be preserved as much as possible," but "when all cannot be preserved, the safety of the innocent is to be preferred." *Id.*

But English history reflects the ancient prohibition on men exercising their fundamental rights to intentionally harm the life or safety of another, or to rebel against a just government.

**1.** For example, kings prohibited using arms against the community, with violators subject to disarmament. Alfred the Great proscribed violent acts with arms.[12] The Statute of Northampton, 2 Edw. 3, c. 3, followed in 1328 to address the dangers from "[b]ands of malefactors, knights as well as those of lesser degree," that "harried the country, committing assaults and murders," and the resulting "spirit of insubordination." K. Vickers, *England in the Later Middle Ages* 107 (C. Oman ed., 4th ed. 1926); *see also* Edward Coke, *The Third Part of the Institutes of the Laws of England* 160 (London, M. Flesher 1644) ("For in those daies this deed of Chivalry was at random, whereupon great perill ensued . . . ."). To enforce the Statute, Edward III ordered sheriffs to investigate "the malefactors who have made assemblies of men-at-arms or have ridden or gone armed in his bailiwick, contrary to the statute and the king's proclamation." Letter to

---

[12] *See* The Laws of King Alfred the Great §§ 7, 19, 38 (c. 878), *reprinted in* 3 *The Whole Works of King Alfred the Great* 119, 127, 129, 133 (Oxford, Messrs J.F. Smith & Co. 1852) (prohibiting "fight[ing]" or "draw[ing] out his weapon" in the "king's hall," "lend[ing] [one's] weapon to another," with the intent that the borrower would "slay a man with it," use, by "a sword-whetter," of another's weapon to commit a crime, and "disturb[ing] the folk-mote with weapon drawing").

Keeper and Justices of Northumbridge (Oct. 28, 1332), *reprinted in* 2 *Calendar of the Close Rolls, Edward III, 1330–1333* 610 (H.C. Maxwell Lyte ed., London, Eyre & Spottswood 1898). The Statute allowed the sovereign to "punish people who go armed to terrify the King's subjects." *Sir John Knight's Case* (1686) 87 Eng. Rep. 75, 76; 3 Mod. 117, 118 (KB). That was "likewise a great offence at the common law, as if the King were not able or willing to protect his subjects." *Id.* The Statute of Northampton thus followed the path of the classical law, demonstrating the right to carry arms could not license a right to cause public terror. *See Bruen*, 597 U.S. at 45–46; *United States v. Williams*, 113 F.4th 637, 650 (6th Cir. 2024); *Kanter v. Barr*, 919 F.3d 437, 456–57 (7th Cir. 2019) (Barret, J. dissenting), *abrogated by Bruen*, 597 U.S. at 70–71.

But the Statute did not displace the right of using arms for self-defense and continued the understanding that an individual "may not onely use force and armes" but also "assemble his friends and neighbors to keep his house against those that come to rob, or kill him, or to offer him violence." *The Third Part of the Institutes of the Laws of England*, at 161–62. Use of force to oppose unlawful force is "by construction excepted out of this [Statute]" because the laws permit the taking up of arms against armed persons. *Id.* at 162 ("Armaque in Armatos sumere jura sinunt."). As a result, individuals with the "intent to defend themselves against their adversaries, are not within the meaning of this Statute, because they do nothing *in terrorem populi*." 2 William Hawkins, *A Treatise of the Pleas of the Crown* ch. 63, § 9, at 22 (7th ed. 1795).

Along with prohibiting affrays, the English surety system dating back to the Saxons also grounded the right to

bear arms. *See* 4 Blackstone, Commentaries \*252. Though initially in the form of "decennaries or frank pledges" where the community mutually promised for a person's good behavior, surety laws later converted into an individual offer of security guaranteeing their own good behavior. *Id.*; *see also Rahimi*, 144 S. Ct. 1899–1900. Under this system, "[a]ny justices of the peace" could demand a surety "according to their own discretion" or at the request of another provided "due cause [was] shown." 4 Blackstone, Commentaries \*253. Sureties were used to prevent two distinct types of future harm by keeping the peace and ensuring good behavior. *Id.* at \*251, 254–56. Sureties complemented recognizances,[13] and "[a]ny justice of the peace" could "bind all those to keep the peace[,] who in his presence make any affray, or threaten to kill or beat another, or contend together with hot and angry words, or go about with unusual weapons or attendance, to the terror of the people." *Id.* at \*254. Similarly, an individual could demand a surety from another when he "hath just cause to fear" that

---

[13] Recognizances for good behavior included "security for the peace," but also covered "somewhat more." 4 Blackstone, Commentaries \*256. Justices of the peace were empowered "to bind over to the good behaviour towards the king and his people" all individuals "that be not of good fame." *Id.* The general phrase "not of good fame," described men that acted "*contra bonos mores*," meaning against good morals, or "*contra pacem*" meaning against the peace. *Id.*; *see id.* (elaborating that this phrase applied to men who kept the company of "women of bad fame," those who "tend[] to scandalize the government," those who "abuse the officers of justice," "common drunkards," or "eaves-droppers"). All showing the moral basis for regulation to preserve the common good.

another in the community would "do him a corporal injury, by killing, imprisoning[,] or beating him." *Id.* at \*255.

Accordingly, regardless of whether surety laws serve as proper historical evidence supporting disarmament before an individualized conviction of a violent crime, *see Rahimi*, 144 S. Ct. at 1938–42 (Thomas, J., dissenting), the surety system illustrates the long-standing idea that liberty cannot be used for lawless violence, consistent with the natural law principles prohibiting individuals from exercising their right to bear arms to tarnish the shared life or dignity of the community.

**2.** English law also curtailed the right to bear arms of individuals suspected of treason or sedition against the sovereign. The Militia Act of 1662 authorized officers of the Crown to disarm any individual that either a Lieutenant or two or more Deputies "judge[d] dangerous to the Peace of the Kingdome," to "[s]ecure the Peace of the Kingdome." City of London Militia Act 1662, 14 Car. 2, c. 3, § 13. In practice, the law was used to confiscate arms from anyone threatening the absolute rule of King Charles II. *See* Stephen P. Halbrook, *The Right to Bear Arms: A Constitutional Right of the People or a Privilege of the Ruling Class?* 35–36, 60–61 (2021).

Similarly, the Game Act of 1670 imposed a property requirement for gun ownership, and effectively disarmed most commoners. 22 & 23 Car. 2, c. 25 (1670); *The Right to Bear Arms*, *supra*, at 36. As Blackstone explains, "prevention of popular insurrections and resistance to the government, by disarming the bulk of the people . . . is a reason oftener meant than avowed by the makers of forest or game laws." 2 Blackstone, Commentaries \*412. And both laws were often used to disarm persons presumed disloyal, including Protestants under Charles II and James II. *That Every Man Be*

16

*Armed*, *supra*, at 43; *see* The Somers Papers, *in* 2 *Miscellaneous State Papers from 1501–1726* at 407, 417–18 (W. Strahan and T. Cadell 1778).

But arbitrary use of this power left James II exiled, William and Mary on the throne, and Catholics disarmed under Protestant rule. *See* 1 W. & M. c. 15, § 4 (1688) (requiring all Catholics and presumed Catholics to swear loyalty to the Crown or forfeit their arms); *see also The Right to Bear Arms*, *supra*, at 60; Bill of Rights, 1 W. & M. Sess. 2 c. 2, § 7 (1689) (codifying that only Protestants may have arms for self-defense). Under the reign of William and Mary, there was "cause to fear that a person, although technically an English subject, was because of his beliefs effectively a resident enemy alien liable to violence against the king." *See* C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 723 (2009). Any such violence was considered treason because it would "affect the supreme executive power," "amount[ing] either to a total renunciation of that allegiance, or at the least a criminal neglect of that duty, which is due from every subject to his sovereign." 4 Blackstone, Commentaries \*75. As a result, "being Roman Catholic was equated with supporting James II and thus with presumptive treason." Marshall, 32 Harv. J.L. & Pub. Pol'y at 721. This is because Roman Catholics essentially "acknowledge[d] a foreign power, superior to the sovereignty of the kingdom," and thus they "[could not] complain if the laws of that kingdom [did] not treat them upon the footing of good subjects." 4 Blackstone, Commentaries \*55. But despite this presumption, disarmament did not occur until an individual declined to swear an oath of loyalty to the Protestant king. *Id.* at 722–23. And even upon such refusal, an individual could still keep "necessary [w]eapons . . . for the defence of his

17

House or person." 1 W. & M. c. 15, § 3 (1688); *see also* Joyce Lee Malcolm, *To Keep And Bear Arms* 122–23 (1994) ("They assumed that everyone had a right to own firearms unless he could be conclusively convicted of Catholicism. Even in this time of danger, Catholics were considered to have a right to own arms for their personal defence and the defence of their households."). This historical strife between Catholics and Protestants reveals a fundamental principle about the right to have arms for self-defense: the king could disarm classes of people who posed true risk of sedition or treason to the sovereign. [14]

* * *

In sum, as reflected in the English Bill of Rights, bearing arms for self-defense was a fundamental right, originating from the laws of nature. But that right was restricted by laws prohibiting the use of arms to intentionally cause terror or harm to members of the community. And government could disarm classes of people that posed an actual risk of sedition or treason. These traditions follow the classical

---

[14] Notably, groups that were disarmed as dangerous by posing risk of sedition or treason differed from individuals viewed as dangerous by causing intentional physical harm to another. Rather than posing harms directly to the subjects of the King, groups likely to revolt against the King posed a threat to the Order of the King. *See* 4 Blackstone, Commentaries *81–82 ("[T]reason" and "insurrection" amount to "a rebellion against the state, an usurpation of the powers of government, and an insolent invasion of the king's authority."). But "riot[s]" or crimes imagined to a neighbor's land, home, or life were considered "no high treason" because they amount to "no general defiance of the public government." *Id.* at *82.

principles of self-preservation, disallowance of public harm, and the elementary view that because government exists for the common good of the community, it may defend its own existence.

## C.

These principles are reflected in our Founding and the Second Amendment, exhibiting respect for the fundamental right to bear arms and its natural limitation that one must not use that liberty to subvert the common good.

Spanning from the colonial generation to the Founders, history reveals that bearing arms for self-defense is rooted in the natural law.[15] Recounting British history, Samuel Adams noted that James II disregarded the "*natural, inherent, divinely[,] hereditary[,] and indefeasible* rights of [his] subjects," but praised the English constitution for restoring the country's "original principles" and noted that the "bill of rights" "stands as a bulwark to the natural rights of subjects." Samuel Adams, *Boston Gazette*, Feb. 27, 1769, at 3, col. 1. The natural right of self-defense was the core of John Adams's defense of the soldiers on trial for the Boston Massacre, contending that "every private person is authorized to arm himself, and on the strength of this authority, [he did] not deny the inhabitants had a right to arm themselves at that time, for their defence, not for offence." 3 *Legal Papers of John Adams*

---

[15] This truth is not a historic relic. Today, still recognizing that certain rights predate government, "35 state constitutions expressly declare that rights are inherent or natural." Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 316 (Rachel E. Barkow et al., 3d ed. 2022).

248 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965); *see also id.* at 245 ("The rules of the common law therefore, which authorize a man to preserve his own life at the expence of another's, are not contradicted by any divine or moral law."). Adams explained that the right of self-preservation "is not only our indisputable right, but our clearest duty, by the laws of nature, this is interwoven in the heart of every individual." *Id.* at 244.

These principles influenced colonial America's collective declaration of independence from Great Britain.[16]

---

[16] *See* Simeon Howard, A Sermon Preached to the Ancient and Honorable Artillery Company in Boston (June 7, 1773), *in* 1 *American Political Writing During the Founding Era, 1760–1805* 186, 201–02 (Charles S. Hyneman & Donald S. Lutz eds., 1983) ("Men are bound to preserve their own lives, as long as they can, consistently with their duty in other respects" and are "bound both by the law of nature and revelation, to provide in the best manner [they] can, for the temporal happiness of [their] famil[ies]. . . . It is therefore an act of benevolence to oppose and destroy that power which is employed in injuring others; and as much, when it is that of a tyrant, as of a wild beast."); Thomas Paine, *The Crisis I: These Are the Times that Try Men's Souls* (Dec. 23, 1776), *reprinted in* 1 *The Complete Writings of Thomas Paine* at 50, 55–56 (Phillip S. Foner, ed., 1945) ("[I]f a thief breaks into my house, burns and destroys my property, and kills or threatens to kill me, or those that are in it, and to 'bind me in all cases whatsoever' to his absolute will, am I to suffer it? What signifies it to me, whether he who does it is a king or a common man; my countryman or not my countryman; whether it be done by an individual villain, or an army of them?").

Following the Revolution, several states recognized a right to bear arms for self-defense rooted in the natural law. *See The Right to Bear Arms*, *supra*, at 147–52 (detailing the specific protections in Virginia, Pennsylvania, North Carolina, Vermont, and Massachusetts declarations of rights); Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 309–17 (Rachel E. Barkow et al., 3d ed. 2022) (same). So too with the Second Amendment, which was "considered as the true palladium of liberty" because "[t]he right of self defence is the first law of nature." 1 Blackstone, Commentaries, app. at 300 (St. George Tucker ed., 1803).

At the core of early America's robust regard of the right to bear arms was "the great natural law of self-preservation" that gives rise to the necessity "for the defence of one's person or house." *Collected Works of James Wilson* 1142 (discussing the principles behind the Pennsylvania Constitution's protection of the right to bear arms that date back to the Saxon era, where individuals "were bound" "to keep arms for the preservation of the kingdom, and of their own persons"). Affirming what reason suggests, American law holds that "a man has a perfect right to his life, to his personal liberty, and to his property," thereby permitting a man "by force [to] assert and vindicate those rights against every aggressor." *Essays of Justice Story*, *supra*, at 262. But the right to possess arms for self-preservation has long been regulated to prohibit violence against the people, and violence against the State—the same the two limitations found in English history, and the classical tradition.

**1.** Laws prohibiting use of arms to cause terror to members of the community date back to colonial America. In 1736, a Justice of the Peace in Virginia provided that it is the

21

duty of "[e]very constable, as a Minister of the Justice," to "take away Arms from such who ride, or go, offensively armed, in Terror of the People, and may apprehend the Persons, and carry them, and their Arms, before a Justice of Peace." George Webb, *The Office and Authority of a Justice of Peace* 92–93 (Williamsburg, William Parks 1736). Justices of the Peace in New Hampshire were instructed to do the same.[17] If "legal proof of any such offence" was presented, the justice was permitted to "commit him to prison" and "cause his arms or weapons to be taken away." Acts and Laws of His Majesty's Province of New Hampshire ch. 11 § 5 (1771). And colonial Massachusetts similarly prohibited "rid[ing] or go[ing] armed Offensively." Mass. Province Laws ch. 18, § 6 (1692).

These laws, which essentially copied the Statute of Northampton, carried over into Founding-era America.[18] Like

---

[17] *See* Acts and Laws of His Majesty's Province of New Hampshire ch. 11 § 5 (1771) ("[E]very justice of the peace within this province, may cause to be stayed and arrested all affrayers, rioters, disturbers or breakers of the peace, or any other that shall go armed offensively, to put his majesty's subjects in fear by threat[e]ning speeches.").

[18] For example, Virginia enacted a near duplicate of the Statute: "No man, great nor small, of what condition soever he be . . . go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the county." *A Collection of All Such Acts of the General Assembly of Virginia* at 33 (Virginia, Augustine Davis 1794). So too did North Carolina. *See A Collection of Statutes of the Parliament of England in Force in the State of North Carolina* 60–61 (New Bern, Francois-Xavier Martin 1792) ("[N]o man great nor small, of what condition soever he be, . . . [shall] bring no force in affray of peace, nor

the original, these statutes prohibited persons from going armed to commit affrays or cause terror to the community.[19] The English surety regime also persisted, allowing temporary disarmament for violations. *Rahimi*, 144 S. Ct. at 1900–01. All consistent with the traditional principle that the right to bear arms for self-defense must not be abused to physically harm members of the community.

**2.** Laws addressing danger to the State focused on groups viewed as disloyal to the government. Take Beacon's Rebellion in 1676, when the rebels in James City County were temporarily disarmed. *See The Right to Bear Arms*, *supra*, at 111–13; *id.* at 113 ("The restraint was only during the rebellion. Now every man may bear arms."). And during the French and Indian War, Catholics who refused to swear an oath of undivided allegiance were prohibited from possessing "in his house or elsewhere" any "arms, weapons, gunpowder[,] or

---

to go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor in no part elsewhere."). The District of Columbia seemingly proposed similar draft legislation, although it is unclear whether that draft legislation ever carried force of law. *See Code of Laws for the District of Columbia: Prepared Under the Authority of The Act of Congress of the 29th of April, 1816* 253–54 (Washington, Davis & Force 1818).

[19] Because affrays were considered "crimes against the personal safety of the citizens," *Collected Works of James Wilson* 1138, as a penalty, individuals had to forfeit their armour to the government. *See Essays of Justice Story*, *supra*, at 97 ("The right of society to punish offences against its safety and good order will scarcely be doubted by any considerate person.").

ammunition." 7 William Waller Hening, *The Statutes at Large; Being a Collection of all the Laws of Virginia* 36–37 (Richmond, Franklin Press 1820).[20] Why? Because "Protestant colonial governments feared that loyalty to the Pope would cause Catholics to take up arms for France." *United States v. Jackson*, 85 F.4th 468, 471 (8th Cir. 2023) (Stras, J., dissenting from denial of rehearing en banc).

Unsurprisingly, the Revolutionary War led to widespread disarmament of loyalists. *See* Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1, 61–63 (2024) (detailing eight orders and laws disarming loyalists to "suppress[]" "enemies to American Liberty," one of which was issued by George Washington). In New York, "any person or persons" convicted of "having furnished the ministerial army or navy . . . with provisions or other necessaries . . . shall be disarmed." Resolutions of September 1, 1775, *reprinted in* 1 *Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New York* 131, 132 (Albany, Thurlow Weed 1842). South Carolina prohibited any person from "bear[ing] arms against" or

---

[20] *See also* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007) (explaining that colonial Virginia "acted to disarm Catholics" "not on the basis of faith" but on "the basis of allegiance"); Johnson et al., *supra*, at 197 (summarizing Maryland laws that forbid possession of firearms and ammunition by "Marylanders who refused to swear loyalty to King George III" and legislation passed by the lower house to disarm any "Papist within [the] Province").

24

"opposing the measures of the Continental or Colony Congress," punishable by disarmament. *Resolutions of March 13, 1776*, *reprinted in Journal of the Provincial Congress of South Carolina*, *1776* 77, 77 (London, J. Almon 1776). And Massachusetts disarmed any person convicted of "being notoriously inimical to the cause of *American* Liberty." Resolutions of July 25 and July 26, 1776, *reprinted in* 1 *American Archives: Fifth Series* 588, 588 (Peter Force ed., 1848). All show that those who committed the specific offense of sedition or treason could be disarmed for a time.

**3.** Practices around the Founding reflect principles that allowed disarmament of individuals who endangered the community by physically harming another, and of individuals who exhibited dangerousness by seeking to overthrow the government. The Second Amendment's ratification process exhibits both the distinctiveness and enduring nature of these two principles. At their state ratifying conventions, Massachusetts, New Hampshire, and Pennsylvania each proposed limiting language to the Second Amendment arguably tied to dangerousness. *See Kanter*, 919 F.3d at 454 (Barret, J., dissenting) (noting that "each of these proposals included limiting language arguably tied to criminality").[21]

Language proposed in Pennsylvania and Massachusetts reflects that those who breached the peace were proscribed from bearing arms. In Massachusetts, Samuel Adams drafted the following proposed amendment, "[T]hat the said Constitution be never construed to authorize Congress . . . to

---

[21] These proposed amendments are part of "[t]he best-available-evidence" of "the practice in the early Republic." Lee J. Strang, *Originalism's Promise: A Natural Law Account of the American Constitution* 69 (2019).

25

prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." Massachusetts Convention Journal (Feb. 6, 1788), *reprinted in* 6 *The Documentary History of the Ratification of the Constitution* 1452, 1453 (John P. Kaminski et al. eds., 2000) (emphasis added). "Peaceable citizens" were those who did not commit a "breach of the peace," meaning those who did not "violat[e] . . . the public peace, as by a riot, affray, or any tumult which is contrary to law, and destructive to the public tranquility." *Breach*, *in* 1 Noah Webster, *An American Dictionary of the English Language* (New York, S. Converse 1828). And in Pennsylvania, twenty-one of the twenty-three members who voted against ratification proposed the following amendment: "That the people have a right to bear arms for the defense of themselves and their own state, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, *unless for crimes committed, or real danger of public injury from individuals*." *The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents* (Dec. 18, 1787), *reprinted in* 2 *The Documentary History of the Ratification of the Constitution* 618, 623–24 (Merrill Jensen et al. eds., 1976) (emphasis added). The natural reading of these proposals is that "crimes committed" concern acts posing a "real danger of public injury." *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting). This reading accords with the natural law principle against taking innocent life that informs American firearm regulations.

In contrast, the language proposed by New Hampshire restricted the right to bear arms to those who had not engaged in rebellion: "Congress shall never disarm any Citizen, *unless such as are or have been in actual Rebellion*." *New Hampshire*

26

*Form of Ratification* (June 21, 1788), *reprinted in* 28 *The Documentary History of the Ratification of the Constitution* 376, 378 (John P. Kaminski et al. eds., 2017) (emphasis added). Citizens who "are or have been in actual Rebellion" is not synonymous with all felons or criminals. This proposal targets individuals who committed the distinct crime of rebellion, which means "taking up Arms against the Supreme Power." *Rebellion*, New Universal Etymological English Dictionary (20th ed. 1763). But New Hampshire's proposal "does not say anything about disarming those who have committed other crimes, much less nonviolent ones." *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting).

**4.** At least two distinct principles run continuous throughout history from Cicero to Founding-era America. First, the right to bear arms is not a license to physically harm another. Second, an individual cannot exercise that right to rebel against a just government ordered for the common good. Penalty for acting adverse to either principle often amounted to disarmament.[22] These principles are the hallmark of our Nation's firearm regulations.

---

[22] But such disarmament was not absolute, and I echo Judge Roth's call for greater executive review of petitions to restore firearm rights, regardless of whether Congress provides funding for 18 U.S.C. § 925(c). *See* Concurring Op. at 11 n.18; *see also Cross v. Buschman*, No. 22-3194, 2024 WL 3292756, at *5 (3d Cir. July 3, 2024) (Matey, J., concurring) ("The Eighth Amendment binds all federal actors, and the President has a duty to ensure his subordinates comply with the Amendment's demands."). That is because "the President holds an independent duty to ensure that the Constitution's guarantees are followed." *Cross*, 2024 WL 3292756, at *5

27

Many reasonable minds read this history to support a different answer, and only one broad principle: the legislature can categorically disarm anyone labeled "dangerous."[23] But that is too vague a conception of "dangerousness." True, both ideas contain types of dangerous individuals, and both center on classifications designed, or at least recognized, by government. But the type of danger posed, and the punishment prescribed, makes the difference. Laws imposing class wide disarmament were enacted during times of war or civil strife

(citing Gary Lawson & Christopher D. Moore, *The Executive Power of Constitutional Interpretation*, 81 Iowa L. Rev. 1267, 1287 (1996) ("Once the President has interpreted the law that he has the power to enforce or execute, a second interpretative stage emerges: the President must then determine whether the law is consistent with the Constitution. The President, no less than Congress or the courts, operates under the Constitution as supreme positive law . . . . The need to interpret the Constitution as a source of positive law, and to prefer the Constitution to any other source of law with which it may conflict, is as much a part of '[t]he executive Power' vested in the President as it is part of '[t]he judicial Power' vested in the federal courts. The Constitution is law, and the executive power of law interpretation includes the power and duty to interpret the Constitution.")). All to say, it is time to examine the Attorney General's independent obligation to review these petitions, as well as the propriety of continuing to delegate this responsibility to the Justice Department's Bureau of Alcohol, Tobacco, Firearms and Explosives when that agency has been thwarted from carrying out its duty.

[23] *See Williams*, 113 F.4th at 656–57; *United States v. Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024); *see also* Dissenting Op. at 6–8, 8 n.8.

where separate sovereigns competed for loyalty. *See Jackson*, 85 F.4th at 472 (Stras, J., dissenting from denial of rehearing en banc) ("[T]he decades surrounding the ratification of the Second Amendment showed a steady and consistent practice. People considered dangerous lost their arms. But being a criminal had little to do with it."). And laws disarming an individual for dangerous conduct harming another member of the community centered on individualized review of specific acts.[24] Combining these principles to reach a higher level of generality discounts the history and, most importantly, disregards the natural law principles explaining *why* we possess the right to bear arms.

### D.

We have wandered far from the reason and spirit of the Second Amendment. The first federal ban on felons possessing firearms arrived one hundred and forty-seven years after the

---

[24] In theory, the implications of both principles may not be as siloed when assessing a facial challenge to § 922(g)(1). For example, there are many individuals convicted of felonies for sedition or murder, which could show that § 922(g)(1) may not be unconstitutional in all contexts. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (explaining that in a "facial challenge to a legislative Act . . . the challenger must establish that no set of circumstances exists under which the Act would be valid"). But that is not the case here because Range asserts an as-applied challenge. *See United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) ("An as-applied attack, in contrast, does not contend that a law is unconstitutional as written[,] but [rather] that its application to a particular person under particular circumstances deprived that person of a constitutional right.").

Amendment's ratification. The Federal Firearms Act, § 922(g)(1)'s predecessor, prohibited any individual convicted of a "crime of violence" to possess a firearm or ammunition. An Act to Regulate Commerce in Firearms, ch. 850, § 2(f), 52 Stat. 1250, 1251 (1938). Congress defined a "crime of violence" as "murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking[,] assault with intent to kill, commit rape, or rob[,] assault with a dangerous weapon, or assault with intent to commit any offense publishable by imprisonment for more than one year." *Id.* § 1(6). Disarming individuals who exhibited that conduct made sense because they engaged in conduct that harmed the physical safety of individuals in the community. But twenty-three years later, Congress swept in all felonies, not just crimes of violence, *see* An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342 § 2, 75 Stat. 757, 757 (1961), thus abandoning reason, which permitted disarmament of individuals to protect the safety of the community or the existence of the government. That hollowed place is where the enacted law remains today.

Such a law cannot be applied to Range who does not exhibit behavior intentionally threatening the life or safety of another. And there is no suggestion that Range threatens the government's existence with sedition or treason. So disarming him is unnecessary to ensure the physical safety of the community, or the continuity of government. *See* McWilliam, *supra,* at 158 ("[O]ne must ask not only whether the statute comports with the broader *ius naturale* principles, but also with the general principles specifically determined within the Second Amendment.").

Because the majority correctly concludes that § 922(g)(1)'s application to Range is repugnant to the

fundamental principles captured by the Second Amendment, I concur.

PHIPPS, *Circuit Judge*, concurring.

I join the Majority Opinion in full because this case may be resolved on narrow grounds: there is no historical analogue for permanently disarming a citizen based on a prior conviction for food-stamp fraud.[1] I write separately to point out additional important "principles that underpin our regulatory tradition,"[2] specifically those related to the liberties of a free people. Application of these principles lends further support to the outcome in this case and in future cases will balance and safeguard the legal analysis so that it does not skew in favor of disarmament.

Appreciation of these principles begins with a recognition that the Founders were practical, prudent, and well-read.[3] They

---

[1] *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 30 (2022) ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." (internal quotation marks omitted) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010))).

[2] *United States v. Rahimi*, 602 U.S. 680, 692 (2024).

[3] *See* Carl J. Richard, *The Founders and the Classics: Greece, Rome, and the American Enlightenment* 53–168 (1994) (detailing how the Founders used Roman and Greek history and political thought to guide their critique of Britain and design of America); *id.* at 118 ("Ancient history provided the founders with a large body of information, knowledge which they used both to make sense of the confusing events of their day and to construct arguments for their political positions."); Donald S. Lutz, *The Relative Influence of European Writers on Late Eighteenth-Century American Political Thought*, 78 Am. Pol. Sci. Rev. 189, 192–95 (1984) (detailing the Founders' fluency in Montesquieu, Blackstone, Locke, Hume, and Beccaria, as well as Plutarch, Cicero, Livy, Tacitus, and Plato).

1

fled from and rebelled against a nation that took away the right to keep and bear arms[4] and that used its military to occupy

[4] *See* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 23–134 (1997) (tracing English republicans' disarming of Royalist sympathizers and Catholics; the restored Royalists' disarming of republicans and the "disaffected"; the aristocracy's disarming of commoners with game laws enforceable by the aristocrats themselves; and the renewed disarming of Catholics by a Protestant king and then Protestants by a Catholic king, until the right was affirmed in 1689); Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 9–74 (2008) (detailing British attempts to disarm Colonists from the late 1760s, and the resistance up and down the colonies, until the outbreak of hostilities); 1 James Burgh, *Political Disquisitions; or, An Enquiry into Public Errors, Defects, and Abuses* 464 (1775) ("A general exercise of the best of their people in the use of arms, was the only bulwark of their liberties."); Leonard W. Levy, *Origins of the Bill of Rights* 138 (1999) (opining that Burgh's *Political Disquisitions* "was probably more influential in America than John Locke's work"); *A Declaration by the Representatives of the United Colonies of North America, Now Met in General Congress at Philadelphia, Setting Forth the Causes and Necessity of Their Taking Up Arms*, *reprinted in* 37 *Documentary History of the Ratification of the Constitution and the Bill of Rights* 49 (John P. Kaminski et al. eds., 2020) (complaining to King George III, alongside the last-ditch Olive Branch Petition, that Colonists had "delivered up their arms" to be later returned, yet "the Governor [of Massachusetts] ordered the arms . . . to be seized by a body of soldiers"); *id.* at 46 ("Our forefathers, inhabitants of the island of Great Britain, left their native land, to seek on these shores a residence for civil and religious freedom."); St. George Tucker, 1 *Blackstone's Commentaries* app. 300 (1803) ("In England, . . . the right of bearing arms is confined to [P]rotestants, and the words suitable to their condition and

several American cities.[5]  The Founders wished to enshrine that right in the core organic document of this Nation – our Constitution.[6]  Of course, the Founders knew that firearms were dangerous and capable of abuse.  But an individual right to keep and bear arms[7] promotes self-defense and protects

degree, have been interpreted to authorize the prohibition of keeping a gun . . . [s]o that not one man in five hundred can keep a gun in his house without being subject to a penalty.”).

[5] *See generally* Donald F. Johnson, *Occupied America: British Military Rule and the Experience of Revolution* (2023) (detailing British military occupations of Boston, New York, Newport, Philadelphia, Charleston, and Savannah, and those occupations’ catalyst effect upon revolutionary sentiment); *see also BOSTON, March 12.*, Bos. Gazette, Mar. 12, 1770, at 3 (counting three dead and eight wounded at the Boston Massacre); L. Kinvin Wroth & Hiller B. Zobel, *The Boston Massacre Trials*, 55 A.B.A. J. 329, 329 (1969) (reporting that two of the wounded succumbed to their injuries, bringing the death total to five).

[6] *See* U.S. Const. amend. II; *see also* 3 Joseph Story, *Commentaries on the Constitution* §§ 1890–91 (1833), *reprinted in* 5 *The Founders’ Constitution*, *supra*, at 214 (“The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; . . . it is at present in England more nominal then real, as a defensive privilege.”); William Rawle, *A View of the Constitution of the United States* 125–26 (2d ed. 1829), *reprinted in* 5 *The Founders’ Constitution*, *supra*, at 214 (Philip B. Kurland & Ralph Lerner eds., 1987) (“No clause in the Constitution could by any rule of construction be conceived to give to congress a power to disarm the people . . . .”).

[7] *See District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (“There seems to us no doubt, on the basis of both text and

against anarchy, rebellion, and foreign invasion.[8]  And so, the right was sewn into our Nation's founding fabric, with the enemies of this Country and our individual liberties being the ones who had most opposed it.[9]

It is against these principles – deeply against them – to flog the historical record until it suggests some analogue or principle justifying disarmament, no matter how abstracted, attenuated, or ahistorical that analogue or principle may be.  In particular, it is a mistake to read the Second Amendment as permitting the most extreme forms of disarmament in the history of England and colonial America.  While the Founders adopted many venerable English legal principles and traditions, such as those developed at common law and in

---

history, that the Second Amendment conferred an individual right to keep and bear arms.").

[8] *See, e.g.*, Burgh, *supra* note 4, at 401 ("And if the generality of housekeepers were only half-disciplined, a designing prince, or ministry, would hardly dare to provoke the people by an open attack against their liberties . . . .  But without the people's having some knowledge of arms, I see not what is to secure them against slavery, whenever it shall please a daring prince, or minister, to resolve on making the experiment.  See the histories of all the nations of the world."); Richard Henry Lee, *Federal Farmer No. 3* (1787), *reprinted in* 19 *Documentary History of the Ratification of the Constitution and the Bill of Rights* 219 (John P. Kaminski et al. eds., 2020) ("[T]he yeomanry of the country . . . possess arms, and are too strong a body of men to be openly offended . . . .").

[9] *See, e.g.*, Halbrook, *supra* note 4, at 78–109 (recounting how, after British soldiers executed civilians on their retreat from Lexington and Concord, royal governors attempted to disarm the people, and Great Britain placed an embargo on the importation of arms to America).

equity,[10] they broke ranks with the past in several respects. For instance, titles of nobility were used in England, but the Constitution expressly prohibits them.[11] If that prohibition did not include titles of nobility that were part of the English historical tradition, then it would be close to meaningless. Similarly, the Second Amendment cannot be read to permit the extreme forms of disarmament used in England and colonial America while under British rule; the Founders rejected those forceful suppressions of their liberties.[12]  Nor do the disarmament measures taken by the American States during the Revolutionary War in response to a person's refusal to take a loyalty oath serve as useful analogues.[13]  As the Majority

---

[10] *See* U.S. Const. art. III, § 2, cl. 1 ("The judicial Power shall extend to all Cases, in Law and Equity . . . .").

[11] *See* U.S. Const. art. I, § 9, cl. 8 ("No Title of Nobility shall be granted by the United States . . . .").

[12] *See* The Declaration of Independence para. 13 (U.S. 1776) ("[The King] has kept among us, in times of peace, Standing Armies without the Consent of our legislatures."); *id.* para. 14 ("He has affected to render the Military independent of and superior to the Civil power."); *id.* para. 27 ("He is at this time transporting large Armies of foreign Mercenaries to compleat the works of death, desolation and tyranny . . . ."); *id.* para. 28 ("He has constrained our fellow Citizens taken Captive on the high Seas to bear Arms against their Country . . . .").

[13] *See, e.g.*, 4 *Journals of the Continental Congress, 1774–1789* 205 (Worthington Chauncey Ford ed., 1906) (calling upon the States "immediately to cause all persons to be disarmed . . . who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies, against the hostile attempts of the British fleets and armies"); G.A. Gilbert, *The Connecticut Loyalists*, 4 Am. Hist. Rev. 273, 280–82 (1899) (recounting Connecticut's disarming those who spoke against the Continental Congress and were "inimical" to the American

Opinion explains, 'the people' entitled to the right to keep and bear arms consists only of citizens. So, a person who did not wish to belong to the new American nation would hardly have been one of 'the people' entitled to keep and bear arms. In sum, the most relevant historical principles for disarming a citizen are those grounded in the more stable and enduring aspects of our legal tradition, such as the common law and equity – as opposed to the principles underlying the excesses of the Crown or Parliament or even those supporting Revolutionary War measures in response to persons who retained foreign allegiances.

---

cause); Act of Mar. 14, 1776, 1775–76 Mass. Acts ch. 21 §§ 1–2, 8 (Massachusetts's disarming all persons over sixteen not being Quakers who would not adopt the American cause as their own and swear to assist its defense); An Act Empowering the Members of the Upper and Lower Houses of Assembly, to Tender to Such of the Inhabitants as are Hereinafter Mentioned, a Declaration, or Test, for Subscription (1776), *reprinted in* 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 566–68 (John Russell Bartlett ed., 1862) (same); Act of May 1777, 177 Va. Acts ch. 3, *reprinted in* 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia* 281–82 (William Waller Hening ed., 1821) (disarming all who refused a loyalty oath and were not excepted from taking it); Act of 1777, 1777 S.C. Acts ch. 6 § 9, *reprinted in* 24 *The State Records of North Carolina* 90 (Walter Clark ed., 1905) (same); Resolution of Mar. 13, 1776, *reprinted in Journal of the Provincial Congress of South Carolina, 1776* 77–78 (1776) (disarming those who bore arms against the Continental or Colony Congress, or opposed either, and requiring a loyalty oath to be rehabilitated and rearmed); An Ordinance Respecting the Arms of Non-Associators, 1776 Pa. Laws ch. 729 (July 19, 1776), *reprinted in* 9 *The Statutes at Large of Pennsylvania from 1682 to 1801* 11 (James T. Mitchell & Henry Flanders eds., 1903) (ordering the disarmament of "non-associators").

From that perspective, I see no historical analogue for the lifetime disarmament of an otherwise free citizen. It is as ancient as it is obvious that a person who is imprisoned or otherwise confined does not have the right to bear arms for the duration of confinement. Similarly, non-confined citizens who are still within the criminal justice system through parole or supervised release may have their freedoms, including the right to bear arms, limited if justified as a penal measure. Critically, in those circumstances, the loss of the right to bear arms is effectuated through an adjudicative process with the availability of the full panoply of constitutional rights for the accused and the convicted – and there are procedures available to directly appeal and collaterally challenge any infringement of a constitutional right.[14] But once a citizen repays his debt to society, a legislative restriction on the right to keep and bear arms based on nothing more than a prior conviction is without relevant historical antecedent.[15] And legislation permanently

---

[14] Similar procedures are available in civil commitment proceedings to protect against a permanent revocation of liberty for persons with serious mental illnesses – a loss of liberty may occur only as long as it is constitutionally justified, and it must be subject to periodic review. *See O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975) (explaining that "even if [a person's] involuntary confinement was initially permissible, it could not constitutionally continue after that basis no longer existed" (citations omitted)); *see Clark v. Cohen*, 794 F.2d 79, 86 (3d Cir. 1986) (explaining that "due process require[s] periodic reviews of [a person's] continuing need for institutionalization . . . because if the basis for a commitment ceases to exist, continued confinement violates the substantive liberty interest in freedom from unnecessary restraint" (internal citation omitted)).

[15] *See* Story, *supra* note 6, at §§ 1890–91 ("The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power

disarming a person who has already repaid his debt to society is even further removed from our Founding-era heritage.[16]

---

of rulers; . . . it is at present in England more nominal then real, as a defensive privilege."); Rawle, *supra* note 6, at 125–26 ("No clause in the Constitution could by any rule of construction be conceived to give to congress a power to disarm the people . . . .").

[16] It is true that before enacting the felon-in-possession statute in 1965, the Subcommittee to Investigate Juvenile Delinquency of the Senate Judiciary Committee heard testimony from Attorney General Katzenbach in which he opined that "[w]ith respect to the second amendment, the Supreme Court of the United States long ago made it clear that the amendment did not guarantee to any individuals the right to bear arms." *Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juv. Delinq.*, 89th Cong. 41 (1965) (statement of Att'y Gen. Nicholas deBelleville Katzenbach); *see also id.* (exhibit 7) (reporting with respect to the felon-in-possession's predecessor statute that "[a]t the time of the passage of the National Firearms Act in 1934 and the consideration and passage by Congress of the Federal Firearms Act from 1935 to 1938, the second amendment was not considered to be an obstacle" and advising that "[d]ecisions applying Federal firearms legislation hold that the second amendment was not, as the first amendment was, adopted with individual rights in mind, but was a prohibition upon Federal action which would interfere with the organization by States of their militia"). That advice has not aged well. *See Heller*, 554 U.S. at 595 (2008), *see also* Op. Off. of Legal Counsel, *Whether the Second Amendment Secures a Legal Right* 28 (2004) ("[T]he Second amendment secures a personal right of individuals, not a collective right that may only be invoked by a state or a quasi-collective right restricted to those persons who serve in organized militia units."). So there is more than a hairline crack in the legal foundation for the felon-in-possession statutory provision.

Thus, any law imposing a permanent restriction on "the right of the people to keep and bear Arms"[17] is constitutionally suspect as a facial matter, and here, the application of 18 U.S.C. § 922(g)(1) to permanently disarm Bryan Range after he repaid his debt to society for his food-stamp fraud violates the Second Amendment.

---

[17] U.S. Const. amend. II.

KRAUSE, *Circuit Judge*, concurring in the judgment, with whom ROTH, *Circuit Judge*, joins in part.

When this case was previously before us, I urged that we assess whether firearm regulations were constitutionally permissible in the present by comparing historical analogues in principle, not with precision. Hewing *precisely* to history and tradition would only make sense in a world where "arms" still meant muskets and flintlock pistols,[1] and where communities were still small and "close-knit."[2] In contrast, the firearms of America today include semi-automatic handguns, assault rifles,[3] and high-capacity magazines; our population of more than 330 million is mobile and far-flung; and, tragically, brutal gun deaths and horrific mass shootings—exceeding 490 this

---

[1] *See* Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 Yale L.J. 99, 153 (2023) ("Americans in 1791 generally owned muzzle-loading flintlocks, liable to misfire and incapable of firing multiple shots. Guns thus generally were not kept or carried loaded in 1791." (quotation omitted)); Akhil Reed Amar, *Second Thoughts*, 65 Law & Contemp. Probs. 103, 107 (2002) ("At the Founding . . . [a] person often had to get close to you to kill you, and, in getting close, he typically rendered himself vulnerable to counterattack. Reloading took time, and thus one person could not ordinarily kill dozens in seconds.").

[2] Stephanos Bibas, *The Machinery of Criminal Justice* 2 (2012).

[3] *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemp. Probs. 231, 240 (2020) ("[A]ssault weapons play a disproportionately large role in three types of criminal activity: mass shootings, police killings, and gang activity.").

1

year—are a daily occurrence in our schools, our streets, and our places of worship.[4] After observing that the balancing of public safety with the right to bear arms has historically been a core function of the legislature in our system of separated powers,[5] that the balance Congress struck in 18 U.S.C. § 922(g)(1) by categorically disarming convicted felons[6] comported with traditional legislative authority to impose even

---

[4] *See Mass Shootings in 2024*, Gun Violence Archive, https://www.gunviolencearchive.org/reports/mass-shooting (last visited Dec. 23, 2024).

[5] *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 715 (2007) ("Achievement of that balance requires highly complex socio-economic calculations regarding what kinds of weapons ought to be possessed by individuals and how to limit access to them by those deemed untrustworthy or dangerous. Such complicated multi-factor judgments require trade-offs that courts are not institutionally equipped to make. Legislatures, by contrast, are structured to make precisely those kinds of determinations."); *see also* Lon L. Fuller, *The Forms and Limits of Adjudication*, 92 Harv. L. Rev. 353, 371 (1978) (noting the "relative incapacity of adjudication to solve 'polycentric' problems").

[6] Section 922(g)(1) makes it illegal for anyone convicted of "a crime punishable by imprisonment for a term exceeding one year" to possess a firearm, unless the crime is a state misdemeanor "punishable by a term of imprisonment of two years or less" or relates to "antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." 18 U.S.C. §§ 921(a)(20), 922(g)(1). For ease of reference, this opinion refers to all crimes covered by § 922(g)(1) as "felonies" and individuals falling within § 922(g)(1)'s purview as "felons."

greater deprivations like capital punishment, and that Congress had provided mechanisms in 18 U.S.C. §§ 921(a)(20) and 925(c) by which an individual offender could seek to lift his disability, I concluded that § 922(g)(1) was constitutional as applied to all felons within its scope, and I dissented on that basis. I also urged that, rather than proceeding on an offense-by-offense basis and implying that § 922(g)(1) had never been enforceable against a felon "like Range,"[7] the majority instead should make clear that Range had successfully challenged only its future enforcement, in effect, lifting the disability that had been lawfully imposed based on § 922(g)(1)'s rebuttable presumption of constitutionality.

Since then, the Supreme Court decided *United States v. Rahimi*, 144 S. Ct. 1889 (2024), and vacated and remanded our Court's en banc decision for reconsideration in light of its teachings.[8] I take from *Rahimi* several lessons that compel a different rationale than the majority's today and that lead me now to concur in the judgment.

The first three confirm the premises of my prior opinion: (1) we should indeed determine "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition"—not whether it "precisely match[es] its historical precursors," *id.* at 1898 (emphasis added); (2) the Second Amendment does permit "the enactment of laws banning the possession of guns by *categories of persons* thought by a legislature to present a special danger of misuse," *id.* at 1901 (emphasis added), and

---

[7] *Range v. Attorney Gen. (Range I)*, 69 F.4th 96, 106 (3d Cir. 2023), *judgment vacated sub nom. Garland v. Range*, 144 S. Ct. 2706 (2024).
[8] *See Garland*, 144 S. Ct. at 2706–07.

3

in particular, "prohibitions . . . on the possession of firearms by 'felons and the mentally ill,'" which the Court reiterated are "presumptively lawful," *id.* at 1902 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626, 627 n.26 (2008)); and (3) the availability of a greater penalty for an analogous offense at the Founding implies that a lesser penalty is constitutional today, e.g., "if imprisonment was permissible" at the Founding for an offense, the "lesser restriction" of disarmament in modern times "is also permissible," *id.*

In addition, however, *Rahimi* also flagged two aspects of a dispossession law as constitutionally relevant: first, that the burden the law imposes has at least the potential to be "of limited duration," and, second, that—notwithstanding the authority of legislatures to disarm entire "categories of persons" presumed dangerous in the first instance—the law allows an individual to challenge that presumption and establish that he does not currently "present a special danger of [firearm] misuse" or a "credible threat" to the safety of others. *Id.* at 1901–02.[9]

---

[9] The Court attached constitutional significance to these two statutory attributes in the context of a law that prohibited possession of a firearm only while "subject to a [domestic violence restraining] order" that included "a finding that such person represents a credible threat to the physical safety" of his domestic partner (or child). 18 U.S.C. § 922(g)(8). It also cautioned that its holding was a narrow one. *See United States v. Rahimi*, 144 S. Ct. 1889, 1903 (2024) ("[T]oday . . . we conclude only this: An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment.").

4

Notwithstanding these lessons, my colleagues in the majority have treated the Supreme Court's remand as essentially pro forma and file an opinion today that is largely unchanged. True, the majority now acknowledges that the relief it provides Range is only prospective protection from prosecution for "any future possession of a firearm," and it seemingly acknowledges that § 922(g)(1) may be categorically applied, consistent with the Second Amendment, to at least "physically dangerous" felons.[10] But it still disavows Congress's power to categorically disarm other felons who fall within § 922(g)(1)'s parameters, and to do so on a presumptively permanent basis. It also still insists on analyzing § 922(g)(1) on an offense-by-offense basis, demanding that any historical analogue match with high precision, rather than reasoning by principle. And it again declines to articulate any clear framework by which courts may distinguish between constitutional and unconstitutional applications of § 922(g)(1).

These aspects of the majority opinion are in error. I ultimately concur in the judgment, however, because *Rahimi*'s reasoning persuades me that—even though our historical tradition supports § 922(g)(1)'s categorical disarmament of all

Nonetheless, the repeated references to these attributes in the majority and concurring opinions and their anchoring in historical tradition suggest they carry constitutional weight more broadly. *See, e.g.*, *id.* at 1902–03 (emphasizing the presence of "judicial determinations," "f[indings] by a court," and that those who posed a credible threat to the physical safety of another were only "temporarily disarmed"); *id.* at 1908–10 (Gorsuch, J., concurring) (same); *see also infra* Section I.C.2.

[10] Maj. Op. at 20; *see also id.* at 25.

felons on a presumptively permanent basis—the Second Amendment demands that the disability it imposes has at least the potential to be "of limited duration," *Rahimi*, 144 S. Ct. at 1902, and that a felon have a meaningful opportunity, after successfully serving his sentence,[11] to show that the burden should be lifted based on individualized findings. Indeed, the same historical analogues demonstrating that those who commit serious crimes can be disarmed as a class of persons that presumptively "present[s] a special danger of misus[ing]" firearms, *id.* at 1901, also confirm the necessity of providing individual class members with a later opportunity to rebut that presumption and reclaim their Second Amendment rights going forward.

I write to clarify three points: First, the historical record reveals that, contrary to the majority's view, legislatures dating back to the Founding had the authority to disarm not just "physically dangerous" felons, but a wide range of groups considered to present a special danger, while also allowing for individual pre-enforcement challenges. Second, the majority's reasoning cannot be squared with Supreme Court and historical precedent, and its continued insistence on historical twins portends confusion and inconsistency among the district courts. And third, while we hold today that Range's declaratory judgment entitles him to protection only for future firearm possession, at least two circuits have suggested that

---

[11] *See United States v. Moore*, 111 F.4th 266, 272 (3d Cir. 2024) (holding that § 922(g)(1) is constitutional as applied to felons who are serving a criminal sentence on parole, probation, or supervised release because our historical tradition "yield[s] the principle that a convict may be disarmed while he completes his sentence and reintegrates into society").

6

successful as-applied challenges operate retroactively, making enforcement void ab initio and jeopardizing both pending § 922(g)(1) indictments and convictions on direct appeal. *See United States v. Williams*, 113 F.4th 637, 657, 661–63 (6th Cir. 2024); *United States v. Diaz*, 116 F.4th 458, 461, 469–70 & n.4 (5th Cir. 2024). I take this opportunity to highlight the drastic consequences of that approach and to explain why a prospective approach comports with *Bruen* and *Rahimi*, is faithful to our regulatory tradition, and is administrable in practice.

I. <u>The Historical Validity of § 922(g)(1)</u>

More than a decade of precedent now illuminates the constitutionality of felon-in-possession bans and the Supreme Court's methodology for reviewing them. The analysis that follows will (A) summarize the Court's pronouncements concerning those bans, (B) survey the relevant regulatory tradition, and (C) consider how § 922(g)(1) fits within that regulatory tradition.

A. <u>Felon-Dispossession Laws in the Court's Recent Precedent</u>

Repeatedly, the Supreme Court has told us that felon-in-possession statutes are presumptively constitutional. In holding the "right of the people"[12] protected by the Second

---

[12] In the first part of its analysis, the majority defends its belief that felons remain part of "the people," so their firearm possession is presumptively protected, and the Government must prove its disarmament regulation comports with historical tradition. Maj. Op. at 11–16. Other jurists believe that historical

Amendment was an "individual right," Justice Scalia's seminal opinion in *Heller* specified this meant "the right of law-abiding, responsible citizens" to keep and bear arms, and therefore characterized "prohibitions on the possession of firearms by felons" as both "longstanding" and "presumptively lawful."[13] 554 U.S. at 579, 592, 626, 627 n.26, 635.

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Court clarified who qualifies as a "law-abiding" citizen when it explained that, despite the infirmity of New York's may-issue open-carry licensing regime, "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes . . . [,] which often require applicants to undergo a [criminal] background check" and "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding,

---

tradition permits the disarmament of felons precisely because "the people" historically meant "law-abiding, responsible citizens." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 26 (2022) (citation omitted). But that debate—unlike the test for what constitutes an adequate "historical analogue," *id.* at 30 (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021))—is largely academic. As then-Judge Barrett recognized, the "same body of evidence" can be used to illuminate who is part of the people or "the scope of the legislature's power," and either approach "yield[s] the same result." *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting).

[13] *See also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality) ("repeat[ing] those assurances"); *Bruen*, 597 U.S. at 72 (Alito, J., concurring) (same); *id.* at 80–81 (Kavanaugh, J., concurring) (same).

8

responsible citizens.'"[14]  597 U.S. 1, 38 n.9 (2022) (quoting *Heller*, 554 U.S. at 635).  And it directed us, in considering whether modern-day regulations are consistent with historical ones, to compare "how and why the regulations burden *a law-abiding citizen's* right to armed self-defense."  *Id.* at 29 (emphasis added).

Most recently, in *Rahimi*, the Court reiterated that the Constitution does not prohibit regulations that ban "the possession of firearms by 'felons and the mentally ill,'" which the Court held "presumptively lawful" even as applied to the "core"[15] right of self-defense inside the home.  144 S. Ct. at 1902 (quoting *Heller*, 554 U.S. at 626, 627 n.26).  Citing *Heller*'s own assurance about the presumptive constitutionality of felon-dispossession laws, the Court disavowed any suggestion "that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Id.* at 1901.  And it again told us to focus our historical analysis on "a law-abiding citizen's" right to bear arms.  *Id.* at 1932 (Thomas, J., dissenting) (quoting *Bruen*, 597 U.S. at 29).  Thus, time and again, the Supreme Court has acknowledged that the deep roots of felon-possession bans in American history impart a presumption of lawfulness to § 922(g)(1).

---

[14] Those background checks screen for both violent and non-violent offenses.  *See, e.g.*, Wash. Rev. Code Ann. § 9.41.070(1)(a); Colo. Rev. Stat. Ann. § 18-12-203(1)(c); Kan. Stat. Ann. § 75-7c04(a)(2); Miss. Code. Ann. § 45-9-101(2)(d); N.H. Rev. Stat. Ann. § 159:6(I)(a); N.C. Gen. Stat. Ann. § 14-415.12(b)(1).

[15] *District of Columbia v. Heller*, 554 U.S. 570, 630, 634 (2008).

As to methodology, *Rahimi* was also instructive, clarifying that "the appropriate analysis involves considering whether the challenged *regulation* is consistent with the *principles* that underpin our regulatory tradition," 144 S. Ct. at 1898 (emphasis added), and that "if imprisonment was permissible" as a penalty for an offense at the Founding, "the lesser restriction" of disarmament imposed by a modern analogue "is also permissible," *id.* at 1902. There, the Court derived the relevant principles from "two distinct legal regimes"—surety laws and going armed laws—"[t]aken together." *Id.* at 1899, 1901. Even though the regulation at issue, § 922(g)(8), was "by no means identical to these founding era regimes," the Court emphasized that "it does not need to be," *id.* 1901, because a regulation that "does not precisely match its historical precursors . . . 'still may be analogous enough'" to withstand constitutional scrutiny. *id.* at 1898 (quoting *Bruen*, 597 U.S. at 30). Rather than seeking out a "dead ringer" or "historical twin," we were instructed to determine whether the modern-day regulation "comport[s] with the principles underlying the Second Amendment" by considering whether the challenged regulation is "'relevantly similar' to laws that our tradition is understood to permit." *Id.* at 1898 (quoting *Bruen*, 597 U.S. at 29).

## B.    Relevantly Similar Historical Analogues

When we go to compare "relevantly similar" laws, "not all history is created equal." *Bruen*, 597 U.S. at 34. Founding-era laws "surrounding the ratification of the text" are generally considered to be "the history that matters most," *Rahimi*, 144 S. Ct. at 1924 (Barrett, J., concurring), because Second Amendment rights "are enshrined with the scope they were understood to have when the people adopted them," *Heller*, 554 U.S. at 634–35. But we also look to "English history dating

from the late 1600s, along with American colonial views leading up to the founding," *Bruen*, 597 U.S. at 20, because the right to keep and bear arms was a "*pre-existing* right," *id.* (quoting *Heller*, 554 U.S. at 592). In addition, post-enactment history and tradition "through the end of the 19th century" is a "critical tool" for determining the principles underlying the Second Amendment. *Id.* at 35 (quoting *Heller*, 554 U.S. at 605).[16]

Here, the Government identifies two sets of relevantly similar laws from which comparable principles can be derived: (1) laws that categorically disarmed entire classes of people, and (2) felony punishment laws. I address each below before

---

[16] The Supreme Court has approvingly cited and relied on post-enactment sources in each of its recent Second Amendment cases. *See Rahimi*, 144 S. Ct. at 1899–1901 (citing laws and tradition from the early nineteenth century); *Bruen*, 597 U.S. at 50–57 & nn.15–24 (analyzing nineteenth-century laws and cases); *McDonald*, 561 U.S. at 778 (Alito, J.) ("[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty."); *Heller*, 554 U.S. at 605 ("We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century."); *see also Rahimi*, 144 S. Ct. at 1915–16 (Kavanaugh, J., concurring) ("As the Framers made clear, and as th[e] Court has stated time and again for more than two centuries, post-ratification history . . . can also be important for interpreting vague constitutional text and determining exceptions to individual constitutional rights."); *id.* at 1924 (Barrett, J., concurring) (explaining that "postenactment history can be an important tool").

11

comparing the principles derived from these analogues to § 922(g)(1).

> 1.   *Categorical Disarmament Laws*

>> a.   England's Restoration and Glorious Revolution

During the late seventeenth century, the English government repeatedly disarmed individuals whose conduct indicated that they could not be trusted to abide by the sovereign and its dictates.

Following the tumult of the English Civil War, the restored Stuart monarchs disarmed nonconformist (i.e., non-Anglican) Protestants.[17]   Of course, not all nonconformists were dangerous; to the contrary, many belonged to pacificist denominations like the Quakers.[18]   However, they refused to participate in the Church of England, an institution headed by the King as a matter of English law.[19]   And nonconformists

---

[17] *See* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 45 (1994) (describing how Charles II "totally disarmed . . . religious dissenters").

[18] *See* Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms: The Common Law Tradition*, 10 Hastings Const. L.Q. 285, 304 n.117 (1983) ("Persons judged to be suspicious by the royal administration were those . . . who belonged to the Protestant sects that refused to remain within the Church of England.  The Quakers were prominent sufferers.").

[19] *See Church of England*, BBC (June 30, 2011), https://www.bbc.co.uk/religion/religions/christianity/cofe/cofe_1.shtml (describing "the Act of Supremacy" enacted during the reign of Henry VIII).

often refused to take mandatory oaths acknowledging the King's sovereign authority over matters of religion.[20] As a result, Anglicans accused nonconformists of believing their faith exempted them from obedience to the law.[21]

Protestants had their rights restored after the Glorious Revolution of 1688 replaced the Catholic King James II with William of Orange and Mary, James's Protestant daughter.[22] But even then, Parliament enacted the English Bill of Rights, which declared: "Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and *as allowed by Law*."[23] This "predecessor to our Second Amendment," *Bruen*, 597 U.S. at 44 (quoting *Heller*, 554 U.S. at 593), reveals that the legislature—Parliament—had the authority to decide who was law-abiding enough to keep and bear arms.[24]

---

[20] *See* Frederick B. Jonassen, "*So Help Me?": Religious Expression and Artifacts in the Oath of Office and the Courtroom Oath*, 12 Cardozo Pub. L., Pol'y & Ethics J. 303, 322 (2014) (describing Charles II's reinstation of the Oath of Supremacy); Caroline Robbins, *Selden's Pills: State Oaths in England, 1558–1714*, 35 Huntington Lib. Q. 303, 314–15 (1972) (discussing nonconformists' refusal to take such oaths).

[21] *See* Christopher Haigh, *'Theological Wars': 'Socinians' v. 'Antinomians' in Restoration England*, 67 J. Ecclesiastical Hist. 325, 326, 334 (2016).

[22] *See* Alice Ristroph, *The Second Amendment in a Carceral State*, 116 Nw. U. L. Rev. 203, 228 (2021).

[23] 1 W. & M., Sess. 2, ch. 2, § 7 (Eng. 1689) (emphasis added).

[24] *Cf.* Lois G. Schwoerer, *To Hold and Bear Arms: The English Perspective*, 76 Chi.-Kent L. Rev. 27, 47–48 (2000)

In 1689, the pendulum of distrust swung the other way. Parliament enacted a statute prohibiting Catholics who refused to take an oath renouncing the tenets of their faith from owning firearms, except as necessary for self-defense.[25]  As with nonconformists, this prohibition was not based on the notion that every single Catholic was dangerous.  Rather, the categorical argument English Protestants made against Catholicism at the time was that Catholics' faith put the dictates of a "foreign power," namely the Vatican, before English law.[26]  Accordingly, the disarmament of Catholics in 1689 reflects Protestant fears that Catholics could not be trusted to obey the law.

That restriction could be lifted only prospectively and on an individual basis.  That is, Parliament permitted Catholics who "repeated and subscribed" to the necessary oath before

_____

(explaining how the English Bill of Rights preserved Parliament's authority to limit who could bear arms).

[25] An Act for the Better Securing the Government by Disarming Papists and Reputed Papists, 1 W. & M., Sess. 1, ch. 15 (Eng. 1689); *see* Malcolm, *supra* note 17, at 123.

[26] *See* Diego Lucci, *John Locke on Atheism, Catholicism, Antinomianism, and Deism*, 20 Etica & Politica/Ethics & Pol. 201, 228–29 (2018).  Official Anglican doctrine—regularly preached throughout England—warned that the Pope taught "that they that are under him are free from all burdens and charges of the commonwealth, and obedience toward their prince." *An Exhortation Concerning Good Order, and Obedience to Rulers and Magistrates*, *in* Sermons or Homilies Appointed to Be Read in Churches in the Time of Queen Elizabeth of Famous Memory 114, 125 (new ed., Gilbert & Rivington 1839).

14

"any two or more Justices of the Peace" to resume keeping arms.[27] But, needless to say, disavowal of religious tenets hardly demonstrated that the swearing individual no longer had the capacity to commit violence; rather, the oath signified allegiance to the English government and an assurance of conformity to its laws. This status-based disarmament of Catholics evinces the "historical understanding"[28] not only that legislatures could categorically disarm groups they viewed as unwilling to obey the law, but also that disarmed members had an opportunity to prospectively regain their right to bear arms.

b.    Colonial America

The English notion that the government could disarm those not considered law-abiding traveled to the American colonies. Although some of the earliest firearm laws in colonial America forbid Native Americans and Black people from owning guns,[29] the colonies also repeatedly disarmed

---

[27] 1 W. & M., Sess. 1, ch. 15 (Eng. 1689).

[28] *Bruen*, 597 U.S. at 26. That the same Parliament that enacted the predecessor to our Second Amendment also passed laws categorically disarming groups of people is particularly relevant to our historical inquiry. *See* William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev. 1467, 1472 (2024) (explaining that early American courts described the right to arms codified in "the English Bill of Rights, the Second Amendment to the U.S. Constitution, and various state constitutions as codifying the same preexisting right").

[29] *See* Clayton E. Cramer, *Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie* 31, 43 (2006). Today, we emphatically reject these bigoted and

full-fledged members of the political community as it then existed—i.e., free, Christian, white men—who the authorities believed could not be trusted to obey the law. Those restrictions are telling because they were imposed at a time before the advent of the English Bill of Rights, when the charters of Virginia and Massachusetts provided unprecedented protections for colonists' firearm rights.[30]

The Virginia Company carried out one of the earliest recorded disarmaments in the American colonies in 1624. For his "opprobrious" and "base and detracting speeches concerning the Governor," Richard Barnes was "disarmed" by the Virginia Council and "banished" from Jamestown.[31] By disrespecting the colonial authorities, Barnes demonstrated that he could no longer be trusted as a law-abiding member of the community and thus forfeited his ability to keep arms.

During the late 1630s, a Boston preacher named Anne Hutchinson challenged the Massachusetts Bay government's authority over spiritual matters by advocating for direct,

_____

unconstitutional laws, as well as their premise that one's race or religion correlates with disrespect for the law. I cite them here only to demonstrate the tradition of categorical, status-based disarmaments. *See* Blocher & Ruben, *supra* note 1, at 165 (urging courts examining historical disarmament laws that would violate the Constitution today to "ask[] *why* earlier generations disarmed certain groups of people, rather than asking only *whom* they disarmed").

[30] *See* Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 174 (3d ed. 2022).

[31] David Thomas Konig, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982).

personal relationships with the divine.[32] Governor John Winthrop accused Hutchinson and her followers of being Antinomians—those who viewed their salvation as exempting them from the law—and banished her.[33] The colonial government also disarmed at least fifty-eight of Hutchinson's supporters, not because those supporters had shown a propensity for violence, but "to embarrass the offenders" who were forced to personally deliver their arms to the authorities in an act of public submission.[34] The Massachusetts authorities therefore disarmed Hutchinson's supporters to shame those colonists because the authorities concluded their conduct evinced a willingness to disobey the law.[35]

Again, however, restoration of the right to bear arms was available, but only prospectively, and only for individuals who affirmatively sought relief: Hutchinson's followers who renounced her teachings and confessed their sins to the authorities "were welcomed back into the community and able

---

[32] *See* Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637–38, 644 (1937).

[33] *Id.* at 648; Ann Fairfax Withington & Jack Schwartz, *The Political Trial of Anne Hutchinson*, 51 New Eng. Q. 226, 226 (1978).

[34] James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381, 391 (1988).

[35] *Cf.* John Felipe Acevedo, *Dignity Takings in the Criminal Law of Seventeenth-Century England and the Massachusetts Bay Colony*, 92 Chi.-Kent L. Rev. 743, 761 (2017) (describing other shaming punishments used at the time, including scarlet letters).

to retain their arms," as they had shown that they could once again be trusted to abide by the law.[36]

Like the Stuart monarchs in England, the Anglican colony of Virginia disarmed nonconformist Protestants in the 1640s due to their rejection of the King's sovereign power over religion. When a group of nonconformist Puritans from Massachusetts resettled in southeastern Virginia, Governor William Berkeley "acted quickly" to head off any "[o]pposition to the king" by disarming them.[37] And after the Glorious Revolution, the American colonies followed England's example by disarming their Catholic residents.[38]

The colonies redoubled the disarmament of Catholics during the Seven Years' War of 1756–1763 based on their perceived unwillingness to adhere to the King's sovereign

---

[36] Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020).

[37] Kevin Butterfield, The Puritan Experiment in Virginia, 1607–1650, at 21 (June 1999) (M.A. thesis, College of William and Mary) (on file with William and Mary Libraries); *see* Charles Campbell, *History of the Colony and Ancient Dominion of Virginia* 211–12 (1860).

[38] Just three years after designating Anglicanism as the colony's official religion, *see* George J. Lankevich, *New York City: A Short History* 30 (2002), New York Governor Benjamin Fletcher disarmed Catholic colonists in 1696, *see* Shona Helen Johnston, Papists in a Protestant World: The Catholic Anglo-Atlantic in the Seventeenth Century 219–20 (May 11, 2011) (Ph.D. dissertation, Georgetown University) (on file with the Georgetown University Library).

18

dictates.[39]  Maryland, for example, though founded as a haven for persecuted English Catholics,[40] confiscated Catholics' firearms and ammunition during the war.[41]  Notably, that decision was not in response to violence; indeed, the colony's governor at the time observed that "the Papists behave themselves peaceably and as good subjects."[42]  Neighboring Pennsylvania followed suit and took "all arms, military accoutrements, gunpowder and ammunition" from all Catholics and "reputed" Catholics.[43]  Virginia  likewise prohibited Catholics and "suspected" Catholics from owning

---

[39] *See* Greenlee, *supra* note 36, at 263.  Colonies disarmed other religious minorities during the Seven Years' War, too. For instance, New Jersey confiscated firearms from Moravians, a group of nonconformist Protestants from modern-day Germany, because the governor deemed their nonconformist views sufficient evidence that they could not be trusted to obey authority.  *See* Johnson et al., *supra* note 30, at 198.

[40] *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1424 (1990).

[41] *See* Acts of May 22, 1756, *reprinted in* 52 *Archives of Maryland*: *Proceedings and Acts of the General Assembly, February 1755 – October 1756*, at 448–49, 454 (J. Hall Pleasants ed., 1935) [hereinafter Md. Act of 1756]; Greenlee, *supra* note 36, at 263; Johnson et al., *supra* note 30, at 197.

[42] Elihu S. Riley, *A History of the General Assembly of Maryland* 224 (1912) (quoting a July 9, 1755 letter from Governor Sharpe).

[43] An Act for Forming and Regulating the Militia of the Province of Pennsylvania, *reprinted in* 5 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 627 (James T. Mitchell & Henry Flanders eds., 1898) [hereinafter Pa. Act of 1757].

weapons or ammunition, declaring that it was "dangerous at this time to permit Papists to be armed."[44]

Again, these generalizations led to overinclusive bans. Not all Catholics posed a threat of misusing their firearms. That said, these laws reveal that legislatures had the authority to disarm every member of a group based on class-wide presumptions about law-abiding behavior. And under each regime, Catholics who violated the ban and were caught in possession of arms—whether or not they were dangerous—were subject to severe penalties.

To account for this overbreadth, colonial governments provided individual Catholics with the opportunity to prospectively restore their armament rights by persuading a government official that they themselves were unlikely to misuse firearms. A Catholic in Virginia who "desire[d] to submit and conform" could "present himself before the justices of the peace," and upon taking a loyalty oath "in open court," would "*thenceforth* be discharged of and from all disabilities and forfeitures, which he might or should be liable to for the *future*."[45] Similarly, a Catholic in Maryland who persuaded a local justice of the peace that he was law-abiding and not dangerous could keep weapons necessary for the defense of his home.[46] But Catholics under these regimes had to affirmatively regain their right to possess arms *before* violating

---

[44] An Act for Disarming Papists, and Reputed Papists, Refusing to Take the Oaths to the Government, *reprinted in* 7 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 35–38 (William W. Hening ed., 1820) [hereinafter Va. Act of 1756].

[45] *Id.* at 38 (emphasis added).

[46] Md. Act of 1756, *supra* note 41, at 448.

20

the disarmament law. Those discovered possessing firearms without first lifting their firearm disability would be arrested, imprisoned without bail, forced to forfeit all their weapons, and subjected to onerous fines.[47] In short, the restoration of armament rights during the Colonial era occurred through pre-enforcement actions, which provided prospective relief to law-abiding challengers who complied with the disarmament law and demonstrated that they did not pose a risk of misusing arms.

### c. Revolutionary War

As the colonies became independent states, legislatures continued to disarm individuals whose status indicated that they could not be trusted to obey the law. John Locke—a philosopher who profoundly influenced the American revolutionaries[48]—argued that the replacement of individual judgments of what behavior is acceptable with communal

---

[47] *Id.* (proclaiming that a Catholic who violated the disarmament law "shall forfeit and lose . . . his Heirs and Successors, his and their said Armour, Gunpowder, and Ammunition; and shall also be imprisoned"); *see also* Va. Act of 1757, *supra* note 44, at 37 (punishing non-oath taking Catholics with forfeiture of all their arms and ammunition, imprisonment without bail, and fines); Pa. Act of 1757, *supra* note 43, at 627 (imposing forfeiture and imprisonment without bail).

[48] *See* Thad W. Tate, *The Social Contract in America, 1774–1787: Revolutionary Theory as a Conservative Instrument*, 22 Wm. & Mary Q. 375, 376 (1965); *see also Gundy v. United States*, 588 U.S. 128, 153 (2019) (Gorsuch, J., dissenting) (observing "John Locke [was] one of the thinkers who most influenced the framers[]").

norms is an essential characteristic of the social contract.[49] Members of a social compact, he explained, therefore have a civic obligation to comply with communal judgments regarding proper behavior.[50]

Drawing on Locke, state legislatures conditioned their citizens' ability to keep arms on compliance with that civic obligation, and several states enacted statutes disarming all those who refused to recognize the sovereignty of the new nation.[51] In Connecticut, for instance, as tensions with England rose, concerns that loyalists could not be trusted to uphold their civic duties as members of a new state culminated in a 1775 statute that forbid anyone who defamed resolutions of the Continental Congress from keeping arms, voting, or serving as a public official.[52]

---

[49] *See* John Locke, *Two Treatises of Government* § 163 (Thomas I. Cook ed., Hafner Press 1947) (reasoning "there only is political society where every one of the members hath quitted his natural power [to judge transgressions and] resigned it up into the hands of the community").

[50] Locke grounded that duty in the consent of those within a political society; however, he argued that mere presence in a territory constitutes tacit consent to the laws of the reigning sovereign. *See id.* § 119.

[51] *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 158 (2007).

[52] G.A. Gilbert, *The Connecticut Loyalists*, 4 Am. Hist. Rev. 273, 282 (1899) (describing this resolution as "a fair sample of most of the others passed at this time").

In 1776, most of the states heeded the Continental Congress's call to disarm those who "are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, the[] United Colonies, against the hostile attempts of the British fleets and armies,"[53] by disarming those who did not take a loyalty oath or were suspected of being disloyal.[54]

---

[53] 4 *Journals of the Continental Congress, 1774–1789*, at 205 (Worthington C. Ford ed., 1906).

[54] *See United States v. Jackson*, 110 F.4th 1120, 1126–27 (8th Cir. 2024); *see, e.g.*, Act of May 1, 1776, ch. 21, §§ 1–2, *reprinted in* 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 479–80 (1886) (requiring every non-Quaker "male person above sixteen years of age" to take an oath of loyalty and disarming those who refused of "all such arms, ammunition and warlike implements, as, by the strictest search, can be found in his possession or belonging to him") [hereinafter Mass. Act of 1776]; Act of 1776, *reprinted in* 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 566–67 (John R. Bartlett ed., 1862) (disarming every male above sixteen years of age who refused to take an oath of loyalty without providing "satisfactory reasons" for their refusal) [hereinafter R.I. Act of 1776]; Act of May 5, 1777, ch. 3, *reprinted in* 9 *The Statutes at Large; Being a Collection of all the Laws of Virginia* 281–82 (William W. Hening ed., 1821) (disarming "all free born male inhabitants of this state, above the age of sixteen years, except imported servants during the time of their service" who refused to swear their "allegiance" to the state) [hereinafter Va. Act of 1777]; Act of Nov. 15, 1777, ch. 6, § 9, 1777 N.C. Sess. Laws 231–32 (declaring that "all persons failing or refusing to take the oath of

George Washington approved of these disarmament laws and stated that "the other colonies ought to adopt similar" measures.[55]

Pennsylvania in particular passed a flurry of laws disarming entire groups whose status suggested they could not be trusted to follow the law. In 1776, Pennsylvania ordered the blanket disarmament of all "non-associators," regardless of whether they were disaffected to the cause of liberty.[56] The

allegiance" that were not exiled "shall not keep guns or other arms within his or their House" and that any such weapons "may be seized by a written Order of a justice of the county") [hereinafter N.C. Act of 1777]; Resolution of Mar. 13, 1776, *in Journal of the Provincial Congress of South Carolina, 1776*, at 77–78 (1776) (disarming convicted non-associators unless and until they took a loyalty oath) [hereinafter S.C. Res. of 1776]; Act of Sept. 20, 1777, ch. 40, § 20, *in Acts of the General Assembly of the State of New-Jersey* 90 (1777) (directing the Council of Safety to "deprive and take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements and Ammunition which they own or possess").

[55] Letter from George Washington to Governor Cooke (Jan. 6, 1776), *in* 3 *The Writings of George Washington* 323 (Worthington C. Ford ed., 1889).

[56] Act of July 19, 1776, *reprinted in* 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 11 (James T. Mitchell & Henry Flanders eds., 1903) (ordering local officials to "take all the arms . . . which are in the hands of non-associators in the most expeditious and effectual manner"); Churchill, *supra* note 51, at 160 n.52 ("Pennsylvania ordered the blanket

following year, it gave all adult males an ultimatum—swear a loyalty oath or "be disarmed" by local authorities.[57]  In 1778, Pennsylvania amended the act to require all adult males who refused or neglected to take an oath to "deliver up [their] arms" to the state.[58]  Those who failed to comply and were caught "carry[ing] . . . or keep[ing] any arms or ammunition in [their] house or elsewhere" faced forfeiture of their arms and disarmament which "continue[d] for and during the life of the . . . offender."[59]  Finally, in 1779, it authorized local officials to disarm "any person" they "suspected to be disaffected to the independence of this state."[60]

These statutes are especially illuminating because Pennsylvania's 1776 constitution strongly protected the

---

disarmament of non-associators, dropping its [ ] distinction between the disaffected and well affected.").

[57] Act of June 13, 1777, *reprinted in* 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 110–13 (James T. Mitchell & Henry Flanders eds., 1903) [hereinafter Pa. Act of 1777].

[58] Act of Apr. 1, 1778, *reprinted in* 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 238–39, 242 (James T. Mitchell & Henry Flanders eds., 1903) [hereinafter Pa. Act of 1778].

[59] *Id.* at 242–43; *see also* Joseph Blocher & Caitlan Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders*, (manuscript at 9), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3702696 (explaining that "Pennsylvania amended the act" in 1778 to make disarmament permanent).

[60] Act of Mar. 31, 1779, *reprinted in* 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 347–48 (James T. Mitchell & Henry Flanders eds., 1903).

people's right to bear arms.[61]  *See Heller*, 554 U.S. at 600–01 (relying on Pennsylvania's "analogous arm-bearing right[]" to "confirm[]" its interpretation of the Second Amendment); *Williams*, 113 F.4th at 654 n.11 ("As of 1776, the Pennsylvania Constitution protected the right to keep and bear arms, so pre-Founding examples from that state are highly probative of the federal right's scope.").  Nonetheless, Pennsylvania deprived sizable numbers of pacifists of that right, including Quakers, Moravians, Mennonites, and other groups whose religious convictions prohibited oath-taking.[62]  Those groups were not disarmed because they were dangerous,[63] but because their refusal to swear allegiance demonstrated an unwillingness to submit to communal judgments embodied in law when they conflicted with personal conviction and thus posed a special

---

[61] PA. Const. of 1776, Decl. of Rights, art. XIII ("That the people have a right to bear arms for the defence of themselves and the state."); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 724 (2009).

[62] *See* Jim Wedeking, *Quaker State: Pennsylvania's Guide to Reducing the Friction for Religious Outsiders Under the Establishment Clause*, 2 N.Y.U. J.L. & Liberty 28, 51 (2006); *see also* Thomas C. McHugh, *Moravian Opposition to the Pennsylvania Test Acts, 1777 to 1789*, at 49–50 (Sept. 7, 1965) (M.A. thesis, Lehigh University) (on file with the Lehigh Preserve Institutional Repository).

[63] *See Heller*, 554 U.S. at 590 ("Quakers opposed the use of arms not just for militia service, but for any violent purpose whatsoever . . . ."); Johnson et al., *supra* note 30, at 301 (noting that states disarmed "Quakers and other pacifists; although they were not fighters, they did own guns for hunting").

risk of danger.[64]  Only those who affirmatively established that they were indeed law-abiding by swearing a loyalty oath before state authorities had their firearm rights prospectively restored.[65]

These class-wide disarmament statutes from the Revolutionary War era shared three characteristics with the group-based disarmament laws of the past.  First, Revolution-era legislatures categorically disarmed entire groups of people believed to be dangerous, likely to misuse firearms, or inclined to behave unlawfully.  These broad generalizations inevitably led to under- and over-inclusive regulatory schemes.  Pennsylvania's loyalty oath, for example, failed to ferret out Benedict Arnold's treachery[66] while simultaneously precluding many peaceful and non-dangerous people from possessing arms.

Second, individuals disarmed by these revolutionary-period statutes could prospectively regain their rights by proving to a government official that they no longer posed a danger of misusing firearms.  In Connecticut, persons reported as "inimical" to the revolutionary cause were "disarmed and not allowed to have or keep any arms," but only until they persuaded the local "civil authority, selectmen, and committees of inspection" that they were "friendly to this and the other

---

[64] *See* Wedeking, *supra* note 62, at 51–52 (describing how Quakers were "penal[ized] for allegiance to their religious scruples over the new government").

[65] Pa. Act of 1777, *supra* note 57, at 111–13.

[66] *See United States v. Jackson*, 85 F.4th 468, 476 (8th Cir. 2023) (Stras, J., dissenting from the denial of rehearing en banc).

27

United Colonies."[67]   Suspected non-associators in South Carolina who successfully "convince[d]" the committee on safety that they "sincerely desire[d] to join in support of the American cause" would have their "arms . . . restored."[68] Non-associators in Massachusetts could have their right to bear arms restored by "order of" the "general court" or "committees of correspondence, inspection or safety."[69]   Males older than sixteen in New Hampshire could retain their arms despite failing to take a loyalty oath if they provided the legislature with "satisfactory reasons" for their refusal,[70] while males in Pennsylvania, Virginia, and North Carolina who were initially disarmed for refusing to take a loyalty oath could regain their right to bear arms by affirmatively seeking out a justice of the peace and taking a loyalty oath, thereby proving that they were no longer dangerous, disloyal, or untrustworthy.[71]

Third, the burden was on members of a disarmed class to rebut the class-wide presumption of firearm misuse *before* possessing a firearm, and those who violated disarmament laws without first satisfying the steps to lift their disability prospectively faced serious consequences.   For example, a disaffected South Carolinian who was "found in possession of

---

[67] Act of Dec. 1775, *reprinted in* 15 *The Public Records of the Colony of Connecticut From May, 1775 to June 1776*, at 193 (Charles J. Hoadly ed., 1890) [hereinafter Conn. Act of 1775].
[68] S.C. Res. of 1776, *supra* note 54, at 78.
[69] Mass. Act of 1776, *supra* note 54, at 484; *see* Churchill, *supra* note 51, at 159.
[70] R.I. Act of 1776, *supra* note 54, at 567.
[71] *See* Va. Act of 1777, *supra* note 54, at 282–83; N.C. Act of 1777, *supra* note 54, at 231–32; Pa. Act of 1777, *supra* note 57, at 112–13.

arms or ammunition" without first having his rights restored by a legislative committee would "again be disarmed" and, this time, also imprisoned.[72] And statutorily disarmed males in Pennsylvania who were caught in possession before having taken a loyalty oath before a justice of the peace were imprisoned, "prosecute[d]," required to "forfeit [their] arms and ammunition to the state," fined "double the value" of their forfeited possessions, and disarmed for "life."[73]

### d. Ratification Debates

It is apparent from the debates around ratification that the Founders believed the Second Amendment permitted legislatures to disarm serious criminals.

The debates between the Federalists and Anti-Federalists in Pennsylvania "were among the most influential and widely distributed of any essays published during ratification."[74] Those essays included "The Dissent of the Minority," a statement of the Anti-Federalist delegates' views[75] that proved "highly influential" for the Second

---

[72] S.C. Res. of 1776, *supra* note 54, at 78.

[73] Pa. Act of 1778, *supra* note 58, at 242–43 (declaring that "all disabilities and incapacities which any person . . . shall incur or be liable to by reason of [the disarmament acts] shall be and continue for and during the life of the delinquent or offender").

[74] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 227 (1999).

[75] *See id.* at 232–33.

Amendment.[76]  *Heller*, 554 U.S. at 604.  The Dissent of the Minority proposed an amendment stating:

> [T]he people have a right to bear arms for the defence of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals.[77]

And, at the Massachusetts convention, Samuel Adams, a prominent Anti-Federalist, proposed an amendment that the Constitution shall "never [be] construed . . . to prevent the people . . . who are *peaceable citizens*, from keeping their own arms."[78]  "Given the Anti-Federalists' vehement opposition" to

------

[76] *See also* Amul R. Thapar & Joe Masterman, *Fidelity and Construction*, 129 Yale L.J. 774, 797 (2020) ("Although one might question why we should listen to the debate's 'losers,' the Anti-Federalist Papers are relevant for the same reason that the Federalist Papers are: to quote Justice Scalia, 'their writings, like those of other intelligent and informed people of the time, display how the text of the Constitution was originally understood.'  Plus, the Anti-Federalists did not exactly 'lose,' in the same way in which a party who settles a case but gets important concessions does not 'lose' the case." (quoting Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 38 (Amy Gutmann ed., 1997))).

[77] 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (emphasis added).

[78] *Id.* at 675, 681 (emphasis added).

federal power, it is particularly "revealing" that even they understood that government could disarm criminals and dangerous people. *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 664 (2013) (Thomas, J., concurring).

While these amendments were not adopted,[79] they "reveal a great deal about the Second Amendment." *Williams*, 113 F.4th at 655; *see Heller*, 554 U.S. at 604 (relying on the "minority proposal in Pennsylvania" and "Samuel Adams' proposal"). The Second Amendment codified a "pre-existing," "venerable," and "widely understood" right, making it unlikely that "different people of the founding period had vastly different conceptions" of its scope. *Heller*, 554 U.S. at 603–05. The Anti-Federalist proposals thus reflect the understanding of the Founding generation—particularly among those who favored enshrining the right to bear arms in the Constitution—that "crimes committed," whether dangerous or not, justified disarmament.[80]

---

[79] The Federalists, who considered a bill of rights unnecessary, defeated the Pennsylvania proposal, while the Massachusetts ratifying convention rejected Adams's proposal because he had waited until the morning of ratification to present it. *See* Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), *in* 7 *Documentary History of the Ratification of the Constitution* 1583 (John P. Kaminski et al. eds., 2001).

[80] *See* Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (explaining that the Founders "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood"); Don

e. Post-Ratification Tradition

The historical tradition of legislatures disarming categories of people whom they considered unfit to possess firearms continued into the nineteenth century.[81] As the concerns from the Revolutionary War faded into the past, so did the disarmament laws targeting perceived disloyal Americans. But the pernicious tradition of prohibiting slaves and Native Americans from possessing firearms persisted,[82] and as worries of slave uprisings grew, many citizens feared that freedmen were untrustworthy or inclined to misuse firearms. *See Williams*, 113 F.4th at 656. Antebellum era

---

B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983) ("Nor does it seem that the Founders considered felons within the common law right to arms or intended to confer any such right upon them. All the ratifying convention proposals which most explicitly detailed the recommended right-to-arms amendment excluded criminals and the violent").

[81] As *Rahimi* makes clear, post-ratification history, at least when it is consistent with Founding-era history, is highly probative of the Second Amendment's meaning. *See supra* note 16.

[82] Act of 1797, ch. 43 § 6, *in* 1 *Laws of the State of Delaware* 104 (1797); Act of 1798, *reprinted in* 2 *The Statute Law of Kentucky* 113 (William Littell ed., 1810); 1804 Ind. Acts 108, § 4; Act of Mar. 6, 1805, *reprinted in A Digest of the Laws of the State of Alabama* 627 (Harry Toulmin ed., 1823); Act of June 7, 1806, *reprinted in* 1 *A New Digest of the Statute Laws of the State of Louisiana* 50 (Henry A. Bullard & Thomas Curry eds., 1842); 1805 Miss. Laws 90, § 4.

legislatures responded with a familiar tactic—disarming freedmen on a class-wide basis.[83]

Like the earlier categorical bans, these statutes unquestionably swept in many peaceable, trustworthy, and law-abiding Americans who posed no danger of misusing their firearms. A few were absolute,[84] but nearly all of these laws allowed a freedman to make an individualized showing that he was not apt to misuse firearms, and, if successful, to receive a certificate or a license restoring his right to possess arms.[85]

---

[83] *See, e.g.*, *infra* notes 84–91.

[84] *See, e.g.*, Act of Feb. 17, 1833, *reprinted in Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840*, at 65 (John P. Duval ed., 1839); 1850 Ky. Acts 296, § 12; Del. Laws 332, § 7 (1863).

[85] *See, e.g.*, Act of Dec. 1792, *reprinted in* 1 *Collection of All Such Acts of the General Assembly of Virginia* 187 (1803) (declaring that no freedman "shall keep or carry any gun . . . or other weapon whatsoever," but "permit[ing them] to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County"); Act of Oct. 1, 1804, §§ 4–5, *reprinted in Laws of Arkansas Territory* 521 (J. Steele & J. M'Campbell, eds., 1835) (same); Act of Oct. 1, 1804, §§ 4–5, *in Laws for the Government of the District of Louisiana* 108 (1804) (same); Act of Oct. 1, 1804, §§ 4–5, *reprinted in Digest of the Laws of the Missouri Territory* 374 (Henry Geyer ed., 1818) (same); Little Rock City Ordinance, *in* Arkansas Gazette, Jan. 12, 1836, at 1 (allowing any freedman "to keep one gun and ammunition therefor, by obtaining a license for that purpose from the City Court, which license may be granted upon giving bond and security for good behavior").

Delaware, for example, made it unlawful for a freedman to "have, own, keep or possess any gun, pistol, sword or any warlike instruments whatsoever."[86] But a freedman could seek the resumption of that right by submitting an application to the local justice of the peace, and if "five or more respectable and judicious citizens" certified that the freedman was a "person of fair character," the justice of the peace could "issue a license" authorizing the freedman to "keep or possess" a gun.[87] In Florida, a local judge could grant a freedman's application if "two respectable citizens of the county [certified] to the peaceful and orderly character of the applicant."[88] And a freedman in Maryland could possess a firearm if "at the time of his" possession, he had "a certificate from a justice of the peace, that he is an orderly and peaceable person."[89]

Also consistent with the prior categorical disarmament laws, restoration under these Antebellum regimes was always prospective, and freedmen had to demonstrate that they did not fit the class-wide generalization of misusing firearms *before* possessing a firearm in violation of a disarmament statute.[90] If

---

[86] Del. Laws 180–81, § 1 (1832).

[87] *Id.*

[88] 1865 Fla. Laws 25, § 12.

[89] 1806 Md. Laws 44–45, § 2.

[90] *See* 1805 Va. Acts 51, §§ 1–3 (prohibiting freedmen from "keep[ing] or car[rying] any firelock of any kind, any military weapon, or any powder or lead, without first obtaining a license" from the court); 1806 Md. Laws 44–45, § 2 (prohibiting a freedman from "carrying a gun" unless "at the time of his carrying the same, [he has] a certificate from a justice of the peace, that he is an orderly and peaceable person"); 1837 Ark.

34

a freedman was caught possessing a firearm without first having his disability lifted by an executive or judicial officer, he would be arrested, imprisoned, fined, and forced to forfeit all his arms and ammunition.[91] In short, restoration was limited to pre-enforcement actions brought by law-abiding freedmen.

---

Acts 587, § 17 ("No free[dman] shall be [allowed] to keep or carry any gun or rifle, or weapon of any kind, or any ammunition without a license first had and obtained, for that purpose, from some justice of the peace."); 1854–55 Mo. Laws 1094, § 2 (prohibiting a freedman from "keep[ing] or carry[ing] any firelock, or weapon of any kind, or any ammunition, without a license first had and obtained for the purpose, from a justice of the peace"); 1840–41 N.C. Sess. Laws 61–62 ("[I]f any . . . free Person of colour shall wear or carry about his or her person, or keep in his or her house, any Shot-gun, Musket, Rifle, Pistol, Sword, Dagger or Bowie-knife, unless he or she shall have obtained a license therefor from the Court of Pleas and Quarter Sessions of his or her County, within one year preceding the wearing, keeping or carrying thereof, he or she shall be guilty of a misdemeanor, and may be indicted therefor.").

[91] 1805 Va. Acts 51, §§ 1–3 (ordering "every constable to give information against, and prosecute every free[dman] who shall keep or carry any arms or ammunition . . . without first obtaining a license" and requiring a convicted freedman to "forfeit all such arms and ammunition" upon conviction); 1806 Md. Laws 44–45, § 2 (requiring a freedman to who was caught "carrying" arms without a "certificate from a justice of the peace" to "forfeit" his arms and pay a fine); Del. Laws 181, § 2 (1832) (authorizing justices of the peace to arrest and punish any freedman found "in possession of any Gun without a license or

35

With the enactment of the Fourteenth Amendment, religion- and race-based disarmament laws became a sordid relic of our Nation's past.[92]  Still, the tradition of disarming

permit"); 1837 Ark. Acts 587, § 18 (punishing every freedman caught possessing "weapon[s] of any kind" without "having a license" with "seizure" of his arms and large fines); 1854–55 Mo. Laws 1094, § 3 (same); 1865 Fla. Laws 25, §§ 12–13 (declaring that "any . . . person of color" who possesses "fire-arms or ammunition of any kind" without "first obtain[ing] a license to do so . . . shall be deemed to be guilty of a misdemeanor, and . . . shall forfeit . . . all such fire-arms and ammunition, and . . . be sentenced" to other punishments); *see also* 1840–41 N.C. Sess. Laws 61–62.

[92] Although many of these laws are repugnant and would be unconstitutional today under the 14th Amendment, *Rahimi* instructs us to determine whether § 922(g)(1) "comport[s] with the *principles* underlying the Second Amendment." 144 S. Ct. at 1898 (emphasis added).  Like the Sixth Circuit in *Williams* and the Eighth Circuit in *Jackson*, we reference these bans only to demonstrate the tradition of legislatures disarming people they presumed posed a special risk of danger to the public. *See Jackson*, 110 F.4th at 1127 ("While some of these categorical prohibitions of course would be impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms."); *United States v. Williams*, 113 F.4th 637, 656–57 (6th Cir. 2024) ("Classifying people as dangerous simply because of their race or religion was wrong from the beginning and unconstitutional from 1868. Nevertheless, these pre-Fourteenth Amendment laws provide insight into how early Americans conceived of the right to bear arms embodied in the

36

categories of persons thought by legislatures to present a "special danger of [firearm] misuse," *Rahimi*, 144 S. Ct. at 1901, continued into the Reconstruction Era and the Gilded Age. Most states restricted the sale of firearms to, or the possession of firearms by, persons under the age of eighteen or twenty-one.[93] Over a dozen states disarmed vagrants, often referred to as "tramps."[94] Many states prohibited drunks from purchasing or carrying guns.[95] And several states banned the sale of arms to mentally ill persons.[96]

Although the "who," "how," and "why," *Rahimi*, 144 S. Ct. at 1898, underlying these categorical disarmament laws somewhat differed from their historical counterparts, "19th-century courts and commentators," *Heller*, 554 U.S. at 603, viewed these laws as constitutional. A "massively popular" nineteenth-century treatise written by "the most famous" voice on the Second Amendment at the time, *Heller*, 554 U.S. at 616, explained that some groups were "almost universally excluded" from exercising certain civic rights, including "the idiot, the lunatic, and the felon, on obvious grounds," and that states "may prohibit the sale of arms to minors."[97]

These laws, like those of earlier decades, were unquestionably overbroad. Not every freedman, drunk,

---

Second Amendment. The key point is that entire groups could be presumptively disarmed.").

[93] Brief of the United States at 24 & n.16, *United States v. Rahimi*, 144 S. Ct. 1889 (2024) (No. 22-915).

[94] *Id.* at 25 & n.18.

[95] *Id.* at 25–26 & n.19.

[96] *Id.* at 24–25 & n.17.

[97] Thomas, M. Cooley, *Treatise on Constitutional Limitations* 41, 739 n.4 (5th ed. 1883).

beggar, minor, or mentally ill person had a propensity to misuse firearms. To the contrary, many members of these disarmed classes likely posed no greater danger of firearm misuse than their fellow citizens who retained their armament rights. Yet state high courts routinely upheld these categorical disarmaments as consistent with their state constitutional rights to bear arms,[98] which were understood to be coextensive with the Second Amendment.[99] For example, despite observing that some tramps were "less . . .vicious than others," the Ohio Supreme Court nonetheless found a state law categorically disarming "tramps" consistent with the state constitutional right to keep and bear arms because the right "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan*, 58 N.E. 572, 575 (Ohio 1900).

In sum, these post-ratification laws, like the colonial ones preceding them, show that legislatures were empowered to disarm entire groups based on prevailing judgments about which categories of people posed "a special danger of

---

[98] *See, e.g.*, *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) (upholding a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with firearms"); *State v. Callicutt*, 69 Tenn. 714, 716–17 (1878) (concluded that a state law "prevent[ing] the sale, gift, or loan of a pistol or other like dangerous weapon to a minor [was] not only constitutional as tending to prevent crime but wise and salutary in all its provisions").

[99] *See* Baude & Leider, *supra* note 28, at 1472 ("[I]n the context of the right to bear arms, courts treated . . . state and federal constitutional provisions as approximately equivalent.").

38

misu[ing]" firearms. *Rahimi*, 144 S. Ct. at 1901. Although the targeted groups changed over time, as did the legislatures' precise calculus for disarming them, the three features of those colonial-era laws remained constant. First, every categorical disarmament law was overbroad—sweeping in law-abiding people who were not dangerous, violent, untrustworthy, or unstable—yet they comported with the Second Amendment. Second, these laws almost universally provided some mechanism for members of a disarmed class to prospectively lift their disability by persuading an executive or judicial official that the class-wide presumption of likely firearm misuse did not apply to them. Third, if a member of a disarmed class violated these disarmament laws without first affirmatively lifting the disability, he was penalized accordingly. Thus, prospective relief was limited to those who abided by the ban unless and until demonstrating that they no longer (if ever) presented a special danger to others.

### 2. *Criminal Punishment*

*Rahimi* teaches that if a greater deprivation of rights was permissible as a penalty for an offense in the relevant past, the "lesser restriction" of disarmament is also permissible in a modern-day regulation. *See* 144 S. Ct. at 1902. With that precept in mind, the numerous historical laws punishing non-violent, as well as violent, felons with death, life imprisonment, estate forfeiture, and permanent loss of certain other civil rights show that an indefinite deprivation of the right to bear arms is

39

a permissible consequence of a felony conviction within our historical tradition.

### a. English Law and Colonial America

In eighteenth-century England, the standard penalty for a felony—even for non-violent felonies like fraud and forgery—was death and forfeiture of land, goods, and chattels, and executed felons traditionally forfeited all their firearms, as well as the rest of their estate, to the government.[100] That practice persisted in the American colonies and the Early Republic—those who committed serious felonies, both violent and non-violent, were executed and subject to permanent estate forfeiture.[101]

Individuals who committed less serious crimes also lost their firearms on a temporary, if not permanent, basis. Virginia punished a person convicted for "base" and "opprobrious" speech by ordering him "disarmed" and declaring him ineligible to exercise "any priviledge or freedom" in the colony.[102] The Massachusetts Bay Colony disarmed individuals for merely *supporting* someone who was convicted

---

[100] *See* 4 William Blackstone, *Commentaries on the Laws of England* 54, 97–98, 389 (1769); *id.* at 155, 162 (listing fraudulent bankruptcy and forging a marriage license as such felonies).

[101] *See Bucklew v. Precythe*, 587 U.S. 119, 129 (2019) ("[D]eath was 'the standard penalty for all serious crimes' at the time of the founding.") (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)); *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring).

[102] Konig, *supra* note 31, at 371.

of a crime.[103]  One New York law "disarmed" anyone who was "convicted" of "oppos[ing] or deny[ing]" colonial or local authority, or "dissuad[ing]" others "from obeying the recommendations" of the Continental or colonial Congress,[104] while another punished those who counterfeited state bills of credit with life imprisonment and the forfeiture of their entire estate, including firearms.[105]  South Carolina "disarmed" persons "upon due conviction" of "opposing the measures of the Continental or Colony Congress."[106]  In Hampshire County, Massachusetts, "all persons . . . convicted of being notoriously inimical to the cause of American Liberty" were "disarmed."[107]  And in Connecticut, anyone "duly convicted" of "libel[ing] or defam[ing]" any acts of the Continental Congress or the Connecticut General Assembly was "disarmed and not allowed to have or keep any arms."[108]

Alternatively, where legislatures stipulated that certain offenses were not punishable by death or life imprisonment,

---

[103] *See supra* notes 32–36 and accompanying text (explaining how supporters of Anne Hutchinson, who was convicted for criticizing the colony's clergy's legalistic interpretation of the Bible, were disarmed).

[104] Resolutions of Sept. 1, 1775, *reprinted in* 1 *Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of the State New-York* 132 (1842).

[105] Act of Apr. 18, 1786, *reprinted in* 2 *Laws of the State of New York Passed at the Sessions of the Legislature 1785–1788*, at 253, 260–61 (1886) [hereinafter N.Y. Act of 1786].

[106] S.C. Res. of 1776, *supra* note 54, at 77.

[107] Resolution of July 25–26, 1776, in 1 *American Archives: Fifth Series* 588 (Peter Force ed., 1848)

[108] Conn. Act of 1775, *supra* note 67, at 193.

but rather forfeiture,[109] the offender was stripped of his then-existing estate, including any firearms,[110] and only upon successfully serving of his sentence and reintegrating into society could he presumably repurchase arms.[111] Even minor infractions were often punished with the seizure of firearms involved in the offense.[112]

Of particular relevance are the Founding-era felonies most similar to Range's crime of defrauding the government—forgery, counterfeiting, fraud, and theft—which, in many

---

[109] *See Moore*, 111 F.4th at 270–72 (collecting historical forfeiture laws).

[110] *See, e.g.*, Act of Apr. 5, 1790, *reprinted in* 13 *Statutes at Large of Pennsylvania* 511, 511–12 (James T. Mitchell & Henry Flanders eds., 1908) (providing for "forfeit[ure of] all . . . goods and chattels . . . possessed at the time the crime was committed and at any time afterwards").

[111] As this Court has recognized, "the early American forfeiture laws . . . yield the principle that a convict may be disarmed while he completes his sentence and reintegrates into society." *Moore*, 111 F.4th at 272.

[112] For example, individuals who hunted in certain prohibited areas had to forfeit any weapons used in the course of that violation. *See, e.g.*, Ordinance of Oct. 9, 1652, *reprinted in Laws and Ordinances of New Netherland 1638–1674*, at 138 (E.B. O'Callaghan ed., 1868); Act of Apr. 20, 1745, *in* 23 *Acts of the North Carolina General Assembly, 1745*, at 218, 219 (1805); 1771 N.J. Laws 19–20; 1832 Va. Acts 70; 1838 Md. Laws 291–92; 12 Del. Laws 365 (1863).

42

jurisdictions, were punishable by death from the Colonial era through the Revolutionary War.[113]

Although the majority suggests that the death penalty soon fell out of use for such offenses,[114] historical records show otherwise. In 1790, the First Congress made counterfeiting and forgery capital offenses.[115] On December 14, 1792, within a year of the ratification of the Bill of Rights, Georgia passed an "An Act for the More Effectually Preventing and Punishing Forgery," which penalized fraud, counterfeiting, and forgery

---

[113] *See* Maj. Op. at 14, 22; *see, e.g.*, *A Digest of the Laws of Maryland* 255 (Thomas Herty ed., 1799) (punishing forgers with "death as a felon, without benefit of clergy"); *Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America* 33–34 (1767) (punishing any person convicted of forging or counterfeiting bills of credit with "Pains of Death"); 10 *Statutes at Large of Pennsylvania* 307, 384 (James T. Mitchell & Henry Flanders eds., 1904) (making forgery and counterfeiting capital crimes in 1781); *Acts of the General Assembly of the State of New Jersey* 8, 136 (Peter Wilson ed., 1784) (listing counterfeiting and theft as capital offenses); *see generally* Banner, *supra* note 101, at 7–8; Kathryn Preyer, *Penal Measures in the American Colonies: An Overview*, 26 Am. J. Legal Hist. 326, 337, 340, 342, 343, 344, 348 (1982) (detailing capital punishment for non-violent offenses in Massachusetts, Pennsylvania, Virginia, and New York).

[114] *See* Maj. Op. at 14–15.

[115] *See* Act of April 30, 1790, ch. 9, § 14, 1 Stat. 112, 115 ("every such person" convicted of forgery, dealing in forged securities, or counterfeiting "shall suffer death").

with death.[116]  Five days later, the General Assembly of Virginia passed an "Act[] for Punishing Persons Guilty of Certain Thefts and Forgeries," which added forgery, counterfeiting, and theft to the list of nonclergyable capital offenses.[117]  In New York, people convicted of counterfeiting, forgery, and larceny continued to "suffer death as a felon" for years after the Second Amendment's ratification.[118]  In 1796, New Jersey declared that anyone convicted of forgery for a second time "shall suffer death."[119]  And at the turn of the nineteenth century, forgery and counterfeiting remained capital crimes in the first instance in Maryland and North Carolina,[120]

---

[116] *A Digest of the Laws of the State of Georgia* 467–68 (1800); *see also id.* at 181, 342–43, 449.

[117] *A Collection of All Such Acts of the General Assembly of Virginia, of a Public or Permanent Nature, as are Now in Force* 260–61 (1794).  Two years later, Virginia doubled down, clarifying that anyone convicted of forging or counterfeiting, or assisting in the forging or counterfeiting, of "any deed, will, testament, bond, writing obligatory, bill of exchange, promissory note . . . or other valuable thing . . . shall suffer death as a felon without benefit of clergy."  *Id.* at 333.

[118] 2 *Laws of the State of New York* 41–42, 74 (1792).  Between 1791 and 1796, New York executed at least 10 people for forgery.  *See* Mark Espy, *Executions in the U.S. 1608–2002*, Death Penalty Info. Ctr. 41–44, https://dpic-cdn.org/production/legacy/ESPYyear.pdf (last visited Dec. 23, 2024).

[119] An Act of Mar. 18, 1796, *reprinted in Laws of the State of New-Jersey* 221 (William Paterson ed., 1800).

[120] *See A Digest of the Laws of Maryland*, *supra* note 113, at 255–56; 1 *The Public Acts of the General Assembly of North-Carolina* 242 (James Iredell & Francois-Xavier Martin eds.,

while Alabama made forgery, counterfeiting, fraud, and other crimes of deceit capital offenses in 1807.[121]

To be sure, a few states dispensed with capital punishment for forgery, counterfeiting, and other crimes of deceit in the decade following ratification.[122] But a handful of "outlier" laws from the Early Republic does not negate what had become a regulatory tradition. *Bruen*, 597 U.S. at 70; *id.* at 46 (expressing "doubt that *three* colonial regulations could suffice to show a tradition"). And concluding from the laws of a few more lenient jurisdictions that the Constitution precluded more severe penalties not only ignores the historical reality in other jurisdictions, but also wrongly "assumes that founding-era legislatures maximally exercised their power to regulate." *Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring).

Regardless, the inference drawn by the majority from this history—that Founding-era legislatures lacked authority to permanently punish non-violent felons—is mistaken. Instead, the statutes cited by the majority prove that even when the most progressive states in our Early Republic dispensed with the death penalty for certain crimes, they continued to exercise their authority to permanently punish non-violent felons. For example, Connecticut, as the majority points out, ended capital punishment for counterfeiting and forgery in 1784.[123] But rather than being executed, twice-convicted forgers and

---

1804); Banner, *supra* note 101, at 139 (explaining that counterfeiting and horse stealing remaining capital offenses in Maryland until 1809).

[121] *A Digest of the Laws of the State of Alabama* 210–11 (Harry Toulmin ed., 1823).

[122] *See* Maj. Op. at 14–15, 15 n.4.

[123] *See id.*

counterfeiters in Connecticut were imprisoned and "kept to hard Labour during the Term of his or her natural Life," while Connecticut continued to punish other non-violent crimes like perjury with death.[124]  New York likewise experimented with eliminating capital punishment for these non-violent crimes. In 1786, its legislature passed a law punishing those who counterfeited state bills of credit with life imprisonment and complete estate forfeiture.[125]  But it reversed course just two years later and reinstated capital punishment for all counterfeiters.[126]  For forgery, New York also "chang[ed] the punishment . . . from death into imprisonment for life" in 1796, but again, "the legal consequences of the conviction, as to disability . . . remained the same.  The party was incapacitated, forever" from exercising his Second Amendment rights because a felon sentenced to life in prison was "deemed to be

---

[124] *Acts and Laws of the State of Connecticut in America* 24, 66 (1784).  When Connecticut updated its criminal codes in 1796, theft, forgery, fraud, counterfeiting, and perjury continued to be subject to permanent punishment.  *See Acts and Laws of the State of Connecticut in America* 184 (1796) (establishing that a thrice-convicted thief, forger, counterfeiter, or user of counterfeit coins would be "imprison[ed]" for the duration of "his natural life"); *id.* at 182 (listing perjury as a capital offense).

[125] N.Y. Act of 1786, *supra* note 105, at 260–61 (declaring that anyone convicted of counterfeiting or altering a newly minted bill of credit or knowingly using a counterfeited or altered bill of credit "shall forfeit all his or her estate both real and personal to the . . . State, and be committed to the [city jail] for life, and there confined to hard labor").

[126] *See* An Act for Preventing and Punishing Forgery and Counterfeiting (Feb. 7, 1788), *reprinted in* 2 *Laws of the State of New York* 41–42 (1792).

civilly dead, to all intents and purposes."[127]  So even the laws cited by the majority confirm that early legislatures had the flexibility to punish non-violent felons in a variety of ways, up to and including physical and civil death, both of which permanently extinguished the felon's civil rights.  *See Folajtar v. Att'y Gen.*, 980 F.3d 897, 920 (3d Cir. 2020) (Bibas, J., dissenting).

### b.    Post-Ratification Tradition

As the Nation's footprint expanded to the south and the west, legislative authority to permanently disarm non-violent criminals followed in tow.  Although some states continued to execute thieves, counterfeiters, forgers, and fraudsters until the mid-nineteenth century,[128] other legislatures, during the Era of Good Feelings, transitioned to stripping these non-law-abiding citizens of fundamental rights.

In 1820, one of the Nation's early leading lawyers and "best known" proponents of abolishing capital punishment,

---

[127] *Troup v. Wood*, 4 Johns. Ch. 228, 247–48 (N.Y. Ch. 1820); *see also Kanter*, 919 F.3d at 459 (Barrett, J., dissenting) ("Civil death was a state in which a person 'though living, was considered dead'—a status 'very similar to natural death in that all civil rights were extinguished.'" (quoting Harry David Saunders, Note, *Civil Death—A New Look at an Ancient Doctrine*, 11 Wm. & Mary L. Rev. 988, 988–89 (1970))).

[128] South Carolina, Alabama, Georgia, Texas, and California executed white people for counterfeiting, forgery, and theft until the 1850s.  *See* Banner *supra* note 101, at 18, 139–40; *see also, e.g.*, Espy, *supra* note 118, at 51, 70, 80 (forgery); *id.* at 56, 62 (counterfeiting); *id.* at 71, 94, 95 (theft); *id.* at 49, 50, 52, 63, 64, 93 (horse theft).

Edward Livingston, was tasked with preparing a systematic code of criminal law for Louisiana.[129] At the time, Louisiana's laws consisted of a "medley of laws and customs" from France, Spain, and English common law that often imposed harsh and unequal punishments, including death for non-violent crimes.[130] Livingston's proposed codes, which brought "*moderation* to the system of crimes and punishments,"[131] eliminated the death penalty for many crimes—including forgery, perjury, and fraud. Capital punishment was replaced with the lesser punishments of "imprisonment" and the "suspension" and permanent "forfeiture" of "political or civil rights"—including the "right of bearing arms."[132] Under Livingston's code of punishments, those convicted of perjury and forgery were permanently disarmed, while fraudsters lost their armament rights for only five years.[133]

---

[129] Banner, *supra* note 101, at 138.

[130] Elon H. Moore, *The Livingston Code*, 19 J. Am. Inst. Crim. L. & Criminology 344, 345 (1928).

[131] Carleton Hunt, *Life and Services of Edward Livingston* 31 (1903) (emphasis added).

[132] Edward Livingston, *A System of Penal Law for the State of Louisiana* 377, 378 (1833); *see id.* at 745 (defining "political rights" as "those which are given by the constitution" and "civil rights" as "those which every free person is authorized, by law, to exercise for the preservation either of his own person [or] property").

[133] *Id.* at 393 (seven years' imprisonment and permanent disarmament for perjury); *id.* at 409 (fifteen years' imprisonment and permanent disarmament for forgery); *id.* at 454 (one-year imprisonment and five-years' disarmament for fraudulent

Many contemporaries concurred with Livingston's proposals to deprive convicts of only certain rights—including the right to bear arms—instead of extinguishing all of their rights through capital punishment. His work won wide acclaim from such Founders as Jefferson, Madison, and Story.[134] Chief Justice Marshall, who read one of these codes "with attention and interest," likewise saw no constitutional concerns, writing in a letter to Livingston: "Among your penalties a deprivation of civil and political rights is frequently introduced. I believe no former legislator has relied sufficiently on this provision; and I have strong hopes of its efficacy."[135]

Although Livingston's codes were not ultimately adopted, the Supreme Court has repeatedly relied on his proposed model legal codes for Louisiana and then for the United States as evidence of the types of laws that would have been considered permissible at the Founding.[136] And

---

interference with an inheritance). These proposals are particularly notable considering Livingston's desire to create a criminal code that was consistent with the "right[s] secured by the constitution," including "the right to bear arms." *Id.* at 62; *see also* Edward Livingston, *A System of Penal Law for the United States* 19-20, 40, 79, 126 (1828) (similar provisions in model penal code for the United States).

[134] *See* Moore, *supra* note 130, at 345, 355.

[135] Letter from John Marshall to Edward Livingston (Oct. 24, 1825), https://findingaids.princeton.edu/catalog/C0280_c3493.

[136] *See, e.g.*, *Beauharnais v. Illinois*, 343 U.S. 250, 255 n.4 (1952) (citing Livingston's "famous draft System of Penal law for Louisiana" as example of historical libel laws); *Cruzan v. Dir. Mo. Dep't of Health*, 497 U.S. 261, 294 (1990) (Scalia, J.,

49

Livingston's proposal to punish certain non-violent felons with permanent disarmament is consistent not only with Founding-era penalties that explicitly or necessarily deprived non-violent felons of their right to bear arms, but also, as social mores continued to evolve, laws in the early 1800s that permanently stripped non-violent felons of other fundamental rights.[137]

Alabama, for instance, deprived "any person . . . convicted of bribery, forgery, [or] perjury" from exercising several fundamental rights, including holding state office, serving as a juror, or voting in any election.[138] In Missouri, convicted forgers, embezzlers, counterfeiters, fraudsters, bribers, and thieves could not serve as witnesses or jurors, vote, or hold public office.[139] And while Indiana continued to punish horse thieves and recipients of stolen horses with death, it deprived those who committed or helped commit perjury,

---

concurring) (citing Livingston's draft code for our history of criminalizing assisted suicide).

[137] Because the traditional punishment for serious crimes was death, early legislatures had little occasion to enact laws explicitly disarming persons convicted of such crimes. Nonetheless, they did enact laws disarming perpetrators of a variety of non-violent offenses. *See supra* notes 102–112 and accompanying text.

[138] Act of Nov. 17, 1819, *reprinted in A Digest of the Laws of the State of Alabama* 230 (Harry Toulmin ed., 1823).

[139] *A Digest of the Laws of the Missouri Territory* 140–45, 149–50 (Henry Geyer ed., 1818).

forgery, fraud, embezzlement, or counterfeiting of their ability to serve in any public office, the military, or on juries.[140]

In sum, before, during, and for a period even after the dawn of our Republic, felons convicted of crimes of deceit could face death, life imprisonment, civil death, and deprivation of their fundamental rights because they were presumed to permanently pose a special risk of danger to society.[141]  And the categorical disarmament laws show that legislatures could prophylactically disarm such categories of people, subject to individual applications for a restoration of rights.[142]  With those regulatory traditions in mind, we next consider the constitutionality of § 922(g)(1) as applied to Range.

C.    Section 922(g)(1) as Applied to Range

No doubt, the categorical disarmament laws and felony punishment laws are "two distinct legal regimes" and § 922(g)(1) "is by no means identical to these founding era regimes." *Rahimi*, 144 S. Ct. at 1899, 1901.  But "it does not need to be," *id.* at 1901, because we are not looking for "historical twin[s]," but for "principles underlying the Second Amendment" that are "relevantly similar" to those animating the statute now before us, *id.* at 1898 (citation omitted).  And "[t]aken together," *id.* at 1901, those two legal regimes demonstrate that § 922(g)(1)—with one qualification discussed below, *infra* Section I.C.2—"comport[s] with the

---

[140] *Laws of the Indiana Territory* 25–28, 30 (1807); *Compend of the Acts of Indiana* 73, 76, 87–88 (W. Johnston ed., 1817); Banner, *supra* note 101, at 131.

[141] *See generally supra* Section I.B.2.

[142] *See generally supra* Section I.B.1.

principles underlying the Second Amendment," *id.* at 1898, as applied to Range.

>    1.    *Section 922(g)(1) Generally Comports with Regulatory Tradition*

In comparing a challenged regulation with the principles underlying its historic analogues, "[w]hy and how the regulation burdens the right are central to th[e] inquiry." *Id.*

As for the "why," four centuries of unbroken Anglo-American history shows that legislatures consistently disarmed entire categories of people who were presumed to pose a special risk of misusing firearms. Only after an individual made the requisite showing to a government official—rebutting the class-wide presumption of firearms misuse—was the disability on the individual's right to possess firearms lifted. The Founding generation understood that felons—who could be sentenced to death or life imprisonment, stripped of their fundamental rights, including their right to arms[143]—were one such group. It is no wonder that *Rahimi*, citing to *Heller*'s assurance of the presumptive constitutionality of felon-in-possession bans, repudiated the "suggest[ion] that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Id.* at 1901.

At the Founding, the purpose of capital punishment and life imprisonment for certain crimes of deceit, akin to Range's fraud offense, "was threefold: deterrence, retribution, and penitence." *Diaz*, 116 F.4th at 469. Those purposes continued

---

[143] *See supra* Section I.B.2.

to animate the early nineteenth century laws stripping such felons of other fundamental rights.[144]  The justification for § 922(g)(1)—deterring lawlessness by those categorically presumed to pose a special risk of danger to society—is "relevantly similar."  *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29).  In enacting § 922(g)(1), "Congress obviously determined that firearms must be kept away from" felons because they belong to a class "who might be expected to misuse them." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 119 (1983).[145]  And just as legislatures dating back to the

---

[144] *See supra* notes 129–136 and accompanying text (discussing proposals to punish those convicted of forgery and perjury with permanent disarmament); *supra* notes 137–140 and accompanying text (discussing laws prohibiting forgers, counterfeiters, fraudsters, and thieves from holding office, voting, being on a jury, or serving in the military).

[145] *See also Lewis v. United States*, 445 U.S. 55, 63, 67 (1980) (explaining that federal gun laws, which were intended to be "a sweeping prophylaxis, in simple terms, against misuse of firearms," focus on felony convictions "in order to keep firearms away from potentially dangerous persons"); *Scarborough v. United States*, 431 U.S. 563, 572 (1977) ("Congress sought to . . . keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." (internal quotation marks omitted)); *Barrett v. United States*, 423 U.S. 212, 218 (1976) ("The very structure of the Gun Control Act demonstrates that Congress . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous"); *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (explaining that the principle purpose of the Safe Streets

Founding determined that certain non-violent felons, including those who committed fraud offenses like Range's, should be prohibited from possessing firearms, "Congress' judgment that a convicted felon . . . is among the class of persons who should be disabled from . . . possessing firearms because of potential dangerousness is rational." *Lewis v. United States*, 445 U.S. 55, 67 (1980). Moreover, like the felony punishment laws of our nascent Republic that imposed punishments necessarily encompassing disarmament, § 922(g)(1) applies only to those convicted of crimes that, as reflected in their applicable prison terms, are deemed most serious by modern-day legislatures in their respective jurisdictions.

As to the "how," § 922(g)(1), like its Founding-era analogues, applies after a person is convicted of a felony and deprives that felon of the right to bear arms on a presumptively permanent basis. Capital punishment, life imprisonment, and civil death entailed permanent disarmament, as did estate forfeiture at times.[146] Thus, just as the availability of imprisonment to respond to the Founding-era offenses akin to § 922(g)(8) rendered "the lesser restriction of temporary disarmament that Section 922(g)(8) imposes . . . permissible" in *Rahimi*, 144 S. Ct. at 1902, the availability of capital punishment and life imprisonment to respond to non-violent crimes like theft, forgery, counterfeiting, fraud, and perjury at the Founding and beyond shows that "the lesser restriction" of

---

Act and Gun Control Act "was to curb crime" and "lawless-ness").

[146] *United States v. Diaz*, 116 F.4th 458, 469 (5th Cir. 2024) ("[T]he majority of the estate forfeiture laws . . . did not provide an opportunity for offenders to regain their possessions.").

disarmament imposed by § 922(g)(1) "is also permissible," *id*.[147]

## 2. *Range's Pre-Enforcement Challenge*

Although § 922(g)(1) on its face fits "neatly within" our historical tradition, *Rahimi*, 144 S. Ct. at 1901, there is one

---

[147] Our sister circuits have likewise relied on *Rahimi*'s greater-includes-the-lesser reasoning to hold that § 922(g)(1) is constitutional as applied to felons who committed a variety of non-violent crimes. *See, e.g.*, *United States v. Hunt*, No. 22-4525, 2024 WL 5149611, at *6 (4th Cir. Dec. 18, 2024) (adopting *Rahimi*'s "greater-includes-the-lesser theory" to foreclose as-applied challenges to § 922(g)(1)); *Diaz*, 116 F.4th at 469 ("Here, if capital punishment was permissible to respond to theft, then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible."); *Jackson*, 110 F.4th at 1125, 1127 (holding that § 922(g)(1) is constitutional as applied to a felon who committed "non-violent" drug offenses in part because early legislatures "authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property"). They have also embraced *Rahimi*'s reasoning when upholding other subsections of § 922. *See, e.g.*, *United States v. Gore*, 118 F.4th 808, 815 (6th Cir. 2024) (rejecting as-applied challenge to § 922(n) because it imposed a "lesser burden" than its historical predecessors); *United States v. Veasley*, 98 F.4th 906, 915 (8th Cir. 2024) ("The 'burden' imposed by § 922(g)(3) is 'comparable,' if less heavy-handed, than Founding-era laws governing the mentally ill . . . It goes without saying that confinement with straitjackets and chains carries with it a greater loss of liberty than a temporary loss of gun rights." (quoting *Bruen*, 597 U.S. at 29)).

respect in which the regime it establishes—in practice—does not comport with the "how" of these relevantly similar historic regulations. As I read *Rahimi*, that qualification obligates us to consider and ultimately grant Range's request for declaratory relief.

Under categorical disarmament laws, where an individual was presumed to pose a special risk to society by virtue of his membership in a particular group and thus was lawfully disarmed as an initial matter, there was typically a mechanism for him to petition and attempt to rebut that presumption—whether by taking a loyalty oath, renouncing allegiance, obtaining a license, or securing a court order.[148] Even for offenses historically punishable by death or lifetime imprisonment, and hence, encompassing permanent disarmament, that punishment followed individualized determinations made by a judge and jury, and a convicted felon could also seek clemency or a pardon based on his individual circumstances.[149] And for both the categorical disarmament laws and the commutation of a permanent deprivation of liberty, the burden was on the petitioner to demonstrate that the class-wide presumption of dangerousness was inapplicable to him individually.[150] In short, our regulatory tradition—as well as *Rahimi*'s attention to the individualized findings required by

---

[148] *See supra* notes 27, 36, 45–46, 65, 67–71, 85, 87–89 and accompanying text.

[149] *See* Banner, *supra* note 101, at 53–56; Preyer, *supra* note 113, at 347–48; Kathryn Preyer, *Crime, the Criminal Law and Reform in Post-Revolutionary Virginia*, 1 Law & Hist. Rev. 53, 61–62, 73–74, 76 (1983).

[150] *See supra* notes 27, 36, 45–47, 72–73, 90–91 and accompanying text.

and the durational limit of the restriction in that case—reflects that where disarmament is based on a categorical presumption of special danger to society, there must be a meaningful opportunity for individualized review to survive constitutional scrutiny.

The necessity of such individualized review was evidently not lost on Congress when it enacted § 922(g)(1). The "plain meaning" of § 922(g)(1)'s text is that "a felony conviction imposes a firearm disability until the conviction is vacated or the felon is relieved of his disability by some affirmative action," *Lewis*, 445 U.S. at 60–61, and its enumeration of certain avenues for prospective relief in § 921(a)(20) and § 925(c) makes it "fully apparent" that Congress intended there to be a mechanism to challenge the permanent duration of the ban, *id.* at 64. Like its historical predecessors in the states and colonies,[151] Congress "clearly intended" that a felon "clear his status *before* obtaining a firearm," *id.* (emphasis in original), and that those who violated that ban without seeking dispensation be subject to prosecution and punishment, *see* 18 U.S.C. §§ 921(a)(20), 924(a)(8).

The problem is that the statutory mechanisms legislated by Congress are not, in practice, meaningfully available. True, § 925(c) authorizes the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) to prospectively restore a felon's right to possess a firearm if he proves that he "will not be likely to act in a manner dangerous to public safety" and that the "public interest" supports rearmament,[152] and § 921(a)(20) exempts any felon whose conviction "has been expunged," who "has been pardoned," or who has had his "civil rights restored." But

[151] *See supra* Section I.B.1.
[152] 18 U.S.C. § 925(c); 27 C.F.R. § 478.144(d).

57

Congress defunded the ATF program in 1992.[153] Expungements are rare,[154] as are pardons.[155] And restoration of rights for a convicted felon is, in many cases, not a legal possibility: There is no federal procedure for restoring civil rights for a federal felon, *see Beecham v. United States*, 511 U.S. 368, 372–73 (1994), and in most states, there is no way, absent a state pardon, for a convicted felon to have his civil rights fully restored.[156]

In the absence of other channels for individualized review, the doors to the federal courthouse must be open.[157]

---

[153] *See Logan v. United States*, 552 U.S. 23, 28 n.1 (2007); *United States v. Bean*, 537 U.S. 71, 74–75 & n.3 (2002); S. Rep. No. 102-353 (1992).

[154] Expungement is generally available for only a small subset of felonies. *See Expungement Laws and Forms: 50-State Survey*, Justia, https://www.justia.com/criminal/expungement-record-sealing/expungement-forms-50-state-resources/ (last updated Feb. 2023).

[155] Pardons are often discretionary and turn on political considerations. *See generally Fifty-State Comparison: Pardon and Policy Practice*, Restoration Rts. Project, https://ccresource-center.org/state-restoration-profiles/50-state-comparisonchar-acteristics-of-pardon-authorities-2/ (last updated July 2024).

[156] *See Fifty-State Comparison: Loss and Restoration of Civil/Firearms Rights*, Restoration Rts. Project, https://ccre-sourcecenter.org/state-restoration-profiles/chart-1-loss-and-restoration-of-civil-rights-and-firearms-privileges-2/ (last updated Mar. 2024).

[157] I take issue with our dissenting colleagues' suggestion that federal courts lack authority to provide relief like I have

Neither our historical tradition nor our modern understanding of the Second Amendment as an "individual right"[158] permits us to blindly defer to a categorical presumption that a given individual permanently presents a special risk of danger without the opportunity for him to rebut it.[159] Even so, Congress' judgment that a felon "might be expected to misuse" firearms, *Dickerson*, 460 U.S. at 119, and thus belongs to a "class of persons who should be disabled from . . . possessing firearms because of potential dangerousness" is undoubtedly "rational," *Lewis*, 445 U.S. at 67. It is also wholly consistent with this Nation's historical tradition of disarming felons and other categories of people presumed by the legislature to pose a special danger of misusing firearms. *See supra* Section I.B. So once the Government establishes that an offender committed a felony, giving rise to that rational presumption, its burden to identify relevantly similar historical regimes has been satisfied, and the burden to seek a declaratory judgment,

---

proposed (or like that proposed in Judge Roth's concurrence) in the face of a statute that would otherwise be unconstitutional. Dissent at 8 n.7. Congress explicitly gave us the authority for the "[c]reation of [a] remedy" in the Declaratory Judgment Act, *see* 28 U.S.C. § 2201, and "'serious constitutional question[s]' . . . would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim," *Webster v. Doe*, 486 U.S. 592, 603 (1988).

[158] *See Heller*, 544 U.S. at 595; *Bruen*, 597 U.S. at 32.

[159] *Cf. Heller*, 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.").

like the burden to take an oath of allegiance, falls to the felon. *See Williams*, 113 F.4th at 662.

Evaluating whether a felon has met that burden is not an unfamiliar exercise for federal judges.  In rendering decisions about the possession of a firearm as a condition bail pending trial, district courts consider "the nature and circumstances of the offense charged, including whether the offense is a crime of violence," and determine whether the defendant poses a risk of "danger" to the public.  18 U.S.C. § 3142(c), (g).  Similarly, when deciding whether a felon on supervised release or probation must "refrain from possessing a firearm," *id.* §§ 3563(b)(8), 3583(d), courts consider several of the federal sentencing factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as the need for disarmament to (1) "reflect the seriousness of the offense"; (2) "promote respect for the law, and to provide just punishment for the offense;" (3) "afford adequate deterrence to criminal conduct;" and (4) "protect the public from further crimes of the defendant," *id.* § 3553(a)(1–2); *see also Williams*, 113 F.4th at 657–58; *United States v. Jackson*, 85 F.4th 468, 478 (Mem.) (8th Cir. 2023) (Stras, J., dissenting from the denial of rehearing en banc).

Applying these factors here, the strength of the record precludes the need for remand.  Unlike the majority—which places the burden on the Government not only to show that Range committed a felony, giving rise to the presumption that he poses a special risk of firearm misuse, but also to establish that he continues to pose that risk—I believe that historical tradition, *see supra* Section I.B, along with Supreme Court precedent, *see Lewis*, 445 U.S. at 61 (observing that the lifting of § 922(g)(1)'s ban requires "some affirmative action"), places the burden on Range, as a convicted felon seeking to re-arm,

to rebut the presumption that he still poses that risk. Ultimately, however, the majority and I land in the same place because I conclude that Range has carried that burden.

Nearly thirty years have passed since Range's predicate conviction—a non-violent offense involving a relatively small amount of funds—and besides a single summary offense for fishing without a license and a few minor traffic infractions, all evidence suggests that Range has been a law-abiding citizen in the intervening decades. Importantly, Range has complied with § 922(g)(1) until this point, and the Government itself concedes there is no evidence that Range is dangerous, violent, mentally unstable, or poses a threat to himself or the public if his disability is lifted.[160] Thus, considering the § 3553(a) factors and the present-day risk that Range will misuse firearms, I will concur in the judgment.

## II. The Majority's Methodological Flaw

Unmoved on remand by *Rahimi*'s call to principles-based analogical reasoning, my colleagues in the majority continue to demand that the Government produce a precise historical match to § 922(g)(1), and, as a result, provide little guidance for our district court colleagues charged with adjudicating as-applied challenges going forward. That failure to provide a clear and workable methodology leaves courts, law enforcement, firearms dealers, and felons themselves guessing about when § 922(g)(1) can be constitutionally applied—disserving all with the resulting ambiguity.

---

[160] *See* J.A. 171; *Range I* Oral Arg. at 35:05–34:10; 32:55–31:52; 28:45–28:10.

*Rahimi*, as even the majority acknowledges, calls for examination of "the principles underlying our Nation's history and tradition of firearm regulation," Maj. Op. at 5, not for a regulation that "precisely match[es] its historical precursors," *Rahimi*, 144 S. Ct. at 1898. Because our law is not "trapped in amber" and "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791," relevantly similar historical laws are sufficient to uphold a modern firearm regulation. *Id*. at 1897–98. *Bruen* also cautioned that the Second Amendment does not impose "a regulatory straightjacket" by requiring a "historical *twin*," and it explained that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 597 U.S. at 30.

Yet how else would one describe the majority's opinion other than a doomed quest for historical dead ringers? Confronted with the Founding-era practice of imposing the far more severe penalty of death and life imprisonment for the offenses most analogous to welfare fraud—including fraud, forgery, counterfeiting, perjury, and theft—the majority responds that the permanent loss of *all* rights is not analogous to "the *particular* . . . punishment at issue here—de facto lifetime disarmament."[161] To *Rahimi*'s admonition that the greater punishment includes the lesser and the historical reality that the Founding-era punishments for offenses like Range's necessarily subsumed the lesser punishment of permanent forfeiture of firearms, the majority avers that offenses *less serious than Range's* were punishable by temporary rather than life sentences, enabling those offenders to reacquire arms upon

---

[161] Maj. Op. at 22 (emphasis added).

62

their release from custody.[162]    To laws that categorically disarmed a wide range of groups "like Loyalists, Native Americans, Quakers, Catholics, and Blacks," the majority dismisses their relevance as directed at those "bearing arms against" the country.[163]  To the historical reality that such laws extended beyond those "bearing arms" to well-known pacifists like the Quakers, the majority decries such analogies as inconsistent with modern-day understandings of the First and Fourteenth Amendments.[164]   And to the "why" and "how" those laws restricted these particular groups—total disarmament of all members of "groups they distrusted"—the majority answers that  those laws "do[] nothing to prove that Range is part of a similar group today."[165]

But the historical analogy is patently obvious: Congress disarmed felons precisely because it determined that such persons "may not be *trusted* to possess a firearm without becoming a threat to society.'"  *Dickerson*, 460 U.S. at 112 (emphasis added) (quoting *Lewis*, 445 U.S. at 63).  In this way, § 922(g)(1) is simply a modern-day analogue to traditional legislative determinations that "firearms must be kept away from persons, such as those convicted of serious crimes, who might be expected to misuse them."  *Id.* at 119; *see supra* Section I.B.  And to that inescapable, historically grounded principle that Congress can categorically disarm felons as a class of persons presenting a special danger of firearms misuse, the majority can only fall back on its bottom line: *any* analogy

---

[162] *Id.* at 23–24.  *But cf. supra* Section I.B.2.a.

[163] Maj. Op. at 20.

[164] *Id.* at 19–20.

[165] *Id.* at 20.

not precisely matching Range's individual circumstances is "far too broad."[166]

Indeed, the only analogue the majority declares sufficient—a Founding-era statute that imposed the same "particular"[167] restriction for the same length of time on the same group of people as the modern-day law[168]—calls for nothing less than a "historical *twin*."[169] The majority admits as much when, confronting the fact that the First Congress made forging and counterfeiting a public security a capital offense, it asserts that Range's crime of making false statements to steal public funds—though admittedly analogous—could hypothetically be "more analogous" to other fraud offenses that carried a lesser punishment.[170] The majority thus thrusts on the Government the insurmountable burden of finding an identical Founding-era offense that imposes "the particular (and distinct) punishment" of lifetime disarmament for each and every felony covered by § 922(g)(1).[171] Yet the proper inquiry is not offense-by-offense, but "whether the challenged *regulation* is consistent with the *principles* that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898 (emphasis added). Analogical reasoning under *Bruen* and *Rahimi* "demands [that] wider lens." *Id.* at 1925 (Barrett, J., concurring).

At bottom, my colleagues have prescribed a methodology of examining historical practices in isolation and

---

[166] *Id.* at 20–21 (quoting *Bruen*, 597 U.S. at 31).

[167] *Id.* at 22.

[168] *See id.*

[169] *Bruen*, 597 U.S. at 30; *Rahimi*, 144 S. Ct. at 1903.

[170] Maj. Op. at 22.

[171] *Id.*

rejecting them if they deviate in any respect from contemporary regulations. But for all the analogues they reject, they decline to adopt any articulable methodology of their own. And not for lack of options. Our sister circuits have taken divergent but principled approaches to adjudicating challenges to § 922(g)(1). *See United States v. Hunt*, No. 22-4525, 2024 WL 5149611, at *7 (4th Cir. Dec. 18, 2024) ("Just as early legislatures retained the discretion to disarm categories of people because they refused to adhere to legal norms in the pre-colonial and colonial era, today's legislatures may disarm people who have been convicted of conduct the legislature considers serious enough to render it a felony."); *United States v. Pierre*, No. 23-11604, 2024 WL 5055533, at *2–4 (11th Cir. Dec. 10, 2024) (concluding that *Bruen* and *Rahimi* did not overrule or abrogate circuit precedent foreclosing facial and as-applied challenges to § 922(g)(1)); *Williams*, 113 F.4th at 661–62 ("History shows that governments may use class-based [laws like § 922(g)(1)] to disarm people it believes are dangerous, so long as members of that class have an opportunity to show they aren't."); *Diaz*, 116 F.4th 469–70 (holding that § 922(g)(1) is constitutional as applied to felons convicted of offenses analogous to ones that "would have led to capital punishment or estate forfeiture" at the Founding); *United States v. Jackson*, 110 F.4th 1120, 1125 (8th Cir. 2024) ("Given these assurances by the Supreme Court [about longstanding prohibitions on the possession of firearms by felons], and the history that supports them, we conclude that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1).").

The closest the majority comes to adopting a coherent methodology is its approving reference to that of the Sixth

65

Circuit in *Williams*.[172] In several respects, I agree with *Williams*. Much like the approach I proposed in my prior dissent[173] and that I espouse today, the Sixth Circuit derived from historical analogues the "relevant principle" that "when the legislature disarms on a class-wide basis, individuals must have a reasonable opportunity to prove that they don't fit the class-wide generalization," 113 F.4th at 661, and because the government historically could "require individuals in a disarmed class to prove they aren't dangerous in order to regain their right to possess arms," it concluded that "in an as-applied challenge to § 922(g)(1), the burden rests on [the felon] to show he's not dangerous," *id.* at 662. So far, so good.

At that point, however, the Sixth Circuit took a different turn and asserted that a defendant could raise that challenge in an effort to dismiss a § 922(g)(1) indictment "albeit after he violated the law, not before." *Id.* at 663; *see also Diaz*, 116 F.4th at 461, 469–70 & n.4. And that conclusion, I reject. My colleagues in the majority gesture at a purely prospective approach by clarifying that the relief we grant today on Range's as-applied challenge protects him only "from prosecution under § 922(g)(1) for any *future* possession of a firearm."[174] Consistent with that prospective approach, they also clarify that the decision to grant a movant that forward-looking relief turns not solely on the nature of the underlying conviction but on whether the movant currently "poses a

---

[172] *See* Maj. Op. at 21.
[173] *Range I*, 69 F.4th at 135–38 (Krause, J., dissenting).
[174] Maj. Op. at 25 (emphasis added).

physical danger to others."[175]  And to that extent, I agree with them.

But there should be no ambiguity on that score, and the majority opinion creates more questions than it answers.  As I explain below, requiring a pre-enforcement challenge as a condition of protection from prosecution under § 922(g) and prosecuting those who violate § 922(g)'s prohibition without obtaining such declaratory relief not only comports with our regulatory tradition but also provides a framework that is both administrable and comports with due process.

## III.    The Benefits of Our Prospective Approach Relative to the Sixth Circuit's

Any approach that would apply post hoc determinations about the constitutional application of § 922(g)(1) on a retroactive basis—i.e., to excuse unauthorized violations of the statutory ban and dismiss pending § 922(g)(1) indictments or vacate § 922(g)(1) convictions—would be deeply flawed. While the Sixth Circuit attempted to cabin the harm by drawing a line at "dangerousness," *Williams*, 113 F.4th at 659, its retroactive modality still falls prey to intractable doctrinal and practical problems.

### A.    Consequences of the Sixth Circuit's Retroactive Approach

A retrospective mode of analysis defies not just logic, but also the Due Process Clause, which guarantees that a "person of ordinary intelligence [must have] a reasonable opportunity to know what is prohibited, so he may act

---

[175] *Id.*

67

accordingly."[176]  But particularly where (as with the majority here) courts continue to demand a precise historical analogue, offenders cannot possibly know in advance of a court's ex post determination whether possessing a firearm post-indictment will be deemed a constitutional entitlement or a federal felony.

Looking to "dangerousness," as the Sixth Circuit did, still fails to give adequate notice about what § 922(g)(1) permissibly criminalizes.  Congress enacted a bright-line rule distinguishing offenders who can possess firearms from those who cannot.  By looking to the maximum punishment available for his offense, a felon or state misdemeanant can easily determine whether he can possess a gun.[177]  In contrast, a holding that § 922(g)(1) constitutionally applies ab initio only to "physically dangerous" felons or felons who commit "violent" crimes replaces Congress's straightforward test with an opaque one, tantamount to rendering the statute void for vagueness.

After all, previous attempts by federal courts to define "violent felony," e.g., for purposes of the Armed Career Criminal Act, yielded "repeated attempts and repeated failures to craft a principled and objective standard [for that term,] confirm[ing] its hopeless indeterminacy."[178]  Those efforts proved so futile that the Supreme Court held in *Johnson v. United States* that the "violent felony" provision "denie[d] fair notice to defendants and invite[d] arbitrary enforcement by judges," thus violating due process.[179]  If § 922(g)(1) is constitutionally applied only to "crimes of violence," are we relegated to the widely disparaged "categorical approach,"

---

[176] *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

[177] *See* 18 U.S.C. § 921(a)(20).

[178] *Johnson v. United States*, 576 U.S. 591, 598 (2015).

[179] *Id.* at 597.

excluding all offenses that lack an element of the "use of force"?[180]  What is the relevance of underlying conduct?  Are courts limited to considering *Shepard* documents?[181]  What about crimes that lack an element of force but are undeniably associated with violence, like drug trafficking, human trafficking, and treason?[182]

Holding § 922(g)(1) unenforceable from the start as to an amorphous sub-class of felons also makes it virtually impossible for the Government to prove the mens rea element of a § 922(g) offense.  In *Rehaif v. United States*, the Supreme Court held that to convict a defendant under § 922(g) the Government must prove the defendant not only knew that he possessed a firearm, but also knew that "he had the relevant status when he possessed [the firearm.]"  588 U.S. 225, 227 (2019).  The Court then clarified in *Greer v. United States* that a *Rehaif* error is not a basis for relief under the plain-error standard unless the defendant can make a sufficient argument on appeal that, but for the error, he could have established he did not know he was a felon.  593 U.S. 503, 508–10 (2021).  That would be a difficult argument to make, the Court observed, because "as common sense suggests, individuals who are

---

[180] *United States v. Scott*, 14 F.4th 190, 195 (3d Cir. 2021).

[181] Those documents include the "charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." *Shepard v. United States*, 544 U.S. 13, 16 (2005).

[182] Range himself candidly conceded at the original en banc oral argument that, under a "violence" test, offenses like possession of child pornography, money laundering, and drunk driving would not support disarmament. *Range I* Oral Arg. at 19:51–20:20, 24:00–24:26.

convicted felons ordinarily know that they are convicted felons [for purposes of § 922(g)(1).]" *Id.* at 506.

But a test that turns on a court's post hoc determination that § 922(g)(1) was unenforceable from the beginning replaces *Rehaif*'s clear and ascertainable standard with an incoherent one: the Government now must prove that, when he possessed the firearm, the felon knew his particular offense of conviction would later be held to have a historical match. And in lieu of *Greer*'s high threshold for plain-error relief, that reasoning hands defendants a ready-made argument for appeal: that they could not know at the time they possessed a firearm—indeed, at any time before a court made the determination—whether their particular felony offense was subject to or exempt from § 922(g)(1). In short, granting relief on a retroactive basis throws open the floodgates the Supreme Court sought to close on *Rehaif* errors in *Greer* and augurs in a deluge of *Rehaif* challenges.

Additionally, a retroactive approach has sweeping implications for state felon-in-possession restrictions. By making application of felon-in-possession statutes void ab initio, the retroactive approach permits felons to raise the same Second Amendment challenges to state regulations as they can to their federal counterpart, leaving state felon-in-possession statutes susceptible to the same patchwork constitutionality as § 922(g)(1). Those laws differ significantly across the forty-eight states that restrict offenders' firearm rights—including which offenses trigger restrictions as well as their duration—in keeping with each state's local circumstances.[183] Instead of

---

[183] *See generally Fifty-State Comparison: Loss and Restoration of Civil/Firearms Rights*, Restoration Rts. Project,

ensuring local communities' concerns and values shape when felons may possess firearms under state law, the retroactive approach brushes aside these weighty federalism interests, making applications of local firearm restrictions unconstitutional at the outset where they do not precisely match a historical twin. Congress took great care to respect local interests in § 922(g)(1) by incorporating state law felony equivalents. *See* 18 U.S.C. § 921(a)(20). The retroactive approach displaces this careful balance of federal and state interests in favor of unpredictable, post hoc determinations, unresponsive to the needs of local communities and antithetical to our system of federalism.

Finally, anything short of requiring a pre-enforcement challenge severely undermines law enforcement efforts and makes the FBI's National Instant Criminal Background Check System (NICS) obsolete. Currently, NICS includes over five million felony conviction records,[184] and that number continues to grow as additional agencies contribute records to the NICS database.[185] Prior felony convictions are by far the most common reason individuals fail NICS background checks.[186]

---

https://ccresourcecenter.org/state-restoration-profiles/chart-1-loss-and-restoration-of-civil-rights-and-firearms-privileges-2/ (last visited Dec. 23, 2024).

[184] *Active Records in the NICS Indices*, FBI, https://www.fbi.gov/file-repository/active_records_in_the_nics-indices.pdf/view (last updated Nov. 30, 2024).

[185] *See* Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1597 (2022).

[186] *See Federal Denials*, FBI, https://www.fbi.gov/file-repository/federal_denials.pdf/view (last updated Nov. 30, 2024).

And the Supreme Court in *Bruen* endorsed the use of background checks, for violent and non-violent offenses alike, to ensure individuals bearing firearms are "law-abiding" citizens. *See* 597 U.S. at 38 n.9.

An indeterminant, post hoc test for which felons fall outside § 922(g)(1) and under what circumstances renders NICS a dead letter. When the police receive a tip that an ex-offender is toting an assault rifle, how do they—or prosecutors for that matter—know if they have probable cause to arrest him for violating the felon-possession ban, or if they instead are bringing liability on themselves for violating the felon's civil rights? Do they look to particular elements of the prior offense to determine that the felon is a "dangerous" or to the conduct underlying that offense? How do they assess that conduct in the case of guilty pleas entered years ago? This approach requires law enforcement in the first instance to undertake the historical research with which even the federal courts have struggled to determine whether there is a precise match and thus probable cause to support an arrest under § 922(g)(1), rendering their jobs, at best, substantially more difficult, and, at worst, nearly impossible.

And, without a functional background check system, how do firearms licensees (FFLs) comply with federal law? Where as-applied challenges can render § 922(g)(1) unenforceable from the outset, FFLs who discover that a potential customer has a felony conviction have no way of knowing whether that offense has a precise historical match or whether the individual will be considered by a court to be "physically

72

dangerous."[187]  Of particular concern, any assessments based on such "vague criteria are vulnerable to biases" along race, class, gender, and other lines, resulting in disparities between which groups retain gun rights and which do not.[188]

### B. Requiring a Declaratory Judgment Avoids These Pitfalls

Holding § 922(g)(1) enforceable through at least the successful completion of a felon's sentence and requiring a declaratory judgment as a prerequisite to relief thereafter not only adheres to our regulatory tradition and the Court's precedent but also provides a clear and administrable framework.[189]

---

[187] The penalty for incorrectly concluding a felon can purchase a weapon without an exhaustive inspection of the felon's crime, conduct, and personal circumstances will be stiff: a single error will result in the loss of the FFL's license, barring the FFL from the industry.  *See Simpson v. Att'y Gen.*, 913 F.3d 110, 114 (3d Cir. 2019).

[188] Ryan T. Sakoda, *The Architecture of Discretion: Implications of the Structure of Sanctions for Racial Disparities, Severity, and Net Widening*, 117 Nw. U. L. Rev. 1213, 1227 (2023); *cf.* Joseph Blocher & Reva B. Siegel, *Race and Guns, Courts and Democracy*, 135 Harv. L. Rev. F. 449, 449 (2022) (arguing "racial justice concerns [with firearm laws] should be addressed in democratic politics rather than in the federal courts").

[189] Judge Roth acknowledges that there is a meaningful difference between the proposal that an individual's opportunity to petition for rearmament arises after the sentence has been

First, declaratory judgment proceedings give effect to the Court's oft-repeated instruction that felon-possession bans are "presumptively lawful,"[190] while respecting that the Government bears the initial burden to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."[191]   Once the Government establishes

served, and the proposal that it arises after the duration of the maximum sentence available for the conviction has passed.  She agrees, however, on the most important point: felons should have a date for when they may petition courts for rearmament, and specific guidance for what they must show for relief.  Judge Roth also strongly agrees with the above critiques of the majority opinion.

[190] *Heller*, 554 U.S. at 626–27 & n.26; *see McDonald*, 561 U.S. at 786; *Rahimi*, 144 S. Ct. at 1902; *Bruen*, 597 U.S. at 72 (Alito, J., concurring); *id.* at 81 (Kavanaugh, J., concurring).  As the Tenth Circuit has observed, "[b]ecause the 'presumptively lawful regulatory measures' language, first stated in *Heller,* has not been abrogated," and has been restated in *McDonald*, *Bruen*, and *Rahimi*, "it remains good law."  *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 119 (10th Cir. 2024); *see also Binderup v. Att'y Gen.*, 836 F.3d 336, 359 n.3 (3d Cir. 2016) (Hardiman, J., concurring in part) (explaining that "*Heller*'s list of 'presumptively lawful' regulations . . . does not qualify as dicta"), *abrogated on other grounds by Bruen*, 597 U.S. 1.  Moreover, even if it were dicta, "federal appellate courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when, as here, a dictum is of recent vintage and not enfeebled by any subsequent statement."  *Oyebanji v. Gonzales*, 418 F.3d 260, 265 (3d Cir. 2005) (Alito, J.) (cleaned up).
[191] *Bruen*, 597 U.S. at 17.

that an offender committed a felony, it has necessarily satisfied its burden consistent with the historical practice of disarming felons upon conviction. The burden at that point, like the taking of oaths or swearing allegiance, falls on the felon to rebut the ban's presumptive lawfulness by establishing he is currently a "law-abiding citizen" who no longer poses a special risk of danger or misusing firearms.[192]

Second, limiting relief in as-applied § 922(g)(1) challenges to prospective declaratory judgments eliminates an intractable due process problem. Any felon who possessed a firearm before securing a favorable declaratory judgment would remain subject to prosecution under § 922(g)(1), and those granted relief would have their rights restored prospectively. That clear rule would provide felons with constitutionally adequate notice as to whether and when they regained their right to bear arms, allowing § 922(g)(1) to withstand void-for-vagueness challenges. Prospective declaratory judgments likewise avoid opening the floodgates to mens rea challenges to § 922(g)(1) prosecutions, and the high threshold *Greer* set for defendants to overturn § 922(g)(1) convictions would endure.[193]

Third, making a declaratory judgment a prerequisite to avoiding § 922(g)(1) enforcement shows respect for the separation of powers and federalism. Other than for those who

---

[192] *Id.* at 26. This approach would not result in repetitive actions because a felon who brings an unsuccessful declaratory judgment suit must provide "newly discovered evidence that, with reasonable diligence, could not have been discovered" to prevail in a subsequent as-applied challenge to § 922(g)(1). Fed. R. Civ. P. 60(b)(2).

[193] *See* 593 U.S. at 508–09.

received favorable declaratory judgments, Congress's decision to disarm felons would remain intact. Also, state statutes restricting felons' firearms rights would be generally enforceable, ensuring local communities' concerns and values continue to shape when felons are permitted to possess firearms under state law.

Finally, a prospective approach avoids the potentially debilitating effect on law enforcement, U.S. Attorney's Offices, and our background check system. Currently, felons can submit documentation to the FBI through a voluntary appeal-file application, including "information regarding an expungement, restoration of firearm rights, pardon, etc."[194] Successful applicants receive a unique personal identification number to prevent future background check denials.[195] Thus, a felon who secures a prospective declaratory judgment can simply submit that judgment to the FBI to prevent false positives on his background check when next purchasing firearms. Then, just as they do today, law enforcement and prosecutors could depend on NICS for data when deciding whom to charge with violating § 922(g)(1); courts could rely on existing jury instructions, the standard conditions of supervised release or parole, and the plain-error test set out in *Greer*; and firearm dealers could

---

[194] *Types of Documents Requested Based on Prohibitor*, FBI (Sept. 14, 2018), https://www.fbi.gov/file-repository/nics-appeal-documents-requested.pdf/view.

[195] *Firearm-Related Challenge (Appeal) and Voluntary Appeal File (VAF)*, FBI, https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/nics/national-instant-criminal-background-check-system-nics-appeals-vaf (last visited Dec. 23, 2024).

ascertain from a background check whether a felon can purchase weapons.

Without clearly limiting as-applied challenges to prospective relief, we put our citizenry at risk for tragic consequences: a flood of motions to dismiss indictments, appeals, and reversals of § 922(g)(1) convictions; more armed felons on our streets; more gun violence; and less trust in a judiciary mired in formalism and the usurpation of legislative authority. The Supreme Court had the opportunity to take up *Range I* and instead remanded, resurrecting a circuit split and a tower of uncertainty. The sooner it provides clarity, the safer our republic will be.

## IV.    Conclusion

For the foregoing reasons, I respectfully concur in the judgment.

ROTH, <u>Circuit Judge</u>, concurring in judgment with whom KRAUSE and CHUNG, <u>Circuit Judges</u> join in part.


The Supreme Court has consistently and repeatedly reaffirmed Congress's presumptive power to limit felons' rights to possess firearms.[1] The facial constitutionality of § 922(g)(1) is not up for debate under this presumption—nor is it before us on Range's appeal. But *Rahimi* and *Bruen* have blurred the lines between facial and as-applied challenges under the Second Amendment. Determining whether § 922(g)(1) "comport[s] with the principles underlying the Second Amendment"[2] requires us to articulate broad principles underlying the challenged regulation and their relevant similarity to oft-repeated historical analogues.

I write separately to focus on two aspects of Range's circumstances: the permanent loss of his right to bear firearms, and the necessity of an efficient path to resolve similar

---

[1] *See District of Columbia v. Heller*, 554 U.S. 570, 626–27, 627 n.26 (2008) (describing certain categorical prohibitions, like felon dispossession, as "presumptively lawful"); *accord. United States v. Rahimi*, 144 S. Ct. 1889, 1902 (2024); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 80–81 (2022) (Kavanaugh, J., concurring); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010); *see also Lewis v. United States*, 445 U.S. 55, 65 n.8 (1980) ("These legislative restrictions on the use of firearms are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties."); *United States v. Bass*, 404 U.S. 336, 338 (1971) (affirming § 922(g)(1) as a constitutionally valid exercise of Congress' Commerce Clause authority).
[2] *Rahimi*, 144 S. Ct. at 1898.

situations.  I am convinced that, in the case of a nonviolent, reformed offender, the loss of the right to possess firearms should not be de facto permanent.  Over two decades have passed since Range completed his sentence for obtaining public welfare funds by misrepresentation—two decades during which he has demonstrated law-abiding, peaceful behavior and shown his possession of firearms would not pose any danger to the public.  The ban of § 922(g)(1) should no longer apply to him.

The government and our sister circuits have presented an exhaustive survey of statutes that set forth an unmistakable Anglo-American tradition of categorical disarmament.[3]  As the sources provided by the government make clear, from English

---

[3] *See, e.g.*, *United States v. Williams*, 113 F.4th 637, 653 (6th Cir. 2024); *United States v. Jackson*, 110 F.4th 1120, 1126 (8th Cir. 2024); *United States v. Perez-Garcia*, 96 F.4th 1166, 1186 (9th Cir. 2024); *United States v. Duarte*, 101 F.4th 657, 676 (9th Cir. 2024), *opinion vacated*, 108 F.4th 786 (9th Cir. 2024); *see also* Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies: Making Sense of Limits on the Right to Keep and Bear Arms in the Founding Era*, 51 Fordham Urb. L.J. 25, 47 (2023); Joseph G. S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 259 (2020); Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607–1794*, 16 L. & Hist. Rev. 567, 577 (1998); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695 (2009).

kings to the 20th century, governments have disarmed the peaceable and dangerous alike with varied justifications.[4]

---

[4] *See generally*, Krause Concurrence at 12–40 (providing an in-depth discussion of categorical disarmament laws from the English Restoration to the American Gilded Age); *see also, e.g.*, 4 William Blackstone, *Commentaries on the Laws of England*, 380–89 (1769) (felons at common law generally forfeited their lands, goods, and chattels); Letter from George Washington to the Pennsylvania Council of Safety (Dec. 15, 1776), National Archives (requesting authorization to disarm individuals remaining neutral in the Revolutionary war, as their arms were needed by the militia); Act of Mar. 7, 1923, ch. 266, § 5, 1923 N.D. Laws 380 (prohibiting the possession of handguns by those convicted of felonies against person or property); Act of Oct. 3, 1961, Pub. L. No. 87-342, § 2, 75 Stat. 757 (forbidding the receipt of a firearm by anyone convicted of a crime punishable by more than a year of imprisonment); Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.) (restricting the sale of firearms to individuals below certain ages); Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87 (banning the sale of guns to persons of unsound mind); Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394 (disarming "tramps" or "vagrants"); Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25 (forbidding intoxicated persons from possessing guns); Federal Firearms Act, ch. 850, § 2(d)-(f), 52 Stat. 1251 (1938) (banning violent criminals, fugitives from justice, and persons under felony indictment from possessing firearms); Act of Oct. 3, 1961 (disarming felons in general, drug users and addicts, and persons with mental illnesses); Violent Crime Control and Law Enforcement

If the government's proposed analogues are evidence of a historical tradition underlying the Second Amendment, then the legislature's power to categorically disarm is undeniably broad. In enacting § 922(g)(1), Congress intended to exercise the full breadth of this power, believing that a felony-equivalent conviction was a sufficient indicator that such individuals posed a danger of misuse.[5] Congress imposed categorical disarmament as a preventive and/or reformative measure.[6] Moreover, the government has met its burden of setting forth analogues that are "relevantly similar" to § 922(g)(1) in "*why* … [they] burden[] the Second Amendment right."[7] These analogues establish a historical principle of disarmament to address the danger of the misuse of firearms, and the Supreme Court has repeatedly identified § 922(g)(1) as a "presumptively lawful regulatory measure[]."[8]

---

Act of 1994 (disarming individuals subject to domestic violence restraining orders).

[5] *See also*, *Huddleston v. United States*, 415 U.S. 814, 824 (1974) ("The principal purpose" of § 922(g) "was to curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'") (citing 1269 S. Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968) U.S. Code Cong. & Admin. News 1968, p. 4410).

[6] *Id.*

[7] *See Rahimi*, 144 S. Ct. at 1901 (emphasis added) (quoting *Bruen*, 597 U.S. at 30); *see also, e.g.*, *id.* at 1902; *Heller*, 554 U.S. at 626–27, 627 n.26; *Bruen*, 597 U.S. at 80–81 (Kavanaugh, J., concurring); *McDonald*, 561 U.S. at 786.

[8] *See, e.g.*, *Heller*, 554 U.S. at 626–27, 627 n.26; *Rahimi*, 144 S. Ct. at 1902; *Bruen*, 597 U.S. at 364 (2020) (Alito, J., concurring); *McDonald*, 561 U.S. at 786.

4

But the government's historical analogues show that Congress has the power only to *suspend* the right to possess firearms—not to de facto permanently remove it. [9] The

---

[9] The only analogue that the Government identifies for permanent disarmament is capital punishment. Historical punishment of felonies with execution is an imperfect analogue, as § 922(g)(1) is not a punishment but rather a disability imposed because of a prior conviction. *See Beecham v. United States*, 511 U.S. 368, 371 (1994) ("Section 922(g) imposes a disability on people who "ha[ve] been convicted."); *Padilla v. Kentucky*, 559 U.S. 356, 376 (2010) (listing "ineligibility to possess firearms" as a consequence of conviction). Treating § 922(g)(1) as a form of punishment would raise serious constitutional questions when the plaintiff, like Range, was convicted only in state court. This is because Congress lacks authority to impose a punishment for a state crime. *See United States v. Lanza*, 260 U.S. 377, 382 (1922) ("[E]ach government in determining what shall be an offense against its peace and dignity is exercising its own sovereignty, not that of the other. For it to do so would crumble the foundations of our system of dual sovereigns, not to mention flout our constitutional prohibition on punishing the same offense twice."). This distinction is important. Historical analogues presented in this context disarmed within the bounds of a criminal sentence—but a § 922(g)(1) disability is a de facto permanent disarmament in most states. *See 50-State Comparison: Loss & Restoraiton of Civil / Firearms Rights*, RESTORATION OF RTS. PROJ. (available at https://ccresourcecenter.org/state-restoration-profiles/chart-1-loss-and-restoration-ofcivil-rights-and-firearms-privileges/) (last accessed Nov. 21, 2024). Because Founding-era felons regained their rights when (or if) they completed their sentence,

government offers two types of historical analogues to support the duration of 922(g)(1)'s disarmament: 1) statutes that disarmed categories of people believed to pose a danger of firearm misuse; and 2) statutes punishing—and incidentally disarming—those convicted of committing historical-equivalents to modern felonies. For the first category, once the government's justification for disarmament no longer applied to an individual—whether at the end of a criminal sentence, upon an individualized determination of a judge or other authority, or as part of a broader reinstatement of civil rights— the right to possess firearms always had the potential of being restored.[10] Thus, while these proposed historical analogues do

---

these analogues do not in and of themselves support the necessity of disarmament once a perceived threat to society has passed. *See Kanter v. Barr*, 919 F.3d 437, 461 (7th Cir. 2019) (Barrett, J., dissenting) (describing the general pitfalls of analogies to capital punishment, and noting that felons serving a term of years had their rights "suspended but not destroyed.") (*abrogated by Bruen*, 597 U.S. at 1). This conclusion is supported by our general understanding that individuals possess limited civil rights while serving their sentence, but that those rights may be restored once they have served their time. The only permanent loss of a fundamental constitutional right that may continue as a collateral consequence of criminal conviction— the loss of the right to vote—required an express sanction in the Constitution. *See Richardson v. Ramirez*, 418 U.S. 24, 54 (1974) ("The exclusion of felons from the vote has an affirmative sanction in [§] 2 of the Fourteenth Amendment.").

[10] For example, the nineteenth century statutes disarming children, the mentally ill, "vagrants", and intoxicated persons were necessarily temporary in nature as a child could age out

6

support a principle of temporary categorical bans, they are not wholly "relevantly similar" to § 922(g)(1) in "*how* [they] burden the Second Amendment right" because the disability imposed by § 922(g)(1) is de facto permanent.[11]

---

of the ban, a mentally ill person could receive treatment, a "vagrant" could be housed, and an intoxicated person could become sober. *See*, *supra* n.4; *see also*, Resolution of Mar. 13, 1776, in Journal of the Provincial Congress of South Carolina, 1776, at 77–78 (1776) (permitting restoration of arms to "any person who . . . shall convince the Committee aforesaid, that he sincerely desires to join in support to the American cause"); Mass. Gen. Laws 484 (1776) (permitting disarmed loyalists to restore their right to possess arms upon a committee or court order); *Duarte*, 101 F.4th at 683 (describing Revolution-era statutes permitting Loyalists to keep weapons "once they showed 'satisfactory reasons' for needing weapons or 'by the order of' colonial committees'"). Many statutes included an internal safety valve permitting individuals to contemporaneously restore their right to possess firearms, including by swearing loyalty oaths, *e.g.*, The Acts of the General Assembly of the Commonwealth of Pennsylvania 193 (1782) (A 1779 Act amending a 1778 law disarming Loyalists, to permit those who had taken an oath of allegiance to rearm themselves.), or putting their use of firearms at surety. *See Rahimi*, 144 S. Ct. at 1899 (discussing history of surety laws as a form of "preventative justice"). Meanwhile, felonies at common law that were punishable by forfeiture of property did not preclude offenders from purchasing new firearms after they had forfeited their old arms. *E.g.*, *id.* at 1901; *United States v. Moore*, 111 F.4th 266, 269 (3rd Cir. 2024).

[11] *See Rahimi*, 144 S. Ct. at 1901 (emphasis added) (quoting *Bruen*, 597 U.S. at 30).

The government identifies a second set of historical analogues to support the de facto permanence of § 922(g)(1) disarmament—historic punishments for serious offenses. For convicted offenders, disarmament was often limited to the duration of their actual imprisonment. In practice then, the maximum possible period of disarmament contemplated by legislatures was frequently the maximum possible period of imprisonment. While that may have been equivalent to permanent disarmament for some offenses, it was not for all and thus would not support permanent disarmament.

In short, the government's two strands of analogues establish a historic principle of imprisoning (and thereby disarming) in response to a felony conviction for a period of time that depended on the offense committed, as well as temporarily disarming categories of people that a legislature deemed to pose a danger of firearm misuse. Together, these two principles reflect that felons can be disarmed under § 922(g)(1) because, as a function of their conviction, Congress has found them to pose a danger of misuse. The remaining question is how long felons' Second Amendment rights may constitutionally be burdened pursuant to these principles.[12]

---

[12] This is the only point of disagreement between the views set forth here and those set forth by Judge Krause in her concurrence. We agree that § 922(g)(1) is constitutional as applied to all offenders that meet its statutory criteria, that those offenders must have an opportunity at some point to show that they should no longer be disarmed, and that they will remain disarmed, up to and including permanently, unless and until they make that showing. In Judge Krause's view, history supports allowing the offender to seek that opportunity as early as the conclusion of his actual sentence, whereas I would not

8

I conclude that when disarmament is purely based on felon *status* (not an individualized assessment of danger to others), an indicator of the power to regulate is the maximum penalty for the offense of conviction. This conclusion is consistent with the historic tradition of disarmaments that are limited in duration.[13] Because it is based upon legislatures' assessments of the danger posed to society by an offense,[14] it is

---

allow it until after the duration of the maximum sentence available for the conviction had passed. Thus, Judge Krause does not join in the durational limit I adopt in the next paragraph above the line or in notes 17 and 20.

[13] I note that we should not assume "that founding-era legislatures maximally exercised their power to regulate." *Id.* at 1925 (Barrett, J., concurring); *Antonyuk v. James*, 120 F.4th 941, 969 (2d Cir. 2024) ("Legislatures past and present have not generally legislated to their constitutional limits."). Here, however, Congress's de facto permanent ban reflects an intent to maximally exercise the power to regulate and disarm all felons for the full period constitutionally permitted. Further, while I have noted above that sentencing alone is an imperfect analogue for disarmament, *Rahimi* indicates that when historic analogues establish a regulatory tradition of responding to a particular threat of firearm misuse (the "why") with disarmament (the "how"), the imposition of imprisonment can inform our understanding of the scope of the historic principle asserted by the government. *See Rahimi*, 144 S. Ct. at 1902 (counseling that sentencing is relevant in analyzing the contours of Congress's power to disarm because the greater penalty of imprisonment can be interpreted to include the lesser penalty of disarmament.)

[14] While this period is not a constitutional limit that has previously been spelled out, I consider it to be a reasonable

9

also consistent with the Second Amendment's protections against unfettered legislative discretion in disarming "the people."[15]  This approach also aligns with the Supreme Court's repeated statements that felon bans are presumptively lawful.[16]

Range's success will likely open the floodgates for similar pre-enforcement challenges.  These *Bruen* challenges are a costly, time-consuming solution for the fact-specific determination of whether an individual still presents a threat of public injury.  Cabining the timeframe during which felons may be disarmed will allow courts and individuals alike to readily assess when rearmament is permitted,[17] obviating a need for

---

estimation of the period during which an offender might be disarmed based solely on his status as a felon.  The duration would of course also depend on the offender being able to demonstrate that he did not present a risk of danger to the public.  In computing the period in a situation where there were multiple offenses, the duration would depend on whether the sentences for the offenses were imposed concurrently or consecutively.

[15] *Id.* at 1946 (Thomas, J. dissenting) (discriminatory disarmaments "warn that when majoritarian interests alone dictate who is 'dangerous,' and thus can be disarmed, disfavored groups become easy prey.").

[16] *See supra*, n.8.

[17] For example, while an offender convicted of a death-eligible crime may be permanently disarmed, an offender, like Range, who is convicted of an offense punishable by a maximum term of imprisonment of five years, may be disarmed for five years from the date his sentence is imposed before he has the opportunity to show that he does not pose a danger to the public and should have his rights restored.

assessing each modern offense individually and comparing it against Founding-era analogues on a case-by-case basis.[18]

Range long ago completed the punishment that Pennsylvania deemed appropriate for his crime: three years of probation, a $100 fine, $288.29 in costs and $2,458 in restitution. The statutory maximum punishment for his offense—five years—has long passed, and he has shown, through years of good behavior, that he does not present a threat to the public. Congress's justification for suspending his ability to possess a firearm no longer applies. The Second Amendment requires restoration of his rights. He should be permitted to petition for restoration upon a showing that his maximum sentence has expired and that he would not present

---

[18] Indeed, the establishment of fixed criteria for the reinstatement of Second Amendment rights may induce Congress to reverse its position on funding § 925(c). It may also enable the Department of Justice to establish a procedure for reviewing petitions for restoration of rights, as well as providing a possible path to restoration prior to the expiration of a convicted offender's maximum sentence if that maximum sentence is unduly extended. On the other hand, once an offender's maximum sentence expires, that individual would still need to comply with state permitting schemes to rearm, thereby preserving states' ability to address situations where restoration may be inappropriate.

a risk of danger to the public if his gun rights were restored.[19] For these reasons, I respectfully concur in the judgment.[20]

---

[19] We do not share our dissenting colleagues' concerns that our proposal here conflicts with Congress's pre-identified method of rearmament, through § 925(c). *See* Dissent at 8 n.7. Our proposal provides a method for the district courts to determine the constitutionality of §922(g)(1), as applied to individual offenders. Determining the limits of statutes' constitutionality has long been the province of the courts, and we do not encroach on Congress's power by doing so here. *See Marbury v. Madison*, 5 U.S. 137, 180 (1803).

[20] Judge Chung concurs because she does not believe Judge Roth's opinion is inconsistent with the majority approach and because, in her view, the constitutional outer limit under *Bruen* of the power to disarm felons like Range (e.g., those falling into the third category identified in *Williams*, 113 F.4th at 659) is coextensive with the maximum penalty for the offense of conviction. This is because, in her view, it is historically the longest period an individual could have been disarmed based on felon status alone. While Founding-era legislatures did not maximally exercise that authority to disarm in this manner, Judge Chung agrees with Judge Roth that the § 922(g)(1) statutory scheme demonstrates that Congress was taking a maximalist approach towards disarmament in enacting it. As a practical matter, Judge Chung's view would mean that the disability is removed automatically and rearmament would be subject to state permitting schemes. Thus, she does not join those portions of Judge Roth's opinion concluding otherwise.

12

SHWARTZ, Circuit Judge, dissenting, with whom RESTREPO, Circuit Judge, joins.

Today, the Majority of our Court has again decided that an individual convicted of fraud cannot be barred from possessing a firearm. While the Majority states that its opinion is narrow, the analytical framework it applies to reach its conclusion could be read to render most, if not all, felon bans unconstitutional. However, the Supreme Court has reiterated that such bans are presumptively lawful, see United States v. Rahimi, 144 S. Ct. 1889, 1902 (2024), and because there is a historical basis for them, I respectfully dissent.

In New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022), the Supreme Court set forth a history-based framework for deciding whether a firearm regulation is constitutional under the Second Amendment. Courts must now examine whether the "regulation [being reviewed] is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Id. at 19. To make this determination, a court must decide whether the challenger or conduct at issue is protected by the Second Amendment and, if so, whether the Government has presented "relevantly similar" historical analogues to justify the restriction. See id. at 24, 29; see also Rahimi, 144 S. Ct. at 1898 (same).

The Majority's analysis is inconsistent with the Supreme Court's jurisprudence and has far-reaching consequences. First, the Majority downplays the Supreme Court's consistent admonishment that felon bans are "longstanding" and "presumptively lawful." District of Columbia v. Heller, 554 U.S. 570, 626-27 & n.26 (2008); McDonald v. City of Chicago, 561 U.S. 742, 786 (2010). In

1

<u>Heller</u> and <u>McDonald</u>, the Supreme Court stated that felon bans are consistent with our historical tradition. <u>Heller</u>, 554 U.S. at 626-27; <u>McDonald</u>, 561 U.S. at 786. More recently, majorities of the Court have reiterated that felon bans are presumptively lawful, and notably did so, respectively, in (1) the very case (<u>Bruen</u>) that explicitly requires courts to find historical support for every firearm regulation, <u>see</u> <u>Bruen</u>, 597 U.S. at 17; and (2) in a case (<u>Rahimi</u>) that upheld a firearm restriction after applying <u>Bruen</u>'s history and tradition test, <u>see</u> <u>Rahimi</u>, 144 S. Ct. at 1902; <u>see also</u> <u>Bruen</u>, 597 U.S. at 72 (Alito, J., concurring) (explaining that <u>Bruen</u> did not "disturb[] anything" the Court said in <u>Heller</u> or <u>McDonald</u>); <u>id.</u> at 81 (Kavanaugh, J., concurring, joined by Roberts, C.J.) ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons[.]" (first alteration in original) (quoting <u>Heller</u>, 554 U.S. at 626)); <u>id.</u> at 129 (Breyer, J., dissenting, joined by Sotomayor, J., & Kagan, J.) ("I understand the Court's opinion today to cast no doubt on . . . <u>Heller</u>'s holding [regarding longstanding prohibitions.]"); <u>Rahimi</u>, 144 S. Ct. at 1902-03 (reiterating <u>Heller</u>'s holding that felon bans are presumptively lawful and assigning error to the Court of Appeals for the Fifth Circuit for "requir[ing] a 'historical twin' rather than a 'historical analogue'"); <u>id.</u> at 1923 (Kavanaugh, J., concurring) (noting <u>Heller</u> identified felon bans as a "categor[y] of traditional exceptions to the [Second Amendment] right").[1]

_____

[1] Other circuit courts have recognized the import of these statements. <u>E.g.</u>, <u>United States v. Hunt</u>, No. 22-4525, 2024 WL 5149611, at *4 (4th Cir. Dec. 18, 2024) ("Far from abandoning <u>Heller</u>'s language about 'longstanding' and 'presumptively lawful' restrictions on felons possessing

These statements show that felon bans have historical roots.[2] See United States v. Jackson, 110 F.4th 1120, 1125-26 (8th Cir. 2024) (upholding the constitutionality of the federal felon ban as applied to a non-violent drug offender based, in part, on the Supreme Court's statements); see also Vincent v. Garland, 80 F.4th 1197, 1202 (10th Cir. 2023) (giving effect to the Supreme Court's prior holdings implying "that it was constitutional to deny firearm licenses to individuals with felony convictions"), cert granted, judgment vacated and remanded, 144 S. Ct. 2708 (Mem) (2024); cf. United States v. Dubois, 94 F.4th 1284,

_____

firearms, the Supreme Court has repeatedly reaffirmed its applicability."); United States v. Langston, 110 F.4th 408, 420 (1st Cir. 2024) ("[T]he Supreme Court has stated repeatedly over sixteen years, from Heller to Rahimi, that felon-in-possession laws are presumptively lawful."); United States v. Rambo, No. 23-13772, 2024 WL 3534730, at *2 (11th Cir. July 25, 2024) (per curiam) (unpublished) (relying on the Supreme Court's repeated statements, including in Rahimi, about § 922(g)(1)'s presumptive validity to reject constitutional challenges to the law); United States v. Young, No. 23-10464, 2024 WL 3466607, at *8-9 (11th Cir. July 19, 2024) (per curiam) (unpublished) (same); United States v. Johnson, No. 23-11885, 2024 WL 3371414, at *3 (11th Cir. July 11, 2024) (per curiam) (unpublished) (same).

[2] The Supreme Court also recognized that other firearm regulations are "longstanding" and "presumptively lawful." Heller, 554 U.S. at 626-27, 627 n.26. Thus, the Majority's willingness to devalue the Supreme Court's observations may have consequences on regulations beyond the status-based ban at issue here.

1293 (11th Cir. 2024) (noting the Supreme Court has not doubted the constitutionality of felon restrictions).

Second, the Majority incorrectly discounts the importance of the Supreme Court's emphasis on law-abidingness as a limitation on the Second Amendment right. While the Majority dismisses this language as "dicta," Maj. Op. at 12, the Bruen Court's use of the phrase fourteen times in the majority opinion alone highlights the significance that this criterion played in its decision, see Bruen, 597 U.S. at 9, 15, 26, 29-31, 33 n.8, 38, 38 & n.9, 60, 70-71; see also Jackson, 110 F.4th at 1126 (noting Bruen's repeated statements about a law-abider's right to possess arms).[3]  Indeed, the Bruen Court approved of certain gun regulations that included criminal background checks.  Bruen, 597 U.S. at 38 n.9.  While the Majority suggests we are "overread[ing]" the phrase "law abiding," Maj. Op. at 9, 12, there is no question that one who has a felony or felony-equivalent conviction could not be characterized as law abiding.  Thus, the Supreme Court's jurisprudence tells us that the right to bear arms is limited to law abiders, and that felon bans are presumptively lawful.

Third, the Majority acknowledges but then disregards important aspects of Bruen.  The Bruen Court emphasized that its test should not be a "regulatory straightjacket" and that

---

[3] Although the Supreme Court recently concluded that an individual may not be disarmed "simply because he is not 'responsible[,]'" Rahimi, 144 S. Ct. at 1903 (quoting the term "responsible" as used in Heller, 554 U.S. at 635, and Bruen, 597 U.S. at 70), it is notable that the Court did not foreclose disarmament based on Heller and Bruen's "law-abiding" requirement.

4

courts should look for a "historical analogue" to the challenged regulation, not a "historical twin." 597 U.S. at 30 (emphasis omitted).[4] Rahimi underscored this point, as it specifically reversed the Fifth Circuit for requiring the latter. 144 S. Ct. at 1897-98, 1903 (holding that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791" and that the Court's recent Second Amendment precedents "were not meant to suggest a law trapped in amber"). Despite these instructions, the Majority demands a historical twin by requiring the Government to identify a historical crime, including its punishment, that mirrors Bryan Range's conviction. At the founding, a fraud-based crime of the type Range committed was considered a capital offense, which obviously carries with it the loss of all possessory rights.[5] Folajtar v. Att'y Gen., 980 F.3d 897, 904-05 (3d Cir. 2020) (collecting authorities). As a result, history demonstrates that fraudsters could lose their life, and hence their firearms rights. Rahimi specifically blessed this type of comparative reasoning. See Rahimi, 144 S. Ct. at 1902 (finding "permissible" "the lesser restriction of temporary disarmament"). Therefore, if fraud was punishable by capital punishment at the founding (i.e., de facto permanent disarmament), then under Rahimi it is appropriate to draw a

---

[4] Judge Krause's comprehensive historical review is consistent with our understanding and supports our discussion of the history relevant to felon disarmament.

[5] Even some noncapital offenses resulted in life imprisonment and the forfeiture of the offender's entire estate, which contemplates the loss of all property, including firearms. Act of Apr. 18, 1786, 2 Laws of the State of New York 253, 260–61 (1886); Act of Nov. 27, 1700, 2 Statutes at Large of Pennsylvania 12 (Wm. Stanley Ray ed., 1904).

5

historical analogue to the lesser consequence of permanent disarmament absent the death penalty. See United States v. Diaz, 116 F.4th 458, 469 (5th Cir. 2024) ("[I]f capital punishment was permissible to respond to theft, then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible."); see also id. at 472 ("At the time of the Second Amendment's ratification, those . . . guilty of certain crimes . . . were punished permanently and severely. And permanent disarmament was part of our country's arsenal of available punishments at that time.").[6]

The Majority also rejects the analogy to now unconstitutional status-based bans on Native Americans, Blacks, Catholics, Quakers, loyalists, and others because Range is not "part of a similar group today." Maj. Op. at 20. Whether Range is a member of one of these groups is irrelevant. Rather, under Bruen, the relevant inquiry is why a given regulation, such as a ban based on one's status, was enacted and how that regulation was implemented. Bruen, 597 U.S. at 29; see also Rahimi, 144 S. Ct. at 1898 (focusing the inquiry on the historical "reasons" for disarmament); id. at 1925 (Barrett, J., concurring) ("'Analogical reasoning' under Bruen demands a wide[] lens: Historical regulations reveal a principle, not a mold."). No matter how repugnant and unlawful those bans are under contemporary standards, the founders categorically disarmed the members of those groups because they were viewed as disloyal to the sovereign. Range v. Att'y Gen., 53 F.4th 262, 273-82 (3d Cir. 2022) (per curiam) (collecting authorities), vacated, 56 F.4th 992 (3d Cir. 2023),

---

[6] Notably, Diaz's "underlying convictions d[id] not inherently involve a threat of violence." Diaz, 116 F.4th at 471 n.5.

6

cert. granted, judgment vacated and remanded, 144 S. Ct. 2706 (Mem) (2024); see also Jackson, 110 F.4th at 1127 (observing that the founding-era categorical prohibitions are relevant "in determining the historical understanding of the right to keep and bear arms"). The felon designation similarly serves as a proxy for disloyalty and disrespect for the sovereign and its laws. Such categorization is especially applicable here, where Range's felony involved stealing from the government, a crime that directly undermines the sovereign.[7] Therefore, the trust

---

[7] The Majority also gives no weight to various founding-era statutory violations that led to disarmament. See, e.g., Act of Dec. 21, 1771, ch. 540, N.J. Laws 343–344; Act of Apr. 20, 1745, ch. 3, N.C. Laws 69–70; see also Range, 53 F.4th at 281 (collecting additional authorities); cf. Rahimi, 144 S. Ct. at 1913, 1917-19 (Kavanaugh, J., concurring) (giving weight to both pre- and post-ratification history). The Majority ignores that history and tradition by contending that offenders were only disarmed of the firearm they possessed at the time of the violation and not barred from possessing firearms in the future. See Maj. Op. at 23; but see Rahimi, 144 S. Ct. at 1897 (noting founding-era firearm restrictions that included both restrictions on firearm use and bans of certain types of weapons). From this, the Majority asserts crime-based bans were not permanent (although in doing so, the Majority notably ignores the permanent nature of capital punishment). Maj. Op. at 22-23. Whether true or not, the federal felon ban under 18 U.S.C. § 922(g)(1) is not permanent. Congress specifically identified ways to avoid the ban, such as by securing an expungement, pardon, or having one's civil rights restored. 18 U.S.C. § 921(a)(20). Additionally, although it is currently unfunded, Congress enacted 18 U.S.C. § 925(c), which allows

7

and loyalty reasons underlying the status-based bans imposed at the founding show that the bans are a relevant historical analogue for the present-day prohibition on felon possession.[8]

---

the Bureau of Alcohol, Tobacco, and Firearms to restore an individual's right to possess a firearm upon consideration of the individual's personal circumstances. See Logan v. United States, 552 U.S. 23, 28 n.1 (2007).

Judge Krause thoughtfully proposes a proceeding at which a felon may seek to be rearmed and Judge Roth creatively suggests a durational limit to disarmament based on the maximum penalty a felon faced. Their suggestions, however, face at least one challenge. As stated above, Congress has identified the ways a felon may be rearmed and hence has already set the disarmament's duration based on whether the felon successfully invokes one of those identified avenues for rearming. See generally Am. Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982) ("As in all cases involving statutory construction, our starting point must be the language employed by Congress," and "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." (internal quotation marks omitted)). Bound by these clearly articulated congressional remedies, federal courts lack the authority to create the remedy that my colleagues each propose.

[8] To the extent the Majority relies on the Supreme Court's statement in Rahimi that "our Nation's tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not[,]" 144 S. Ct. at 1902, that statement was clearly cabined by the Court's acknowledgement that its analysis "start[ed] and stop[ped]" with the notion that there is

8

Finally, the Majority's approach will have far-reaching consequences. Although the Majority states that its holding is "narrow" because it is limited to Range's individual circumstances, Maj. Op. at 24, the only individual circumstance the Majority identifies is that the penalty Range faced differs from the penalty imposed for a similar crime at

"ample evidence that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others[,]" id. at 1898. Therefore, Rahimi is best read as conclusively establishing that history and tradition support disarming violent individuals, but not reaching whether history and tradition likewise permit disarmament of nonviolent offenders as that issue was undisputedly not before the Court. Indeed, the Court went out of its way to state that it was "not suggest[ing] that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse[,]" id. at 1901, which today includes fraudsters, see 18 U.S.C. § 921(a)(20)(A) (excluding from the disarmament law those convicted of "offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices," but not persons convicted of the type of fraud at issue in this case). This reading of Rahimi and our history and tradition accord with the Court of Appeals for the Eighth Circuit's recent post-Rahimi § 922(g)(1) precedent. See Jackson, 110 F.4th at 1121-22, 1127 (noting that "Rahimi does not change" its previous ruling, and that the "historical record suggests that legislatures traditionally possessed discretion to disqualify . . . those who deviated from legal norms, not merely to address a person's demonstrated propensity for violence"); accord Hunt, 2024 WL 5149611, at *6-7.

the founding. As discussed above, <u>Rahimi</u> bolsters the view that such fact is irrelevant under <u>Bruen</u>. Thus, the Majority's ruling is not cabined in any way and, in fact, rejects all historical support for disarming non-violent felons. As a result, the Majority's analytical framework leads to only one conclusion: there will be no, or virtually no, non-violent felony or felony-equivalent crime that will bar an individual from possessing a firearm.[9] <u>Rahimi</u> counsels that cannot be so, which is why the Majority's broad ruling is contrary to both the sentiments of the Supreme Court and our history.

I therefore respectfully dissent.

---

[9] Additionally, and significantly, the Majority provides no way for a felon to know whether his crime of conviction prevents him from possessing a firearm. It also provides little guidance to the district courts, and it will lead to confusion and disuniformity as to how courts deal with factually similar challenges to § 922(g)(1). <u>Cf.</u> <u>Rahimi</u>, 144 S. Ct. at 1926 (Jackson, J., concurring) (observing that "lower courts are struggling" with <u>Bruen</u>'s "history-and-tradition test").

10